Mette H. Kurth (SBN 187100)
Andy S. Kong (SBN 243933)
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013-1065
Telephone:    213.629.7400
Facsimile:    213.629.7401
E-mail:        kurth.mette@arentfox.com
               kong.andy@arentfox.com

*Proposed* Attorneys for Debtors and Debtors in
Possession

Debtors' Mailing Address
121 Gray Avenue
Santa Barbara, CA 93101

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA BARBARA DIVISION

| | |
|---|---|
| In re:<br><br>**THE WALKING COMPANY**, a Delaware corporation, d/b/a Alan's Shoes, Footworks, Overland Trading Co., Sole Outdoors, and Martini Shoes, f/k/a TWC Acquisition Corporation,<br><br>                Debtor. | Case No.:  9:09-bk-15138-RR<br>Chapter 11<br>**EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR IN POSSESSION TO HONOR CERTAIN PREPETITION EMPLOYEE BENEFITS AND WAGES IN THE ORDINARY COURSE OF BUSINESS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Hearing**<br><br>DATE:    TBD<br>TIME:    TBD<br>PLACE:   1415 State Street<br>           Santa Barbara, CA 93101 |

LA/213824.2

# TABLE OF CONTENTS

**Page**

I. BACKGROUND FACTS ........................................................................... 5

    A. Company Overview ............................................................... 5

    B. The Company's Employees Are Critical to the Company's Ongoing
       Operations and Its Reorganization Efforts ................................ 6

    C. The Company's Employee Obligations and Benefit Programs ........ 7

       1. Prepetition Wages, Salaries, and Associated Benefits ........ 7

       2. Employee Benefits ............................................... 9

       3. Vacation Time .................................................. 11

       4. Sick Leave ..................................................... 11

       5. Medical and Dental Insurance ................................. 12

       6. Life and Disability Insurance ................................. 13

       7. Workers' Compensation ........................................ 14

       8. Flexible Spending Accounts .................................... 14

       9. 401(k) Retirement Benefits Plan .............................. 15

       10. Business Expense Reimbursement ............................... 15

       11. Miscellaneous ................................................. 16

    D. Honoring of Checks and Transfers Related to Employee Obligations
       and Maintenance of Payroll Accounts ..................................... 16

    E. ADP Administrative Fees ..................................................... 17

II. ARGUMENT ........................................................................................ 17

       1. Honoring the Prepetition Employee Benefits and Wages Is In
          the Ordinary Course of Business .............................. 18

    B. The Prepetition Wages and Prepetition Employee Benefits Are
       Priority Claims Under Bankruptcy Code Sections 507(a)(4) and (5) ........ 19

    C. This Court Has Authority Pursuant to Sections 105(a) and 363(b)(1)
       and (c)(l) to Grant the Relief Requested ................................. 20

III. CONCLUSION ..................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

Green v. Drexler (In re Feit & Drexler, Inc.),
    760 F.2d 406 (2d Cir. 1985) ...................................................................21

In re All Seasons Indus., Inc.,
    121 B.R. 822 (Bankr. N.D. Ind. 1990) ...........................................18, 19

In re Canton Castings, Inc.,
    103 B.R. 874 (Bankr. N.D. Ohio 1989) ...................................................19

In re Gulf Air, Inc.,
    112 B.R. 152 (Bankr. W.D. La. 1989) ...........................................18, 22

In re Interco, Inc.,
    128 B.R. 229 (Bankr. E.D. Mo. 1991) .....................................................18

In re Ionosphere Clubs, Inc.,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989) ......................................................21

In re Pac. Forest Indus., Inc.,
    95 B.R. 740 (Bankr. C.D. Cal. 1989) ......................................................19

In re Salant Corp.,
    53 B.R. 158 (Bankr. S.D.N.Y. 1985) ......................................................19

LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.),
    116 B.R. 887 (Bankr. S.D.N.Y. 1990) ...........................................18, 22

## Federal Statutes

11 U.S.C. § 105(a) ...........................................................................20
11 U.S.C. § 1105(a) .........................................................................17
11 U.S.C. § 1107(a) .........................................................................19
11 U.S.C. § 1108 ..............................................................................19
11 U.S.C. § 363 ................................................................................17
11 U.S.C. § 363(b)(l) .......................................................................20
11 U.S.C. § 363(c) ...........................................................................20
11 U.S.C. § 363(c)(1) .......................................................................19
11 U.S.C. § 507(a)(4) ..............................................................17, 20
11 U.S.C. § 507(a)(4)(A) ...............................................................19
11 U.S.C. § 507(a)(5) ..............................................................17, 20
11 U.S.C. § 507(a)(8)(D) ...............................................................17
11 U.S.C. § l05(a) ...........................................................................20

## Other Authorities

2 Collier on Bankruptcy, ¶ 105.02 .................................................21

1  **TO THE HONORABLE ROBIN L. RIBLET, UNITED STATES**
2  **BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE;**
3  **THE DEBTORS' SECURED LENDER; THE DEBTORS' 20 LARGEST**
4  **UNSECURED CREDITORS; AND ALL PARTIES ENTITLED TO SPECIAL**
5  **NOTICE:**

6  The Walking Company ("TWC")[1] hereby moves this Court, on an emergency
7  basis, for entry of an order authorizing the Company—in its sole discretion and as a
8  matter of its business judgment—to honor certain prepetition employee benefits and
9  wages in the ordinary course of business and consistent with its prior employment
10  policies.[2] This relief applies solely to persons employed by the Company from and after
11  the Petition Date (defined below).[3]

12  As set forth in the annexed Memorandum of Points and Authorities, there are good
13  and sufficient grounds for granting this Motion.  Commencing these cases has disrupted
14  the Company's normal payroll processes.  The Company's employees are paid their
15  wages and salaries bi-weekly, in arrears, every other Friday for the two-week period
16  ended the previous Saturday.  Accordingly, at any given time the Company has
17  outstanding payroll obligations to its employees.  At the time these cases were
18  commenced, the Company estimates that it will have approximately $1,641,000 in
19  accrued, unpaid payroll obligations attributable to prepetition periods, *e.g.,* an average of
20

---

21  [1] TWC's debtor affiliates are its parent company, The Walking Company Holdings, Inc., a
     Delaware corporation ("Holdings"), and its subsidiary, Big Dog USA, Inc. ("Big Dog").
22   Holdings and Big Dog have filed joinders to this Motion.  (TWC, Holdings and Big Dog are
     collectively referred to as the "Company").
23

24  [2] The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334.  This is a
     core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of the Cases are proper
25   pursuant to 28 U.S.C. §§ 1408 and 1409.

26  [3] The Motion does *not* seek authority for the Company to provide wages or benefits to
     employees who also serve as its officers.  Benefits for those officers are the subject of a
27   separate insider compensation request.  Moreover, the Company does not intend by the Motion
     to assume any executory obligations, and the Motion should not be deemed to be an assumption
28   or adoption of any agreements or policies underlying the Company's employee benefit
     programs.  Furthermore, nothing in this Motion constitutes an acknowledgment of any liability.

- 2 -

LA/213824.2

1    approximately $965.29 per employee.  The Company also provides its employees with

2    benefit programs comparable to the benefit programs offered by other retailers.  The

3    Company estimates that approximately $630,000, or approximately $803 per eligible

4    employee, was accrued with respect to prepetition periods and is still outstanding.  Due to

5    the uncertainty that the Company's bankruptcy filing has caused in connection with

6    employees' long-term job security, if employees are not provided with immediate

7    assurances that the Company's obligations to them will be honored, there is a significant

8    risk that employee morale will suffer.  Honoring employee obligations in the ordinary

9    course of business is critical if the Company is to maintain credibility with its employees

10   and maintain a stable employee base during its reorganization.

11          There are at least three legal grounds that enable the Company to honor its

12   prepetition employee benefits and wages.  First, case law recognizes that the terms under

13   which a debtor employs its personnel—including the terms and conditions of employee

14   benefit programs—is a matter that the debtor may manage in the ordinary course of

15   business subject to its business judgment.  Second, any prepetition claims for employee

16   benefits and wages that do not exceed $10,950 per employee and that continuing

17   employees might assert against the Company may well be entitled to administrative

18   priority under Bankruptcy Code section 507(a)(3).  Third, under the judicial necessity-of-

19   payment doctrine and Bankruptcy Code section 105, courts often authorize a debtor to

20   take action, such as honoring prepetition employee benefits and wages, that are necessary

21   to the debtor's reorganization efforts.

22          Pursuant to the accompanying *Ex Parte Application for Order Shortening Time for

23   Hearing on the Debtors' Emergency First Day Motions*, the Company is requesting that

24   the Court set the hearing on this Motion at the earliest possible time on whatever notice

25   the Court may direct, but in no event later than 3:30 p.m. on Wednesday, December 9,

26   2009, which is the deadline for the Company to deliver payroll data to Automatic Data

27   Processing, Inc. ("ADP") in order to fund its payroll on Friday, December 11, 2009.

28   Because the Company's employees are vital to its ability to continue to operate it

- 3 -

business, and the uninterrupted payment of wages and the honoring of employee benefits is vital to maintaining employee morale during the reorganization process, granting the relief requested herein on an emergency basis is both necessary and appropriate in these cases.

**WHEREFORE**, the Company respectfully requests that the Court enter an Order, on an emergency basis: (1) authorizing, but not directing, the Company to pay or honor in its discretion certain employee obligations, as set forth in detail in the annexed Memorandum of Points and Authorities; (2) authorizing and directing the Company's banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and to honor all electronic payment requests made by the Company related to the foregoing to the extent that sufficient funds are in the accounts; (3) specifically providing that nothing in the Court's order should be deemed or construed to constitute an express or implied assumption of any agreement or liability; and (4) granting to the Company such other and further relief as is necessary and appropriate.

Dated:  December 7, 2009                    **ARENT FOX LLP**


By: /s/ *Mette H. Kurth*
    Mette H. Kurth
    Andy S. Kong
    *Proposed* Attorneys for the
    Debtors and Debtors in Possession

-4-

LA/213824.2

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## BACKGROUND FACTS

**A.    Company Overview.**

Headquartered in Santa Barbara, California, the Company consists of two distinct retail operations. The Company's operations are largely focused on TWC, which is a leading specialty retailer of authentic comfort footwear, operating 210 stores in premium malls across the nation. TWC generated approximately 93% of the Company's sales in 2009. Big Dog is a retailer of a lifestyle collection of popular-priced T-shirts, casual sportswear, and accessories featuring the Big Dog trademark. Together, TWC and Big Dog employ over 1,600 individuals across the country.

As is set forth in greater detail in the accompanying *Declaration of Andrew D. Feshbach in Support of First Day Motions*, TWC entered a period of strategic expansion from 2006 to 2008 during which it opened approximately 140 new stores. During this period, TWC agreed to the high rents then commanded by its landlords. However, after the economy in general, and retail markets in particular, went into serious decline in 2008 and 2009, TWC suffered a decline in sales and it is no longer able to operate profitably while sustaining what are now above-market rents at many of its locations. During 2009 the Company has sought to implement a turn-around plan for TWC, a key part of which was an attempt to negotiate rent reductions with its landlords. While the Company was successful in achieving many elements of its turn-around plan, landlords largely refused to provide meaningful rent reductions.

Accordingly, it is now necessary for the Company to pursue a "right sizing" strategy for TWC that will permit it to reorganize around its profitable stores, eliminating those whose continued operation would prevent a successful reorganization. The Company commenced these chapter 11 cases on December 7, 2009 (the "Petition Date") in order to implement a pre-negotiated plan of reorganization that is supported, in principal, by many of the company's key creditor constituencies, and that should permit

LA/213824.2

1   the Company to emerge from chapter 11 with a new infusion of $10 million in capital and

2   return to profitability in 2010.   The Company anticipates that it will file its plan of

3   reorganization by the end of December 2009, and it will be seeking confirmation of its

4   plan promptly thereafter, with an anticipated exit from chapter 11 as early as the end of

5   the first quarter of 2010.

6   **B.**    **The Company's Employees Are Critical to the Company's Ongoing**

7        **Operations and Its Reorganization Efforts.**

8       The Company employs approximately 1,665 people at its headquarters in Santa

9   Barbara, California, its merchandising department in Westlake, California, its distribution

10   center in Lincolnton, North Carolina, and its 210 retail locations throughout the country.

11   Of these employees, 784 are full-time employees, approximately 822 are part-time

12   employees, and 59 are seasonal/temporary employees.   Of the full-time employees, 275

13   are salaried and 509 are hourly.   All of the part-time and seasonal/temporary employees

14   are hourly employees.

15       These employees, many of whom interact directly with the Company's customers,

16   are critical to the Company's successful operations and its reorganization efforts.   In

17   addition to supporting the Company's retail sales operation, they provide crucial

18   administrative functions, financial management, human-resource services, marketing,

19   merchandising, and distribution services needed to operate the Company's national retail

20   business.   Since the Company commenced its bankruptcy cases, many of its employees

21   will also be heavily involved in preparing the schedules and financial reports required by

22   the Office of the United States Trustee, preparing the vital financial projections and

23   budgets that are required by the Company's lenders, and finalizing a plan of

24   reorganization for the Company.

25       To prevent defections and bolster employee morale, the Company has already

26   announced to the Company's employees that the Company will seek authority to honor its

27   prepetition employee obligations.   Failing to honor payroll commitments and

28   discontinuing employee-benefit programs would at any time be devastating to employee

LA/213824.2

1    morale and would almost certainly result in employee attrition, and this is especially true

2    for a Company in the midst of a reorganization effort on a compressed time frame.  With a

3    number of store closings anticipated, many employees are already going to be concerned

4    about their job security, and it is therefore imperative that the Company provide

5    assurances that, so long as employees remain with the Company, they can be assured that

6    the Company will continue to honor all if its employee obligations in the ordinary course

7    of business without disruption.

8    **C.    The Company's Employee Obligations and Benefit Programs.**

9          **1.    Prepetition Wages, Salaries, and Associated Benefits**

10          The Company's employees are paid their wages and salaries bi-weekly, in arrears,

11    every other Friday for the two-week period ended the previous Saturday.  Accordingly, at

12    any given time the Company has outstanding payroll obligations to its employees.  Big

13    Dog's most recent regular payroll occurred on November 27, 2009 and covered all

14    amounts due to employees through a cut-off date of November 21, 2009.  TWC's most

15    recent regular payroll occurred on December 4, 2009 and covered all amounts due to

16    employees through a cut-off date of November 28, 2009.   Employees have earned

17    additional prepetition wages from these cut-off dates through the Petition Date (the "Stub

18    Period").

19          The Company's payroll is disbursed by Automatic Data Processing, Inc. ("ADP"),

20    which provides the Company with payroll management and administrative services.  In

21    order for ADP to timely process the Company's payroll according to its established

22    payroll cycles, the Company must provide payroll data to ADP by no later than 3:30 p.m.

23    every Wednesday.  For its next payroll, which is due on December 11, 2009, Big Dog

24    must provide payroll data to ADP by Wednesday, December 9, 2009 at 3:30 p.m.  Then

25    Big Dog must wire sufficient payroll funds to ADP no later than 1:30 p.m. on Thursday,

26    December 10, 2009.  Similarly, for its next payroll, due on December 18, 2009, TWC

27    must provide payroll instructions to ADP no later than Wednesday, December 16, 2009,

28    and it must fund its payroll obligations by December 17, 2009.  Employees then receive

LA/213824.2

1   their direct deposits or payroll checks, as the case may be, through ADP on the applicable

2   payroll date. (From time to time, payroll checks that require special handling may also be

3   drawn on the Company's own payroll account).   To avoid any disruption to regular

4   payroll schedules, it is imperative that the Court grant this Motion no later than early

5   afternoon on Wednesday, December 9, 2009.

6        Based on the Company's historical payroll expenses and outstanding payroll

7   obligations, the next payroll for Big Dog's approximately 100 employees will be about

8   $35,000, which relates entirely to the Stub Period from November 22, 2009 through

9   December 5, 2009.   In addition, the next Big Dog's payroll will include about $6,000

10  earned by employees on December 6 and 7, 2009.   The next payroll for TWC's

11  approximately 1,600 employees will be $1,600,000, which will include $1,050,000

12  accrued during the Stub Period from November 29, 2009 through the Petition Date.  None

13  of the Company's employees are expected to be owed more than $10,950 on account of

14  accrued, unpaid prepetition wages.

15       In the ordinary course of its business, the Company routinely withholds from the

16  employee wages certain amounts that the Company is required to transmit to third parties

17  for purposes such as Social Security and Medicare, federal and state or local income taxes,

18  contributions to the Company's benefit plans, 401(k) contributions, garnishment, child

19  support or similar obligations pursuant to court order or law (collectively, the

20  "Withholding Obligations").  No such prepetition amounts have accrued for Big Dog.  For

21  TWC, however, the prepetition amount of such Withholding Obligations accrued but

22  unpaid as of the Petition Date is approximately $6,000.  The Withholding Obligations do

23  not constitute property of these estates and principally represent employee earnings that

24  governments (in the case of taxes), employees (in the case of voluntary withholding

25  obligations), and judicial authorities (in the case of involuntary withholding obligations),

26  have designated for deduction from employee paychecks.

27       The Company also provides an incentive cash bonus to its sales team on a monthly

28  basis (the "Monthly Sales Bonus").  The Monthly Sales Bonus is calculated based on the

LA/213824.2

1  individuals' and stores' monthly sales performance compared against prior year same

2  month sales and against the current year monthly sales goals. The total November 2009

3  monthly sales bonus will be approximately $60,000, of which the entire amount relates to

4  prepetition bonuses. The total December 2009 monthly sales bonus will be approximately

5  $65,000, of which $20,000 will relate to prepetition earnings. Additionally, to further

6  incentivize its sales team to promote sales during this critical holiday shopping season, the

7  Company implemented a series of retail sales contest bonuses for the period November 27

8  through December 31, 2009. These will be approximately $44,000, of which $17,000

9  relates to prepetition performance.

10      The Company is seeking authority to continue funding its payroll obligations in the

11  ordinary course of its business and to pay all prepetition wages, including the Withholding

12  Obligations and Monthly Sales Bonus, as planned and to forward the corresponding

13  prepetition Withholding Obligations to the appropriate parties and to pay all prepetition

14  employment taxes as they come due. No employee is owed more than $10,950 in

15  prepetition wages; thus, the Company will not make payroll distributions to any particular

16  employee in an amount that would exceed the allowable priority portion of such

17  employee's prepetition wages under section 507(a)(4) of the Bankruptcy Code, including

18  Withholding Obligations and any Monthly Sales Bonus. The costs associated with paying

19  these priority employee wage claims, Withholding Obligations and Monthly Sales

20  Bonuses are relatively minimal compared with the damage to the Company and its

21  reorganization efforts that would ensue if the Company failed to meet its payroll

22  obligations.

23      **2.    Employee Benefits**

24      The Company's business practice has been to provide its employees with a variety

25  of benefit plans and programs designed to assist them in meeting certain financial

26  burdens, including those that can arise from illness and death, and to keep employee

27  morale positive for the benefit of the Company's business. These programs include such

28  standard benefits as paid vacation and sick time, legal holidays, bereavement leave and

- 9 -

1   time off for jury duty; medical and dental insurance, including an incentive bonus for

2   employees who decline coverage under the Company's medical and dental insurance plan

3   provided they prove coverage under their spouse's or other insurance plan; a Section 125

4   cafeteria plan and flexible spending account reimbursement for medical and dependent

5   care; voluntary short-term and long-term disability insurance; group term-life and long-

6   term disability insurance for certain of its employees; voluntary supplemental term life

7   insurance; a 401(k) pension plan; and workers' compensation.

8       The Motion requests that the Court enter an order authorizing the Company to

9   honor and continue its employee benefit programs in the ordinary course of business.

10  This relief applies solely to persons employed by the Company from and after the Petition

11  Date (*except* for the payment of medical benefits as required under COBRA for departed

12  employees).

13      Except for those limited exceptions indicated below, the Company is current on the

14  prepetition obligations under its benefit programs, and it pays in advance for these

15  benefits.   Therefore, in most instances, the Motion is not seeking authority to honor

16  benefits accrued prepetition.  To the extent that certain benefits earned or accrued under

17  the Company's employee-benefit programs may constitute prepetition claims, many of

18  these claims have not yet been reported to or calculated by the Company.   It would

19  therefore be difficult, if not impossible, for the Company to calculate the exact benefits

20  accrued by each of over 1,600 employees during the prepetition period and to identify and

21  separately treat the prepetition and postpetition claims arising under the employee-benefit

22  programs or to identify any benefits that might exceed $10,950.   Moreover, any such

23  effort would require the Company to divert valuable resources away from pressing

24  operational matters and would thus be contrary to the interests of all creditors and the

25  estates.  Therefore, the figures included in the following discussion are only estimates of

26  the amounts currently outstanding under the employee-benefit programs.

27

28

LA/213824.2

### 3.    Vacation Time

Vacation for all regular full-time employees begins accruing from their first month of service with the Company.  Temporary or part-time employees are not eligible for vacation benefits.  Regular full-time employees will earn 40 hours a year of vacation for their first year of employment, 80 hours a year from their second through fifth year of employment, and 120 hours a year thereafter.  Once an employee has accrued 80 or 120 hours of vacation time, depending on the employee's year of service, that employee cannot accrue additional time until accrued vacation time has been reduced to less than 80 or 120 hours.  The Company pays employees for unused vacation time upon the employee's termination, but if later rehired, that employee will not receive credit for any period of prior service.

The Company's books and records indicate that, as of the Petition Date, its outstanding liability for all accrued, unpaid vacation time was approximately $600,000, which equates to an average of approximately $765 per eligible employee.  Moreover, with respect to all but four of the Company's employees, the total accrued unpaid prepetition wages and the outstanding vacation pay that would be paid if the employee were to leave the Company's employ does not exceed $10,950.  With respect to those four employees who are owed more than $10,950 on account of their combined accrued prepetition wages and vacation time, controls have been put in place at the Company to ensure that none will receive, in the aggregate, more than $10,950 pursuant to the Wages and Benefits Motion.

### 4.    Sick Leave

With respect to sick leave, regular full-time employees, after completing 90 days of service, accrue five sick leave days a year.  Part-time employees are not eligible for sick leave.  These benefits are earned on a prorated basis each pay period after completion of the first 90 days of employment.  Unused sick leave may be accumulated from year to year.  If unused sick leave reaches more than 10 days (80 hours), as a show of appreciation, the employee may request either: (1) a bonus check for 50% of the value of

- 11 -

1    the hours over 80, or (2) vacation time equal to half of any accrued sick leave over 80

2    hours (provided that moving these hours does not cause the employee to exceed the 80 or

3    120 hour vacation ceiling).

4        The Company's maximum exposure if every eligible employee were to use all

5    accrued sick leave (which is highly improbable) is equivalent to approximately $800,000,

6    or $1,020 per eligible employee.    Unused sick leave is not cashed out at the time of

7    termination. The benefit is only available in the form of "time off" from work other than

8    good attendance bonuses; no cash payments are made to employees.

9        **5.    Medical and Dental Insurance**

10        The Company offers all regular full-time employees and legal dependents

11    company-subsidized medical and dental insurance.  The Company is self-insured for its

12    medical and dental insurance and uses UnitedHealthCare as its plan administrator and

13    supplemental medical and dental insurance provider.  The Company implements a specific

14    stop-loss program whereunder any individual medical claim exceeding $130,000 is fully

15    covered by UnitedHealthCare, and total aggregate medical claims paid during the plan

16    year which exceed approximately $2.6 million are fully covered by UnitedHealthCare.  To

17    administer its plan, the Company pays UnitedHealthCare a monthly fee at the beginning

18    of the month for that coming month.  The Company owes approximately $38,000 to

19    United HealthCare for administration fees related to the month of December, of which

20    approximately $9,500 relates to prepetition fees.  The Company also makes a $57,000

21    deposit at the start of the plan year for prepaid fees which the Company replenishes as

22    UnitedHealthCare draws down on the account every Wednesday for claims paid on the

23    Company's behalf during the previous week.  Participating employees' contributions to

24    the medical and dental plans are deducted from such employees' bi-weekly pay.

25        Prior to October 1, 2009, the Company used Great West Life to administer its

26    medical and dental insurance plan.  Reported claims and claims incurred but not reported

27    are estimated to total approximately $450,000.  (Some of those claims are from Great

28    West  Life,  with  some  claims  potentially  greater  than  180  days  old).  Like

- 12 -

1  UnitedHealthCare, Great West Life draws down on the Company's account every
2  Tuesday for claims paid the previous week.   The total prepetition liability for these
3  benefits, including claims and administrative fees, is approximately $460,000, or $920 per
4  eligible employee.

5       Additionally, to limit its exposure to claim costs due to the self-insured nature of
6  the Company's medical and dental insurance, the Company provides a $1,000 annual
7  "Spousal Incentive Bonus" for employees who decline coverage under the Company's
8  medical and dental insurance plan provided they prove coverage under their spouse's or
9  other insurance plan.   There is no prepetition liability for the Spousal Incentive Bonus.
10 The Motion seeks only authority to continue the Spousal Incentive Bonus, at the
11 Company's discretion.

12      Lastly, the Company provides a supplemental health benefit to certain key
13 employees, whereby all medical and dental expenses incurred by the participating
14 employees, including but not limited to deductibles and co-pays, which are not otherwise
15 covered under the employees' insurance, are reimbursed by the Company.   There is no
16 prepetition liability for this supplemental health benefit.   The Motion seeks only authority
17 to continue the benefit at the Company's discretion.

18      **6.   Life and Disability Insurance**

19      The Company offers basic life insurance coverage for employees who participate
20 in the medical insurance plan.   The premiums and other related charges for this insurance
21 coverage are fully paid by the Company, and they total approximately $24,000 annually.
22 The Company's books and records indicate that the Company owes approximately $2,000
23 of premiums to United HealthCare for such basic life insurance for the month of
24 December 2009, of which approximately $500 relates to prepetition premiums.

25      In addition, the Company provides employees with voluntary short-term and long-
26 term disability benefit and voluntary supplemental life insurance programs.   Such plans
27 are entirely funded by the participating employees through deductions from the
28 participating employees' bi-weekly pay.   As such, all premiums withheld have been

- 13 -

1  remitted to the insurance companies. There is no prepetition liability for such benefit

2  programs.

3        The Company provides Group Term Life insurance and Long-Term Disability

4  benefits to certain key employees. The premiums and other related charges for such

5  policies are entirely paid by the Company, and they total approximately $55,000 annually.

6  There is no prepetition liability for such Group Term Life and Long-Term Disability

7  benefits. The Motion seeks only authority to continue the Group Term Life and Long-

8  Term Disability benefit, at the Company's discretion.

9        **7.    Workers' Compensation**

10        The Company also maintains an employer-funded workers' compensation

11  insurance policy with an approximate annual premium of $650,000. This premium was

12  paid with an initial deposit of $172,000, with nine monthly payments of $53,000 due

13  from August 2009 through April 2010, and the policy is paid in advance. The Company's

14  books and records indicate that the last premium was paid on November 10, 2009.

15  Accordingly, there are no prepetition amounts outstanding.

16        **8.    Flexible Spending Accounts**

17        The Company provides flexible spending accounts ("FSA") for medical and

18  dependent care costs. Employees who participate in the FSA program make annual

19  contribution elections. Such election amounts are deducted from the employee's pay

20  ratably over the calendar year. As eligible expenses are incurred, employees submit

21  reimbursement requests to United HealthCare, the Company's FSA administrator. The

22  Company has no legal or equitable interest in any employee contributions that it may be

23  holding in connection with the FSA program. If United HealthCare were not allowed to

24  collect employee's contributions to the FSA from the Company, this could violate the

25  Employee Retirement Income Security Act of 1974, as amended ("ERISA"), resulting in

26  potential personal liability for the Company's officers. In any event, the Company's

27  books and records indicate that there are no deducted but unremitted FSA program

28

- 14 -

1    contributions as of the Petition Date.  The Motion seeks only authority to continue the

2    FSA program, at the Company's discretion.

3        **9.    401(k) Retirement Benefits Plan**

4        The Company has adopted a 401(k) Retirement Savings Plan ("401(k) Plan") for

5    certain eligible employees, which is intended to be a qualified retirement plan under the

6    Internal Revenue Code.  The plan is administered under a trust fund arrangement.  The

7    Company effects monthly salary deductions on behalf of its employees, but it makes no

8    matching contributions to the 401(k) Plan.  The Company has no legal or equitable

9    interest in any employee contributions that it may be holding in connection with the

10    401(k) Plan.  Failure to timely forward the employee's contributions to the 401(k) Plan

11    may be a violation of ERISA, resulting in potential personal liability for the Company's

12    officers.  The Company's books and records indicate that there are no deducted but

13    unremitted 401(k) Plan contributions as of the Petition Date.  The Motion seeks only

14    authority to continue the existing 401(k) Plan, at the Company's discretion.

15        **10.    Business Expense Reimbursement**

16        The Company reimburses eligible employees for reasonable expenses incurred

17    through business travel or for business entertainment.  The following business expenses

18    are typically reimbursed: travel expenses, automobile expenses, lodging, tips, and

19    business meals.  Employees must submit expense reports before they may receive

20    reimbursement for their business expenses. All cash advances must be accounted for, and

21    expense receipts are required.  Employees then forward the expense reports to the

22    accounts-payable department, and expenses are reimbursed with a check within a week of

23    receipt.

24        Before the Company commenced these cases, employees incurred various business

25    expenses that, consistent with ordinary practice, are reimbursable by the Company.

26    Because the Company cannot know the exact amount of requested business

27    reimbursements until the accounts payable department receives expense reports from all

28    eligible employees, it is difficult to determine the total outstanding reimbursement

LA/213824.2

1    obligations at any given time.  Based upon the known business expense reimbursements

2    and the historical amounts of such reimbursements paid to its employees, it is estimated

3    that the total unreimbursed business expenses attributable to the 180-day period before the

4    Petition Date should not exceed $50,000 in the aggregate, or roughly $60 per eligible

5    employee.

6    **11.    Miscellaneous**

7    The Company also offers its full-time employees three days of paid leave as

8    bereavement leave.  With respect to jury duty, the Company generally does not pay for

9    employees serving jury duty unless it is required to do so by in a particular state in which

10   it is operating.  The Company also offers its employees other miscellaneous benefits such

11   as carpool incentives, employee discounts on merchandise purchased by employees at any

12   of the Big Dog and TWC retails stores.  There are no known meaningful prepetition

13   liabilities associated with these employee benefits.  Employees are also entitled to obtain

14   insurance coverage pursuant to section 4980B of the Internal Revenue Code to administer

15   Continuation Health Coverage ("COBRA"), but any prepetition costs related to COBRA

16   coverage benefits are *de minimis*.

17   **D.    Honoring of Checks and Transfers Related to Employee Obligations and**

18   **Maintenance of Payroll Accounts.**

19   Furthermore, the Company is requesting that all applicable banks and other

20   financial institutions be authorized and directed to receive, process, honor and pay all

21   checks presented for payment and to honor all transfer requests made by the Company

22   related to employee obligations discussed herein, whether such checks were presented or

23   funds transfer requests were submitted prior to or after the Petition Date (including checks

24   that have been presented and dishonored), to the extent that the accounts contain sufficient

25   funds.  The Company will be requesting, as part of its cash management motion, to keep

26   its payroll account open for this purpose.  The Company will identify to the banks the

27   checks that are to be honored pursuant to an order approving this Motion.  Accordingly,

28   checks other than those for employee obligations should not be honored inadvertently.

LA/213824.2

1    Moreover, pursuant to a budget that the Company has filed with the Court together with

2    its request for approval of postpetition financing, the Company expects to have sufficient

3    funds to pay all employee obligations, to the extent described herein, on an ongoing basis

4    and in the ordinary course of business.

5    **E.    ADP Administrative Fees.**

6        As of the Petition Date, the Company owes ADP approximately $3,000 to $4,000

7    in unpaid fees with respect to ADP's processing of the Company's payroll and related

8    administration.    To avoid any disruption to payroll processing services, the Company

9    requests authority to pay ADP its unpaid fees, up to $5,000, that ADP may be owed in

10    connection with the foregoing services and to continue to pay ADP postpetition in the

11    ordinary course of the Company's business with respect to the same.

12    **II.**

13    **ARGUMENT**

14        As discussed above, it is critical to the Company's reorganization efforts that the

15    Company minimize any adverse impact of these chapter 11 filings on its workforce. If the

16    Company is not permitted to meet all payroll-related obligations in the ordinary course of

17    business, the Company could suffer, at the worst possible time, a loss of employee morale

18    as well as the loss of employees who are familiar with the Company and its business and

19    whose efforts are needed by the Company during this critical reorganization period.

20    Failure to honor payroll and employee benefits obligations could, therefore, severely

21    impair the Company's reorganization efforts.    The amounts to be paid pursuant to this

22    Motion are comparatively small in light of the importance and necessity of preserving the

23    employees' services and morale for the benefit of the estates.

24        Moreover, not only is the relief requested authorized pursuant to Bankruptcy Code

25    sections 1105(a) and 363, but the employee claims with respect to prepetition wages and

26    employee benefit programs that the Company is seeking to honor are entitled to priority in

27    payment under Bankruptcy Code sections 507(a)(4) and (5) and 507(a)(8)(D). Only four

28    employees are owed more than the statutory cap of $10,950 when factoring in their

LA/213824.2

1    accrued vacation pay along with their prepetition wages.  The Company has put in place

2    controls to ensure that it will not pay those employees more than $10,950 pursuant to this

3    Motion.

4          **1.**     **Honoring the Prepetition Employee Benefits and Wages Is In the**

5                  **Ordinary Course of Business**

6          Numerous courts have recognized that a chapter 11 debtor must be able to maintain

7    a stable employee base and harmonious employee relations if it is to successfully

8    reorganize:

9              [E]mployee good will and contentment is an asset which is

10             vital to the continuation of a debtor's business operation and
          its ability to effectively reorganize during the Chapter 11

11             process. . . .  In granting Debtors' applications for permission
          to provide hardship payments to injured workers, this Court

12             determined that the uninterrupted payment of LTV Steel
          workers' compensation obligations is essential to employee
          morale and industrial tranquility which, in turn, are critical to

13             a successful reorganization.[4]

14         Courts also generally acknowledge that a debtor may—in the ordinary course of

15   business and subject to its business judgment—set the terms of continuing employee

16   relationships such as the terms and conditions of employment.  For example, in *All*

17   *Seasons*[5] the bankruptcy court considered a debtor's application to continue its prepetition

18   compensation packages to various management personnel.  The court held that the

19   continued employment and compensation of the management-level insiders was within

20   the scope of the debtor's ordinary course of business and that the compensation packages

21   could therefore be continued without court approval.[6]  Many other courts, including the

---

22    [4]  *LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, 116 B.R. 887, 898 (Bankr.

23   S.D.N.Y. 1990) (citation omitted); *see also In re Gulf Air, Inc.*, 112 B.R. 152, 154 (Bankr.
W.D. La. 1989) ("[R]etention of skills, organization, and reputation . . . must be considered

24   valuable assets contributing to going concern value and aiding rehabilitation . . . ."); *cf. In re
Interco, Inc.*, 128 B.R. 229, 230 (Bankr. E.D. Mo. 1991) ("In order to maintain and enhance

25   the Debtors' estates during Chapter 11, continue a competitive operating status within highly
competitive industries and confirm a successful reorganization plan, it is essential that the

26   Debtors retain certain critical executives . . . .").

27    [5]  *In re All Seasons Indus., Inc.*, 121 B.R. 822 (Bankr. N.D. Ind. 1990).

28    [6]  *Id.* at 825-26 ("[W]here postpetition operations are concerned, as long as it confines itself to
operating within the ordinary course of business, debtor-in-possession's actions are cloaked

- 18 -

1   Bankruptcy Court for the Central District of California, have acknowledged that both

2   wages and benefits—such as vacation and leave policies—offered to continuing rank-and-

3   file employees are also ordinary course.[7]

4        The fact that certain terms of the employment relationships were established

5   prepetition does not render their postpetition maintenance any less in the ordinary course.

6   Otherwise, debtors in possession would be required to seek court approval for virtually all

7   aspects of their employee relationships.  As the bankruptcy court noted in *All Seasons*, this

8   is precisely the result that Congress sought to avoid when it enacted Bankruptcy Code

9   sections 363(c)(1), 1107(a), and 1108, which permit a debtor in possession to continue

10   operations in the ordinary course of business.[8]

11        The Company's employee benefit programs are simply one facet, albeit an

12   important one, of its employee relations.  The terms of the employee benefit programs and

13   of the Company's employee relations are matters for the Company, in its business

14   judgment, to handle in the ordinary course of its business.

15   **B.**    **The Prepetition Wages and Prepetition Employee Benefits Are Priority**

16        **Claims Under Bankruptcy Code Sections 507(a)(4) and (5).**

17        Pursuant to section 507(a)(4)(A) of the Bankruptcy Code, employee claims for

18   "wages, salaries, or commissions, including vacation, severance, and sick leave pay"

19

---

20   with aura of propriety and, thus, debtor is entitled to presumption concerning reasonableness

21   of its decisions. . . . The presumption extends to all aspects of the debtor's ordinary, day-to-day operations.") (citations omitted).

22   [7]  *See, e.g., In re Pac. Forest Indus., Inc.,* 95 B.R. 740, 743 (Bankr. C.D. Cal. 1989) ("Employees do not need court permission to be paid and are usually paid as part of the ongoing operation

23   of the business."); *In re Canton Castings, Inc.,* 103 B.R. 874, 876 (Bankr. N.D. Ohio 1989) ("Apparently, in the exercise of caution, the Debtor has applied to the court for authority to

24   make the vacation benefit payments.  It would not, in this court's opinion, have needed to do so.  Its authority to operate its business under 11 U.S.C. § 1108 includes its right, indeed its

25   duty, to abide by contracts which it has not sought to abrogate."); *In re Salant Corp.,* 53 B.R.

26   158, 160 (Bankr. S.D.N.Y. 1985).

27   [8]  *See* 11 U.S.C. §§ 363(c)(1), 1107(a), and 1108; *All Seasons,* 121 B.R. at 826 ("One of the major purposes for [the restructuring of the law pursuant to the Bankruptcy Code] was to

28   remove the bankruptcy judge from the immediate supervision of the day-to-day aspects of the administration of an estate.") (citations omitted).

- 19 -

1   earned within 180 days before the Petition Date are afforded priority unsecured status to

2   the extent of $10,950 per employee.    Similarly, Bankruptcy Code section 507(a)(5)

3   provides that employees' claims for contributions to certain employee benefit plans are

4   also afforded priority unsecured status to the extent of $10,950 per employee covered by

5   such plan, less any amount paid pursuant to section 507(a)(4).

6          The Company believes that the employee wages and benefits relating to the 180

7   day period prior to the Petition Date constitute priority claims under Bankruptcy Code

8   sections 507(a)(4) and (5).    And with respect to prepetition wages and benefits, no

9   employee will be paid on account of claims above the $10,950 amount stated in

10  Bankruptcy Code section 507(a)(4) and (5). As priority claims, they must be paid in full

11  before any general unsecured obligations of the Company may be satisfied.    Accordingly,

12  the relief requested may affect only the timing of the payment of these priority obligations

13  and will not prejudice the rights of general unsecured creditors or other parties in interest.

14  **C.      This Court Has Authority Pursuant to Sections 105(a) and 363(b)(1 ) and (c)(l)**

15  **to Grant the Relief Requested.**

16         Statutory support for the requested relief also exists pursuant to Bankruptcy Code

17  sections 105(a) and 363(b)(1) and (c)(l) and the "necessity of payment" doctrine.

18  Bankruptcy Code section 363(b)(l) authorizes a debtor in possession to use property of the

19  estate other than in the ordinary course of business after notice and a hearing. Bankruptcy

20  Code section 363(c) further authorizes a debtor in possession to enter into transactions in

21  the ordinary course of business without notice and a hearing.    Pursuant to Bankruptcy

22  Code section 105(a), "[t]he court may issue any order, process, or judgment that is

23  necessary or appropriate to carry out the provisions of this title."[9]   The basic purpose of

24  section 105(a) is to enable the court to do whatever is necessary to aid in its jurisdiction,

25

26

27  ───────────────
    [9]   11 U.S.C. § l05(a).

28

1  in anything arising in or relating to a bankruptcy case.[10]    Essentially, section 105(a)

2  codifies the bankruptcy court's inherent equitable powers.[11]

3      Where business exigencies require, courts have exercised their equitable power

4  under section 105(a) to authorize a debtor to pay prepetition claims of particular creditors

5  essential to continued operations.[12]    The "necessity of payment doctrine," which

6  empowers a court to authorize a debtor to pay prepetition claims, is critical to virtually

7  any non-liquidating chapter 11 case. "[T]he 'necessity of payment' doctrine . . . [permits]

8  immediate payment of claims of creditors where those creditors will not supply services

9  or material essential to the conduct of the business until its pre-reorganization claims shall

10  have been paid."[13] This doctrine applies in all chapter 11 cases because "the rationale for

11  the 'necessity of payment' rule, *i.e.*, facilitating the continued operation and rehabilitation

12  of the debtor . . . is also a paramount goal of chapter 11."[14]    Therefore, where continued

13  operation and rehabilitation of a debtor require payment of prepetition wages, the Court

14  may authorize such payment under section 105(a) of the Bankruptcy Code.

15      It is generally recognized that the continuation of a stable employee base and

16  harmonious employee relations in operating a chapter 11 case is critical to a successful

17  reorganization.  As the court noted in *In re Chateaugay Corp.*:

18          [E]mployee good will and contentment is an asset which is
            vital to the continuation of a debtor's business operation and
19          its ability to effectively reorganize during the Chapter 11
            process. . . . In granting Debtors' applications for permission
20          to provide hardship payments to injured workers, this Court
            determined that the uninterrupted payment of LTV Steel
21          workers' compensation obligations is essential to employee

22

23

---

24  [10]  2 Collier on Bankruptcy, ¶ 105.02 (Lawrence P. King et al. eds., 15th ed. 1988).

25  [11]  *See Green v. Drexler (In re Feit & Drexler, Inc.)*, 760 F.2d 406, 414 (2d Cir. 1985).

    [12]  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).

26  [13]  *Ionosphere Clubs*, 98 B.R. at 176 (*quoting In re Lehigh & New England Ry. Co.*, 657 F.2d

27  570, 581 (3d Cir. 1981).

28  [14]  *Ionosphere Clubs*, 98 B.R. at 176 (*citing Dudley v. Mealey*, 147 F.2d 268 (2d Cir. 1945), *cert.
    denied*, 325 U.S. 873 (1945)).

- 21 -

1  morale and industrial tranquility which, in turn, are critical to
2  a successful reorganization.[15]

3  Similarly, in *In re Gulf Air, Inc.*, the court endorsed the debtor's payment of
4  prepetition employee wage claims because "retention of skills, organization, and
5  reputation for performance must be considered valuable assets contributing to going
6  concern value and aiding rehabilitation where that is possible."[16]

7  Moreover, for a number of reasons, the Bankruptcy Code affords special treatment
8  to certain prepetition claims of employees.  Compared to a typical claim in bankruptcy,
9  wages represent a large part of an employee's wealth.  In addition, unlike an ordinary
10  trade creditor, the typical employee does not have other sources of income and thus
11  cannot diversify the risk of the employer's default.  Many employees live from paycheck
12  to paycheck and rely exclusively on receiving their full compensation or reimbursement of
13  their expenses in order to continue to pay their daily living expenses.  The employees here
14  may be exposed to significant financial and healthcare related problems if the Company is
15  not permitted to pay and/or honor the wages and benefits owed to its employees in the
16  ordinary course of the Company's business.

17  **III.**

18  **CONCLUSION**

19  **WHEREFORE**, based on this Motion, the accompanying Declaration of Andrew
20  D. Feshbach in Support of Emergency "First Day" Motions, the Declaration of Roberta J.
21  Morris in Support of Emergency "First Day" Motions, the record in these cases, including
22  the pleadings and documents filed on behalf of the parties, the arguments and
23  representations of counsel, and any oral or documentary evidence presented at or prior to
24  the time of the hearing on this Motion, the Company respectfully that this Court enter an
25  order: (1) authorizing, but not directing, the Company to pay or honor in its discretion
26  certain employee obligations, as set forth in detail in the annexed Memorandum of Points

27  [15]  *In re Chateaugay Corp.*, 116 B.R. at 898 (internal citations omitted).
28  [16]  *Gulf Air*, 112 B.R. at 154.

- 22 -

LA/213824.2

1   and Authorities; (2) authorizing and directing the Company's banks and other financial

2   institutions to receive, process, honor, and pay all checks presented for payment and to

3   honor all electronic payment requests made by the Company related to the foregoing to

4   the extent that sufficient funds are in the accounts; (3) specifically providing that nothing

5   in the Court's order should be deemed or construed to constitute an express or implied

6   assumption of any agreement or liability; and (4) granting to the Company such other and

7   further relief as is necessary and appropriate.

8

9   Dated:  December 7, 2009                                    **ARENT FOX LLP**

10

11                                                              By: /s/ *Mette H. Kurth*

12                                                              Mette H. Kurth
                                                                Andy S. Kong
13                                                              *Proposed* Attorneys for the
                                                                Debtors and Debtors in Possession
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA/213824.2