1   Mette H. Kurth (SBN 187100)
    Andy S. Kong (SBN 243933)
2   **ARENT FOX LLP**
    555 West Fifth Street, 48th Floor
3   Los Angeles, CA  90013-1065
    Telephone:   213.629.7400
4   Facsimile:    213.629.7401
    E-mail:       kurth.mette@arentfox.com
5                 kong.andrew@arentfox.com

6   *Proposed* Attorneys for Debtors and Debtors in
    Possession
7
    Debtors' Mailing Address
8   121 Gray Avenue
    Santa Barbara, CA 93101
9
                    **UNITED STATES BANKRUPTCY COURT**
10
                    **CENTRAL DISTRICT OF CALIFORNIA**
11
                    **SANTA BARBARA DIVISION**
12

13
    In re:                          | Case No.:  9:09-bk-15138-RR
14
                                    | Chapter 11
15  **THE WALKING COMPANY**, a      | **DECLARATION OF ROBERTA J.**
16  Delaware corporation, d/b/a Alan's | **MORRIS IN SUPPORT OF EMERGENCY**
    Shoes, Footworks, Overland Trading | **"FIRST DAY'" MOTIONS**
17  Co., Sole Outdoors, and Martini | <u>Hearing</u>
    Shoes, f/k/a TWC Acquisition    |
18  Corporation,                    | DATE:    TBD
19                                  | TIME:    TBD
            Debtor.                 | PLACE:   1415 State Street
20                                  |          Santa Barbara, CA 93101

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

| | Page |
|---|---|
| I.    THE DECLARANT | 1 |
| II.    THE CONSOLIDATED BALANCE SHEET | 2 |
|     A.    The Company's Assets | 2 |
|     B.    The Company's Liabilities | 3 |
|     C.    Loan Documents | 6 |
| III.    EMERGENCY MOTIONS | 7 |
| IV.    EMPLOYEE WAGES AND BENEFITS | 8 |
|     A.    Employee Wages and Salaries | 9 |
|     B.    Employee Benefits | 11 |
| V.    CASH MANAGEMENT | 18 |
|     A.    Overview of the Cash Management System | 18 |
|     B.    The Bank Accounts | 19 |
| VI.    PREPETITION SALES AND USE AND SIMILAR TAXES | 26 |
| VII.    UTILITIES | 27 |
| VIII.    NOTICE PROCEDURES | 29 |
| IX.    SCHEDULE PREPARATION | 29 |
| X.    JOINT ADMINISTRATION | 30 |

I, Roberta J. Morris, declare as follows:

1.    I am over 18 years of age.  If called as a witness, I could and would competently testify with respect to the matters set forth in this declaration from my own personal knowledge or from knowledge gathered from others within the debtors' organization, my review of relevant documents, or my opinion based upon my experience concerning the debtors' operations.

## I.

## THE DECLARANT

2.    I am the Chief Financial Officer ("CFO") of The Walking Company Holdings, Inc., a Delaware corporation ("Holdings"), and its two wholly owned subsidiaries, The Walking Company, a Delaware corporation ("TWC"), and Big Dog USA, Inc. ("Big Dog," and collectively with Holdings and TWC, the "Company").

3.    I have served as the CFO of Big Dog and Holdings (f/k/a Big Dog Holdings, Inc.) since 1993.  Prior to 1993, I served as a Senior Audit Manager at Deloitte & Touche LLP, an international public accounting firm.  Prior to that, I was with Kenneth Leventhal & Company, a real estate boutique accounting firm.  I hold an accounting degree from California State University Northridge and am a Certified Public Accountant.

4.    As CFO, I oversee and direct all of the Company's financial planning, financial reporting, and cash management activities, as well as human resources, information systems, and distribution.  I have also been serving—and will continue to serve—as one of the persons for the Company's efforts in these chapters 11 cases.  As CFO, I have worked extensively with the books and records of the Company, including its financial statements and projections, business plans, business analyses and reports, lease obligations, contracts and other legal documents, notes and correspondence, and the like. On a regular basis, I have witnessed and/or participated in negotiations with lenders, vendors, and customers of the Company.  Based on all of the foregoing, I have developed an intimate familiarity over the past 17 years with the Company's books and records,

LA\215377.4

1   which are maintained in the ordinary course of business under my supervision and control

2   as custodian, its business and financial history, its operations, and its current business and

3   financial situation, and with the financial and operational details of the Company's retail

4   and business operations.

5        5.    I submit this declaration in support of the relief that the Company has

6   requested in the various "first-day" motions that have been filed in these cases, and to

7   assist the Court and other interested parties in understanding the circumstances that led to

8   the commencement of these chapter 11 cases. I have reviewed the first-day motions, and I

9   believe that the relief sought therein will enable the Company to continue to operate

10  effectively during its transition to chapter 11, thereby avoiding or minimizing certain

11  adverse operational and financial consequences that might otherwise result from the

12  commencement of these cases, and that this relief is essential to ensuring the uninterrupted

13  operation of the Company's business and the success of these cases.

14

15  **II.**

16  **THE CONSOLIDATED BALANCE SHEET**

17

18  **A.**    **The Company's Assets**

19       6.    Based on the Company's books and records, as of September 30, 2009, the

20  Company's unaudited balance-sheet assets totaled approximately $110.1 million. Of this

21  amount, the Company held, on a book value basis, approximately $49.7 million in net

22  inventories; fixed assets (including property and equipment) of $35.1 million, net of

23  depreciation; $14.0 million in deferred income taxes; $2.9 million in intangible assets

24  (including intellectual property); $1.4 million in net accounts receivable; prepaid expenses

25  of $0.9 million; $0.5 million in cash; and other assets totaling $5.6 million. While the

26  Company has not yet closed its books for November 2009, I estimate that the total assets

27  as of that date, and December 7, 2009 (the "Petition Date"), will be approximately $103

28

-2-

million, representing a slight reduction in inventory as a result of usual back-to-school and pre-holiday sales.

### B.    The Company's Liabilities

7.    Based on its books and records, as of September 30, 2009, the Company's unaudited, balance-sheet liabilities totaled approximately $84.5 million. This amount includes the $30.6 million outstanding under the secured prepetition credit facility and other agreements owing to Wells Fargo Retail Finance, LLC ("WFRF"); $18.5 million in principal owing under the *8.375% Convertible Notes due 2015* (the "Notes"); approximately $12.3 million in trade debts; $11.6 million in deferred rent and lease incentives; $1.7 million due under an unsecured term note; $1.5 million in capital lease obligations; $1.0 million in insider stock option notes; and $7.3 million in accrued expenses and other current liabilities. Although the Company has not yet closed its books for November 2009, I estimate that the total liabilities as of that date, and the Petition Date, will be approximately $76 million, representing a slight reduction in obligations to WFRF and accounts payable as fall inventory has been liquidated through ordinary, seasonal sales. Some of the Company's more significant liabilities are described in more detail, below.

8.    ***The Prepetition Pre-Petition Facility.*** WFRF (as successor in interest to Wells Fargo Retail Finance II, LLC), a Delaware limited liability company, as arranger and administrative agent for the lenders, and the Company (including each subsidiary) are parties to a *First Amended, Restated, and Consolidated Loan and Security Agreement, dated as of July 7, 2005* (as amended by nine amendments thereto, the "Pre-Petition Financing Agreement"). The Pre-Petition Financing Agreement provides for a total commitment of $60 million (the "Pre-Petition Facility"), with the ability for the Company to issue documentary and standby letters of credit of up to $8 million. The Company's ability to borrow under the facility is determined using an availability formula based on eligible assets, and pursuant to this formula, the Company had approximately $100,000 in availability under the Pre-Petition Financing Agreement on December 4, 2009.

- 3 -

9.     As part of the earlier attempt to turnaround the Company outside of bankruptcy, in March 2009 Fred Kayne and Andrew Feshbach provided personal guaranties of the Company's obligations to WFRF in order to obtain an over-advance facility.  Such over-advance facilities were paid in full by the Company in October 2009, and the guaranties were then withdrawn.

10.     As of the Petition Date, the approximate loan balance under the Pre-Petition Facility is $25 million and there are no outstanding letters of credit.  The interest rate under the Pre-Petition Financing Agreement ranges from the bank's base rate plus a margin of 0.5% or a LIBOR loan rate plus a margin ranging between 1.75% and 2.25% depending upon the average excess availability under the Pre-Petition Facility.  As of the Petition Date, the interest rate for the outstanding base rate loans was 3.75% and the interest rate for the outstanding LIBOR rate loans was between 2.489% and 2.492%.

11.     The Pre-Petition Facility is collateralized by substantially all of the Company's assets and requires daily, weekly, and monthly financial reporting as well as compliance with financial, affirmative, and negative covenants.  Based on the value of WFRF's collateral, which includes approximately $49.6 million in net inventories, the outstanding indebtedness owing under the Pre-Petition Financing Agreement is more than fully secured.

12.     *8.375% Convertible Notes due 2015.*   On April 3, 2007, the Company entered into a *Convertible Note Purchase Agreement* with certain purchasers pursuant to which the Company issued and sold $18.5 million of Notes, interest payable quarterly. Among other features of the Notes, they are convertible into fully paid and nonassessable shares of the Company's common stock to an aggregate of up to 1,027,777 shares at any time after the issuance date, at an initial conversion price of $18.00 per share.

13.     If the Notes are not converted before their maturity, the Notes will be redeemed by the Company on the maturity date at a redemption price equal to 100% of the principal amount of the Notes then outstanding, plus any accrued and unpaid interest. The net proceeds of the Notes, after debt issuance costs, were used to reduce the

- 4 -

LA\215377.4

1  outstanding balance of Company's Pre-Petition Facility, and thereby to support TWC's

2  store expansion throughout 2006 and 2007.

3      14.    Effective as of April 1, 2009, as noted above, the Company negotiated with

4  the holders of the Notes (the "Noteholders") an agreement to amend the Notes to provide

5  that the interest on the Notes could be paid through "PIK Interest" for up to eight quarters,

6  at the Company's option, beginning with interest accrued from January 1, 2009, and to

7  extend the maturity of the Notes by three years.  In exchange for these concessions,

8  among other things, the Noteholders required that the Company secure its obligations

9  under the Notes with a junior security interest in substantially all of its assets (excluding

10  certain trademarks and other intellectual property relating to Big Dog), subject and

11  subordinated to the security interests of WFRF under the Pre-Petition Financing

12  Agreement.

13      15.    In addition, the following Noteholders—Kayne Anderson Capital Income

14  Partners (QP), LP; the Cotsen Family Foundation; The Kayne Foundation, Richard A.

15  Kayne, Trustee; and Richard & Suzanne Kayne Living Trust dated 1/14/99—who are

16  collectively owed approximately $12 million in principal amount of Notes, agreed to

17  amend their Notes to provide that the outstanding principal amount of the Notes would be

18  reduced by 25%, conditioned upon the Company's landlords agreeing to grant certain rent

19  concessions to the Company no later than December 1, 2009.  The Company was not able

20  to achieve these rent concessions.

21      16.    ***Deferred Rent and Lease Incentives.***    In response to the Company's

22  requests for rent relief, which began in the spring of 2009, landlords generally refused to

23  provide actual rent reductions.  Some landlords agreed to defer a portion of TWC's

24  monthly rent for a certain number of months in 2009, with TWC to pay back that

25  deferred-rent amount in 2010, or in later years.  In some cases, interest was required on

26  the deferred rent.  Various concessions were required of the Company in order to obtain

27  these rent deferrals, such as agreements to open new, temporary stores or waivers of

28  options.  Some landlords, without any written agreement, did not enforce their rights

LA\215377.4

under their leases when TWC had no option but to take unilateral rent reductions. Some of these landlords expressly reserved the right to declare a default at any time if the Company did not eventually pay the landlord the unpaid rent.

17.   ***The Term Note.*** As part of the acquisition of Natural Comfort, Inc., TWC issued a $1,700,000 three-year unsecured promissory note to the seller. The principal on this note is payable on January 15, 2011. The note bears an interest rate of 7.0% and accrued interest is payable quarterly.

## C.   <u>Loan Documents</u>

18.   The Prepetition Financing Agreement is comprised of the following documents:

a.   The *Ratification and Amendment Agreement*, dated as of December 7, 2009;

b.   The *First Amended, Restated and Consolidated Loan and Security Agreement*, dated as of July 7, 2005, with attached Exhibits and Schedules;

c.   The *Revolving Credit Note*, dated as of July 7, 2005;

d.   The *Amended and Restated General Continuing Guaranty*, dated as of July 7, 2005;

e.   The *Second Amendment to Guarantor Security Agreement*, dated as of July 7, 2005;

f.   The *First Amendment to First Amended, Restated, and Consolidated Loan and Security Agreement*, dated as of August 31, 2005, among the Borrowers, the Parent, the Lenders, and the Agent;

g.   The *Second Amendment to First Amended, Restated, and Consolidated Loan and Security Agreement*, dated as of October 23, 2006, among the Borrowers, the Parent, the Lenders, and the Agent;

LA\215377.4

h.  The *Third Amendment to First Amended, Restated, and Consolidated Loan and Security Agreement*, dated as of November 28, 2006, among the Borrowers, the Parent, the Lenders, and the Agent;

i.  The *Fourth Amendment to First Amended, Restated, and Consolidated Loan and Security Agreement*, dated as of April 2, 2007, among the Borrowers, the Parent, the Lenders, and the Agent;

j.  The *Fifth Amendment to First Amended, Restated, and Consolidated Loan and Security Agreement*, dated as of May 14, 2007, among the Borrowers, the Parent, the Lenders, and the Agent;

k.  The *Sixth Amendment to First Amended, Restated, and Consolidated Loan and Security Agreement*, dated as of March 24, 2008, among the Borrowers, the Parent, the Lenders, and the Agent;

l.  The *Seventh Amendment to First Amended, Restated, and Consolidated Loan and Security Agreement*, dated as of May 2, 2008, among the Borrowers, the Parent, the Lenders, and the Agent;

m.  The *Eighth Amendment to First Amended, Restated, and Consolidated Loan and Security Agreement*, dated as of January 26, 2009, among the Borrowers, the Parent, the Lenders, and the Agent; and

n.  The *Ninth Amendment to First Amended, Restated, and Consolidated Loan and Security Agreement*, dated as of March 20, 2009, among the Borrowers, the Parent, the Lenders, and the Agent.

## III.

## **EMERGENCY MOTIONS**

19.  I believe strongly that the Company will suffer severe and irreparable harm if it does not promptly obtain the relief requested in its emergency, "first-day" motions.

LA\215377.4

1     The facts and circumstances relating to the relief requested in these motions, and the

2     urgency of that relief, are set forth in the following sections.

3

4 **IV.**

5 **EMPLOYEE WAGES AND BENEFITS**

6     20.     The Company employs approximately 1,665 people at its headquarters in

7     Santa Barbara, California, its merchandising department in Westlake, California, its

8     distribution center in Lincolnton, North Carolina, and its 210 retail locations throughout

9     the country. Of these employees, 784 are full-time employees, approximately 822 are

10     part-time employees, and 59 are seasonal/temporary employees. Of the full-time

11     employees, 275 are salaried and 509 are hourly. All of the part-time and

12     seasonal/temporary employees are hourly employees.

13     21.     I believe that these employees, many of whom interact directly with the

14     Company's customers, are critical to the Company's successful operations and its

15     reorganization efforts. In addition to supporting the Company's retail sales operation,

16     they provide crucial administrative functions, financial management, human-resource

17     services, marketing, merchandising, and distribution services needed to operate the

18     Company's national retail business. Since the Company commenced its bankruptcy cases,

19     many of its employees will also be heavily involved in preparing the schedules and

20     financial reports required by the Office of the United States Trustee, preparing the vital

21     financial projections and budgets that are required by the Company's lenders, and

22     finalizing a plan of reorganization for the Company.

23     22.     To prevent defections and bolster employee morale, the Company has

24     already announced to the Company's employees that the Company will seek authority to

25     honor its prepetition employee obligations. In my judgment, failing to honor payroll

26     commitments and discontinuing employee-benefit programs would at any time be

27     devastating to employee morale and would almost certainly result in employee attrition,

28     and this is especially true for a Company in the midst of a reorganization effort on a

LA\215377.4

compressed time frame. With a number of store closings anticipated, I believe that many employees are already going to be concerned about their job security, and it is therefore imperative that the Company provide assurances that, so long as employees remain with the Company, they can be assured that the Company will continue to honor all if its employee obligations in the ordinary course of business without disruption.

### A.    **Employee Wages and Salaries**

23.    The *Emergency Motion for an Order Authorizing Debtor in Possession to Honor Certain Prepetition Employee Benefits and Wages in the Ordinary Course of Business* (the "Wage and Benefit Motion") seeks authority for the Company to pay wages for its employees, including amounts owed on account of prepetition services, in the ordinary course of business. This relief applies solely to persons employed by the Company from and after the Petition Date. Likewise, this relief does not seek authority for the Company to provide wages to employees who also serve as its officers. (Wages for officers are the subject of separate insider compensation requests.)

24.    Commencing these cases has disrupted the Company's normal payroll processes. The Company's employees are paid their wages and salaries bi-weekly, in arrears, every other Friday for the two-week period ended the previous Saturday. Accordingly, at any given time the Company has outstanding payroll obligations to its employees. Big Dog's most recent regular payroll occurred on November 27, 2009 and covered all amounts due to employees through a cut-off date of November 21, 2009. TWC's most recent regular payroll occurred on December 4, 2009 and covered all amounts due to employees through a cut-off date of November 28, 2009. Employees have earned additional prepetition wages from these cut-off dates through the Petition Date (the "Stub Period").

25.    The Company's payroll is disbursed by Automatic Data Processing, Inc. ("ADP"), which provides the Company with payroll management and administrative services. In order for ADP to timely process the Company's payroll according to its established payroll cycles, the Company must provide payroll data to ADP by no later

- 9 -

LA\215377.4

1   than 3:30 p.m. every Wednesday. For its next payroll, which is due on December 11,

2   2009, Big Dog must provide payroll data to ADP by Wednesday, December 9, 2009 at

3   3:30 p.m. Then Big Dog must wire sufficient payroll funds to ADP no later than 1:30

4   p.m. on Thursday, December 10, 2009. Similarly, for its next payroll, due on December

5   18, 2009, TWC must provide payroll instructions to ADP no later than Wednesday,

6   December 16, 2009, and it must fund its payroll obligations by December 17, 2009.

7   Employees then receive their direct deposits or payroll checks, as the case may be,

8   through ADP on the applicable payroll date. However, some payroll checks are drawn on

9   the Company's own payroll account. To avoid any disruption to regular payroll

10  schedules, I believe that it is imperative that the Court grant the Wage and Benefit Motion

11  no later than early afternoon on Wednesday, December 9, 2009.

12        26.    Based on my review of outstanding payroll obligations and the Company's

13  historical payroll expenses, I estimate that the next payroll for Big Dog's approximately

14  100 employees will be $35,000, which relates entirely to the Stub Period from November

15  22, 2009 through December 5, 2009. In addition, I estimate that the next Big Dog's

16  payroll will include $6,000 earned by employees on December 6 and 7, 2009. I estimate

17  that the next payroll for TWC's approximately 1,600 employees will be $1,600,000,

18  which will include $1,050,000 accrued during the Stub Period from November 29, 2009

19  through the Petition Date. (Any uncashed checks older than 180 days are stale dated, and

20  upon the employee's request the Company issues a new check after confirming with its

21  books and records. The Company is not seeking authority to replace any such stale dated

22  checks.) None of the Company's employees are expected to be owed more than $10,950

23  on account of accrued, unpaid prepetition wages.

24        27.    In the ordinary course of its business, the Company routinely withholds

25  from the employee wages certain amounts that the Company is required to transmit to

26  third parties for purposes such as Social Security and Medicare, federal and state or local

27  income taxes, contributions to the Company's benefit plans, 401(k) contributions,

28  garnishment, child support or similar obligations pursuant to court order or law. No such

- 10 -

LA\215377.4

prepetition amounts have accrued for Big Dog. For TWC, however, the prepetition amount of such withholding obligations accrued but unpaid as of the Petition Date is approximately $6,000.

28.    The Company provides an incentive cash bonus to its sales team on a monthly basis (the "Monthly Sales Bonus"). The Monthly Sales Bonus is calculated based on the individuals' and stores' monthly sales performance compared against prior year same month sales and against the current year monthly sales goals. I estimate the total November 2009 monthly sales bonus will be $60,000, of which the entire amount relates to prepetition bonuses. I also estimate the total December 2009 monthly sales bonus will be $65,000, of which $20,000 will relate to prepetition. Additionally, to further incentivize its sales team to promote sales during this critical holiday shopping season, the Company implemented a series of retail sales contest bonuses for the period November 27 through December 31, 2009. I estimate that these will be $44,000, of which $17,000 relates to prepetition performance.

**B.    Employee Benefits**

29.    The Company's business practice has been to provide its employees with a variety of benefit plans and programs designed to assist them in meeting certain financial burdens, including those that can arise from illness and death, and to keep employee morale positive for the benefit of the Company's business. These programs include such standard benefits as paid vacation and sick time, legal holidays, bereavement leave and time off for jury duty; medical and dental insurance, including an incentive bonus for employees who decline coverage under the Company's medical and dental insurance plan provided they prove coverage under their spouse's or other insurance plan; a Section 125 cafeteria plan and flexible spending account reimbursement for medical and dependent care; voluntary short-term and long-term disability insurance; group term-life and long-term disability insurance for certain of its employees; voluntary supplemental term life insurance; a 401(k) pension plan; and workers' compensation.

LA\215377.4

30.    The Wages and Benefits Motion requests that the Court enter an order authorizing the Company to honor and continue its employee benefit programs in the ordinary course of business.    This relief applies solely to persons employed by the Company from and after the Petition Date (*except* for the payment of medical benefits as required under COBRA for departed employees).

31.    Except for those limited exceptions indicated below, the Company is current on the prepetition obligation under its benefit programs, and it pays in advance for these benefits.    Therefore, in most instances, the Wages and Benefits Motion is not seeking authority to honor benefits accrued prepetition.    To the extent that certain benefits earned or accrued under the Company's employee-benefit programs may constitute prepetition claims, many of these claims have not yet been reported to or calculated by the Company. I believe that it would therefore be difficult, if not impossible, for the Company to calculate the exact benefits accrued by each of over 1,600 employees during the prepetition period and to identify and separately treat the prepetition and postpetition claims arising under the employee-benefit programs or to identify any benefits that might exceed $10,950.    Moreover, any such effort would require the Company to divert valuable resources away from pressing operational matters and would thus be contrary to the interests of all creditors and the estates.    Therefore, the figures included in the following discussion are only estimates of the amounts currently outstanding under the employee-benefit programs.

32.    ***Vacation Time.***    Vacation for all regular full-time employees begins accruing from their first month of service with the Company.    Temporary or part-time employees are not eligible for vacation benefits.    Regular full-time employees will earn 40 hours a year of vacation for their first year of employment, 80 hours a year from their second through fifth year of employment, and 120 hours a year thereafter.    Once an employee has accrued 80 or 120 hours of vacation time, depending on the employee's year of service, that employee cannot accrue additional time until accrued vacation time has been reduced to less than 80 or 120 hours.    The Company pays employees for unused

LA\215377.4

1  vacation time upon the employee's termination, but if later rehired, that employee will not

2  receive credit for any period of prior service.

3      33.    Based on my review of the Company's books and records, my best estimate

4  is that the Company's books and records indicate that, as of the Petition Date, its

5  outstanding liability for all accrued, unpaid vacation time was approximately $600,000,

6  which equates to an average of approximately $765 per eligible employee. With respect to

7  all but four of the Company's employees, the total accrued unpaid prepetition wages and

8  the outstanding vacation pay that would be paid if the employee were to leave the

9  Company's employ does not exceed $10,950. With respect to those four employees who

10  are owed more than $10,950 on account of their combined accrued prepetition wages and

11  vacation time, I have put in place controls at the Company to ensure that none will

12  receive, in the aggregate, more than $10,950 pursuant to the Wages and Benefits Motion.

13      34.    *Sick Leave.*  With respect to sick leave, regular full-time employees, after

14  completing 90 days of service, accrue five sick leave days a year.  Part-time employees

15  are not eligible for sick leave.  These benefits are earned on a prorated basis each pay

16  period after completion of the first 90 days of employment.  Unused sick leave may be

17  accumulated from year to year.  If unused sick leave reaches more than 10 days (80

18  hours), as a show of appreciation, the employee may request either: (1) a good attendance

19  bonus check for 50% of the value of the hours over 80, or (2) vacation time equal to half

20  of any accrued sick leave over 80 hours (provided that moving these hours does not cause

21  the employee to exceed the 80 or 120 hour vacation ceiling).

22      35.    The Company's maximum exposure if every eligible employee were to use

23  all accrued sick leave (which I believe to be highly improbable) is equivalent to

24  approximately $800,000, or $1,020 per eligible employee.  Unused sick leave is not

25  cashed out at the time of termination.  The benefit is only available in the form of "time

26  off" from work.  Other than the good attendance bonuses noted above, no cash payments

27  are made to employees.

28

LA\215377.4

36.    ***Medical and Dental Insurance.***    The Company offers all regular full-time employees and legal dependents company-subsidized medical and dental insurance.  The Company is self-insured for its medical and dental insurance and uses UnitedHealthCare as its plan administrator and supplemental medical and dental insurance provider.  The Company implements a specific stop-loss program whereunder any individual medical claim exceeding $130,000 is fully covered by UnitedHealthCare, and total aggregate medical claims paid during the plan year which exceed approximately $2.6 million are fully covered by UnitedHealthCare.    To administer its plan, the Company pays UnitedHealthCare a monthly fee at the beginning of the month for that coming month.  The Company owes approximately $38,000 to United HealthCare for administration fees related to the month of December, of which approximately $9,500 relates to prepetition fees.  The Company also makes a $57,000 deposit at the start of the plan year for prepaid fees which the Company replenishes as UnitedHealthCare draws down on the account every Wednesday for claims paid on the Company's behalf during the previous week.  Participating employees' contributions to the medical and dental plans are deducted from such employees' bi-weekly pay.

37.    Prior to October 1, 2009, the Company used Great West Life to administer its medical and dental insurance plan.  Reported claims and claims incurred but not reported are estimated to total approximately $450,000.  Some of those claims are from Great West Life with some claims potentially greater than 180 days old.    Like UnitedHealthCare, Great West Life draws down on the Company's account every Tuesday for claims paid the previous week.  The total prepetition liability for these benefits, including claims and administrative fees, is approximately $460,000, or $920 per eligible employee.

38.    Additionally, to limit its exposure to claim costs due to the self-insured nature of the Company's medical and dental insurance, the Company provides a $1,000 annual "Spousal Incentive Bonus" for employees who decline coverage under the Company's medical and dental insurance plan provided they prove coverage under their

LA\215377.4

spouse's or other insurance plan. There is no prepetition liability for the Spousal Incentive Bonus. The Wages and Benefits motion seeks only authority to continue the Spousal Incentive Bonus, at the Company's discretion.

39.    Lastly, the Company provides a supplemental health benefit to certain key employees, whereby all medical and dental expenses incurred by the participating employees, including but not limited to deductibles and co-pays, which are not otherwise covered under the employees' insurance, are reimbursed by the Company. There is no prepetition liability for this supplemental health benefit. The Wages and Benefits motion seeks only authority to continue this supplemental health benefit, at the Company's discretion

40.    *Life and Disability Insurance.* The Company offers basic life insurance coverage for employees who participate in the medical insurance plan. The premiums and other related charges for this insurance coverage are fully paid by the Company, and they total approximately $24,000 annually. My review of the Company's books and records indicates that the Company owes approximately $2,000 of premiums to United HealthCare for such basic life insurance for the month of December 2009, of which approximately $500 relates to prepetition premiums.

41.    In addition, the Company provides employees with voluntary short-term and long-term disability benefit and voluntary supplemental life insurance programs. Such plans are entirely funded by the participating employees through deductions from the participating employees' bi-weekly pay. As such, all premiums withheld have been remitted to the insurance companies. There is no prepetition liability for such benefit programs.

42.    The Company provides Group Term Life insurance and Long-Term Disability benefits to certain key employees. The premiums and other related charges for such policies are entirely paid by the Company, and they total approximately $55,000 annually. There is no prepetition liability for such Group Term Life and Long-Term

LA\215377.4

1   Disability benefits.  The Wages and Benefits motion seeks only authority to continue the

2   Group Term Life and Long-term Disability benefit, at the Company's discretion.

3       43.  ***Workers' Compensation.***  The Company also maintains an employer-

4   funded workers' compensation insurance policy with an approximate annual premium of

5   $650,000.  This premium was paid with an initial deposit of $172,000, with nine monthly

6   payments of $53,000 due from August 2009 through April 2010, and the policy is paid in

7   advance.  The Company's books and records indicate that the last premium was paid on

8   November 10, 2009, so I believe there are no prepetition amounts outstanding.

9       44.  ***Flexible Spending Accounts.***  The Company provides flexible spending

10  accounts ("FSA") for medical and dependent care costs.  Employees who participate in

11  the FSA program make annual contribution elections.   Such election amounts are

12  deducted from the employee's pay ratably over the calendar year.  As eligible expenses

13  are incurred, employees submit reimbursement requests to United HealthCare, the

14  Company's FSA administrator.  The Company has no legal or equitable interest in any

15  employee contributions that it may be holding in connection with the FSA program.  If

16  United HealthCare were not allowed to collect employee's contributions to the FSA from

17  the Company, this could violate the Employee Retirement Income Security Act of 1974,

18  as amended ("ERISA"), resulting in potential personal liability for the Company's

19  officers.  In any event, I have reviewed the Company's books and records, and I do not

20  believe that there are any deducted but unremitted FSA program contributions as of the

21  Petition Date.   The Wages and Benefits motion seeks only authority to continue the FSA

22  program, at the Company's discretion.

23      45.  ***401(k) Retirement Benefits Plan.***  The Company has adopted a 401(k)

24  Retirement Savings Plan ("401(k) Plan") for certain eligible employees, which is intended

25  to be a qualified retirement plan under the Internal Revenue Code.   The plan is

26  administered under a trust fund arrangement.  The Company effects monthly salary

27  deductions on behalf of its employees, but it makes no matching contributions to the

28  410(k) Plan.   The Company has no legal or equitable interest in any employee

- 16 -

LA\215377.4

1   contributions that it may be holding in connection with the 401(k) Plan. Failure to timely

2   forward the employee's contributions to the 401(k) Plan may be a violation of ERISA,

3   resulting in potential personal liability for the Company's officers. I have reviewed the

4   Company's books and records, and I do not believe that there are any deducted but

5   unremitted 401(k) Plan contributions as of the Petition Date.  The Wages and Benefits

6   motion seeks only authority to continue the existing 401(k) Plan, at the Company's

7   discretion.

8        46.   ***Business Expense Reimbursement.***  The Company reimburses eligible

9   employees for reasonable expenses incurred through business travel or for business

10  entertainment.    The following business expenses are typically reimbursed: travel

11  expenses, automobile expenses, lodging, tips, and business meals.  Employees must

12  submit expense reports before they may receive reimbursement for their business

13  expenses. All cash advances must be accounted for, and expense receipts are required.

14  Employees then forward the expense reports to the accounts-payable department, and

15  expenses are reimbursed with a check within a week of receipt.

16       47.   Before the Company commenced these cases, employees incurred various

17  business expenses that, consistent with ordinary practice, are reimbursable by the

18  Company.  Because the Company cannot know the exact amount of requested business

19  reimbursements until the accounts payable department receives expense reports from all

20  eligible employees, it is difficult to determine the total outstanding reimbursement

21  obligations at any given time.   Based upon my review of known business expense

22  reimbursements and the historical amounts of such reimbursements paid to its employees,

23  I estimate that the total unreimbursed business expenses attributable to the 180-day period

24  before the Petition Date should not exceed $50,000 in the aggregate, or roughly $60 per

25  eligible employee.

26       48.   ***Miscellaneous.***  The Company also offers its full-time employees three days

27  of paid leave as bereavement leave.  With respect to jury duty, the Company generally

28  does not pay for employees serving jury duty unless it is required to do so by a particular

- 17 -

LA\215377.4

1  state in which it is operating. The Company also offers its employees other miscellaneous

2  benefits such as carpool incentives, employee discounts on merchandise purchased by

3  employees at any of the Big Dog and TWC retails stores. I am unaware of any

4  meaningful prepetition liabilities associated with these employee benefits. Employees are

5  also entitled to obtain insurance coverage pursuant to Section 4980B of the Internal

6  Revenue Code to administer Continuation Health Coverage ("COBRA"), but I believe

7  that any prepetition costs related to COBRA coverage benefits are *de minimis*.

## V.

## CASH MANAGEMENT

11    49.    The Company maintains a complex cash management system that tracks and

12  concentrates the cash received and expended by the Company. The Company has used

13  the core cash management system for many years in the ordinary course of its business,

14  and it is necessary to the Company's continued, efficient operations. I believe that this

15  cash management system is similar to the other cash management systems commonly

16  employed by businesses comparable to the Company in size and complexity. This system

17  enables the Company to control and maintain corporate funds and ensure cash availability,

18  reduce administrative expenses, and timely and accurately present information regarding

19  cash-flow activity. Further, failure to maintain the cash management system would

20  constitute a default under the Pre-Petition Financing Agreement as well as under the

21  Postpetition Financing Agreement. If the Company were required to close all of its

22  existing bank accounts, this would constitute a major administrative burden, significantly

23  disrupt the Company's operations and its relationship with WFRF, interrupt the timely

24  collection of funds upon which the Company's operations depend, and severely disrupt

25  the Company's efforts to reorganize.

26    A.    **Overview of the Cash Management System**

27    50.    The key features of the cash management system are described below. The

28  Company's stores deposit cash proceeds of sales into various depository accounts, and

LA\215377.4

from there the funds are swept three to five times per week into the Company's restricted account. TWC and Big Dog each also maintain a merchant account at Wells Fargo, N.A. ("Wells Fargo") for the deposit of credit card proceeds. The merchant accounts are swept daily, and the proceeds are deposited into the Company's restricted account. Funds from the restricted accounts are then withdrawn daily by WFRF to pay down the Pre-Petition Facility. To the extent the assets of one debtor are used to pay down borrowings of a co-debtor under the Pre-Petition Facility, such debtor has an intercompany claim for reimbursement.

51.    Funds needed to pay employees, to pay vendors, to fund claims under the Company's self-insurance program, and to meet other operational obligations are funded by daily draw requests made by the Company upon its Pre-Petition Facility. As draw requests are honored by WFRF, the funds are deposited into either the Big Dog operating account or the TWC operating account, as appropriate. These two operating accounts are maintained at Wells Fargo, and any funds remaining in the operating accounts at the end of each day are automatically deposited overnight to interest-bearing sweep accounts at Wells Fargo. All of the Company's accounts are FDIC insured. In addition, except for certain of the depository accounts described below, all of the Company's accounts are maintained with banks that have been approved as a depository for funds of debtors in possession by the United States Trustee for Region 16.

## B.    The Bank Accounts

52.    The following is a summary of the bank accounts that comprise the Company's cash management system. In addition, a diagram of the cash management system is attached hereto at Exhibit 1.[1]

53.    *The Depository Accounts.* The Company maintains 37 depository accounts with the following banks, each of which was selected because it has a branch located near one of the Company's store locations. A list of the depository accounts is attached hereto

---

[1] The bank accounts listed in this declaration and on the exhibits hereto reference only the last four digits of each account number in accordance with the applicable local rules.

LA\215377.4

as Exhibit 2. Thirty-three of these depository accounts are maintained by TWC, and four are maintained by Big Dog. The stores deposit cash proceeds of sales into these depository accounts and funds are swept three to five times per week into the respective Wells Fargo restricted accounts. These depository accounts are an important part of the Company's cash management system, and if these accounts were closed the Company's collection of funds would be unnecessarily delayed and the administrative burdens on the Company's treasurer would be increased with no offsetting benefit to the Company. No checks are written on the depository accounts.

54.    As reflected on Exhibit 2, I have confirmed that 12 of the 37 depository accounts are with banks that have been approved as a depository for funds of debtors in possession by the United States Trustee for Region 16. The remaining 25 accounts are with banks that have not been approved by the United States Trustee for Region 16. However, the Company has confirmed that each of the depository accounts is FDIC insured. Further, the amounts deposited in the depository accounts rarely exceed $15,000 and would never approach the FDIC insurance limits. Thus, the funds maintained in the depository accounts are not at risk.

55.    *The Merchant Bank Accounts (TWC #8061 & BD #3531).* TWC and Big Dog each maintain a merchant account at Wells Fargo for the deposit of credit card proceeds. The merchant accounts are zero balance ("ZBA") accounts, and funds deposited into the merchant accounts are swept daily into the restricted accounts. Like the depository accounts, the merchant bank accounts are an important part of the Company's cash management system, and if these accounts were closed the Company's collection of funds would be unnecessarily delayed and the administrative burdens on the Company's treasurer would be increased with no offsetting benefit to the Company. No checks are written on the depository accounts.

56.    *The Restricted Accounts (TWC #8053 & BD #3549).* As noted above, the Company maintains two restricted accounts with Wells Fargo. Funds received by the Company through its retail sales, whether received in cash or by credit card payment, are

LA\215377.4

deposited into the restricted accounts, and from there the funds are withdrawn daily by Wells Fargo to pay down the Pre-Petition Facility. The Company does not have access to the funds in the restricted accounts. The Company is seeking authority to maintain the restricted accounts as the means of making payments with respect to the postpetition credit facility that is being provided to the company by WFRF pursuant to the DIP Financing Motion. No checks are written against the restricted accounts, and no party has the ability to withdraw funds from the restricted accounts other than WFRF. Accordingly, no funds will be withdrawn from the restricted accounts on account of prepetition obligations of the Company, except to the extent that a so-called "roll up" of prepetition debt may be authorized by this Court pursuant an order approving the DIP Financing Motion.

57.    ***Operating Accounts (TWC #8079 & BD #3689).***    The Company maintains two operating accounts at Wells Fargo, one for TWC and one for Big Dog. The operating accounts are funded from daily draw requests made on the Pre-Petition Facility, and from there funds are transferred as needed to the Company's payroll, disbursement, or customer refund accounts. Any funds remaining in the operating accounts at the end of each day are automatically deposited overnight to interest-bearing sweep accounts maintained Wells Fargo, one for TWC and one for Big Dog. These accounts are a critical part of the Company's cash management system, and if these accounts were closed the Company's ability to receive advances under the Pre-Petition Facility and to route those advances to the needed disbursement accounts would be unnecessarily delayed and the administrative burdens on the Company's treasurer would be increased with no offsetting benefit to the Company. No checks are drawn on the operating accounts.

58.    ***The Payroll Accounts (TWC #8087 & BD #3556).***    The Company maintains two dedicated payroll accounts at Wells Fargo, one for TWC and one for Big Dog. These payroll accounts are Positive Pay, ZBA accounts that are funded by the operating accounts in amounts necessary to cover the Company's payroll expenses. Payments from the payroll accounts are generally made through ADP, which performs

LA\215377.4

payroll functions on behalf of the company. Occasionally, payroll payments are made directly to an employee, such as when an employee has been terminated. Any funds remaining in the payroll accounts are swept daily back into the operating accounts. The Company is requesting authority to maintain the payroll accounts for the limited purpose of paying prepetition wages and expenses and to fund the Company's postpetition payroll obligations with respect to its employees. Simultaneously, the Wages and Benefits Motion seeks authority to authorize the payment of prepetition wages and expenses.

59.    ***The Disbursement Accounts (TWC #6415 & BD #4018).*** The Company maintains two controlled disbursement accounts at Wells Fargo, one for TWC and one for Big Dog, against which checks for the Company's expenditures are drawn (other than payroll obligations for TWC and Big Dog and customer refunds for TWC). The disbursement accounts are Positive Pay, ZBA accounts that are funded by transfers from the operating accounts. Any funds remaining in the disbursement accounts are swept daily back into the operating accounts in amounts necessary to cover the Company's business expenditures.

60.    ***The Customer Refund Account (TWC #8487).*** TWC also maintains a customer refund account at Wells Fargo. The customer refund account is another Positive Pay, ZBA account that is funded by transfers from TWC's operating account in amounts necessary to pay refunds due to its customers. Payments from the customer refund account are made by check. Any funds remaining in the customer refund account are swept daily back into TWC's operating account. The first-day motions include a request by the Company for authority to honor its prepetition customer obligations, including obligations with respect to customer refunds and gift cards. To the extent that this relief is granted, the customer refund account will be used to honor prepetition customer refunds.

61.    ***Positive Pay System.*** As set forth above, the payroll, controlled disbursement, and customer refund accounts are "Positive Pay" disbursement accounts. The Positive Pay system is designed to reduce potential fraud and to reduce administrative costs associated with cash management by permitting the Company to control the

LA\215377.4

payment of checks presented to its bank.  The Positive Pay system works through a

sophisticated system of magnetic coding that is imprinted on each disbursement check

issued against the Positive Pay account.  Before Wells Fargo can honor any check

presented against an account using the Positive Pay system, it must compare critical

information magnetically encoded on that check (*e.g.,* check number and amount) to a list

of authorized checks that the Company electronically transmits to the bank whenever

checks are written.  Wells Fargo will only honor the check if all critical information is

successfully verified.  Furthermore, the Company can receive an electronic transmission

from Wells Fargo at any time indicating what checks have been presented against its

Positive Pay account.

62.    These key features of a Positive Pay account, while designed as a protection

against fraud, can also be used in connection with a bankruptcy filing to ensure that a

debtor's outstanding, prepetition checks will not be honored subsequent to the

commencement of its bankruptcy case.  Concurrently with the commencement of the

Company's cases, I have directed our controller to remove from the Company's list of

authorized checks all checks then outstanding, and to promptly transmit this updated list,

which will reflect no outstanding, authorized checks, to Wells Fargo.  After this is done, if

a check that was outstanding on the Petition Date is presented to Wells Fargo for payment,

the critical information magnetically encoded on that check will not match any check on

the Company's list of outstanding, authorized checks, and Wells Fargo will be unable to

honor that check.  Thus, I believe there is virtually no risk that, if the Positive Pay

accounts remain open, prepetition checks could inadvertently be honored.

63.    The Positive Pay system took significant time to implement and any

disruption to this system, if the disbursement accounts were to be closed and reopened

with new account numbers, would take several weeks to accomplish.  During that time,

the Company could only disburse funds by either issuing wire transfer instructions, which

are too costly to be used for most transactions, or operating without the Positive Pay

control features, exposing the Company to potential fraud.  The resulting disruption to the

LA\215377.4

Company's operations could have a devastating effect on its relationship with its vendors. The Company's reorganization efforts therefore require that the Positive Pay accounts continue essentially intact, and the Company is requesting authority to keep the Positive Pay accounts open. In accordance with the DIP Financing Motion, I intend to fund the disbursement accounts from the operating accounts.

64. **The Sweep Accounts (TWC & BD – no account numbers).** Any funds remaining in the operating accounts at the end of each day are automatically deposited overnight to interest-bearing sweep accounts maintained at Wells Fargo, one for TWC and one for Big Dog. These sweep accounts are a critical part of the Company's cash management system. These accounts are depository accounts, and no checks are drawn against them.

65. **Flexible Spending Account.** The Company maintains a flexible spending account at Bank of America for the benefit of its employees. The Company's flexible spending account is funded solely from deductions made from employees' salaries, and it is administered by United Healthcare, which issues the reimbursement checks drawn against that account. Although the account is funded by employee contributions, the Company has a residual and/or contingent interest in certain funds contained in the account.

66. **Health Insurance Account.** The Company maintains a health insurance account at Bank of America for the benefit of its participating employees and their dependents. The account was created in furtherance of the Company's self-insured company-subsidized medical, and dental plans. The Company uses UnitedHealthCare as its plan administrator. The account is funded from TWC's operating account. UnitedHealthCare is authorized to initiate ACH transfers each week from TWC's operating account to the health insurance account in amounts necessary to cover the prior week's paid claims. Participating employees' contributions to the medical and dental plans are deducted from such employees' bi-weekly pay.

LA\215377.4

67.    *401(k) Retirement Savings.*    The Company maintains an employee 401(k) retirement savings custodial account with Fidelity Investments funded by employee deductions made from employees' eligible earnings.    Participating employees' contributions to the 401(k) plan are deducted from such employees' bi-weekly pay based on a percentage of eligible earnings elected by the participating employees.  Contributions are invested based on the investment elections made by the employees, or if no investment elections are made contributions are deposited into conservative default investments. Although the Company does not currently make matching contributions, it has done so in the past.  The Company has no legal or equitable interest in the funds maintained in the 401(k) account.  Further, the Company maintains a 401(k) forfeiture account with Fidelity Investments, which contains approximately $175,000 comprised of matching contributions funded by the Company in the past that were forfeited when employees terminated their employment before their rights to such funds had vested.  It is my understanding that the funds in the forfeiture account are not available to the Company and can only be used to provide matching contributions to employees in the event that the Company chooses to provide matching funds in the future.

68.    I believe that it is essential that the Company maintain its existing bank accounts and cash-management system as described above and that the Court grant the Cash Management Motion on an expedited basis.  Absent prompt relief, the Company will incur significant and unnecessary costs, enormous interruption to its business, and substantial harm.  The relief requested in the Cash-Management Motion is essential to maintaining smooth operations and to preventing an interruption in either the Company's receipt of revenues or its prompt payment of payroll and other obligations that are essential to the maintenance of going-concern operations.  I believe that, if the Company was required at this time to close all of its prepetition bank accounts and reconstruct its cash management system from scratch, this would constitute a major administrative burden, and the Company's payroll and revenue collection activities would suffer a serious interruption, which could cause immediate and irreparable harm to the Company's

LA\215377.4

1  business operations, interrupt the timely collection of funds upon which its operations

2  depend, and severely prejudice its reorganization efforts.

3       69.   I believe that maintaining the Company's bank accounts and cash

4  management system will not interfere with its performance of its duties as a debtor in

5  possession, including its obligations to segregate and separately account for its prepetition

6  and postpetition financial activities, and will not prejudice any party.  As discussed above,

7  the majority of the accounts comprising the Company's cash management system are

8  depository, concentration, or Positive Pay accounts.  Only prepetition checks related to

9  prepetition obligation that this Court has authorized the Company to honor (*e.g.,* wages,

10  benefits, and certain customer obligation) will be honored.  No other prepetition checks

11  will be cleared through these accounts.  Moreover, in accordance with the U.S. Trustee

12  Guidelines, the Company is in the process of closing its books and records and opening

13  "new" books and records for the postpetition period.  I believe that these measures are

14  reasonable and sufficient to ensure that the Company separately accounts for its

15  postpetition financial activities.

16  **VI.**

17  **PREPETITION SALES AND USE AND SIMILAR TAXES**

18       70.   In the ordinary course of its business, the Company incurs a variety of taxes.

19  These taxes include (a) personal property taxes on the Company's tangible assets; (b)

20  sales and use taxes on retail goods that the Company has sold or assets that the Company

21  acquires; (c) franchise taxes payable to various states where the Company conducts

22  business; and (d) other taxes or assessments that may be imposed by various state or local

23  authorities.  In the aggregate, based on my review of the Company's books and records as

24  well as the Company's historical performance and tax obligations, I estimate that

25  approximately $1 million in taxes are accrued and unpaid for the prepetition Period.  An

26  approximate breakdown of these taxes by type is attached hereto as Exhibit 3.

27       71.   I believe that timely payment of such taxes, in the ordinary course, whether

28  relating to prepetition, or postpetition periods, is necessary to allow the Company to

continue orderly operations during its reorganization.  The Company is required to timely remit sales taxes with respect to all of its sales of goods to customers, and if these taxes are not remitted in a timely manner, taxing authorities may attempt to suspend the Company's business.

## VII.

## UTILITIES

72.    In connection with the operation of its nationwide retail business, the Company obtains electricity, natural gas, oil, water, sewer, telephone, trash collection, internet and/or other services from a number of utilities.  A complete list of the utility companies identifying the account, type of utility service received, and any deposits held by each utility company is attached hereto as Exhibit 4.

73.    Some of the utilities already hold deposits.  Moreover, the Company routinely pays its monthly utility obligations when due.  (Since the Company's chapter 11 filings occurred during the middle of the billing cycles for some utilities, there may be some nominal outstanding prepetition amounts owed to the utilities.)  I expect that the Company's postpetition cash will be more than sufficient to pay all postpetition obligations to the Utility Companies, and the Company has specifically included in its budget payments to the utilities, including the payment of the deposits proposed under the *Emergency Motion for Order (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, and (B) Determining Adequate Assurance of Payment for Future Utility Services* (the "Utilities Motion").

74.    The Company has proposed to give each of the Company's utilities a cash deposits equal to two weeks of utility services, calculated as a historical average during the 12 months prior to the Petition Date, which amount may be adjusted by the Company to account for the termination of utility services by the Company on account of any closed business locations.  The average monthly invoice amount from which this deposit will be calculated is listed on Exhibit 4.  The Company proposes to pay the deposit within 30

LA\215377.4

days after the Court's entry of an order granting its (the "Utilities Motion").  The Utilities Motion seeks entry of an order: (a) determining that the Company's utilities will receive adequate assurance of payment by the Company for future utility services if the Company furnishes this proposed deposit; (b) establishing an expedited procedure for the utilities to follow if they wish to dispute the adequacy of the proposed deposit; and (c) prohibiting the utilities from altering, refusing, or discontinuing postpetition utility services to the Company without further order of the Court.

75.    I believe that the relief requested in the Utilities Motion should be granted on an expedited basis.  It is my understanding that the Company has only 30 days from the Petition Date to obtain an order specifying adequate assurance of payment for postpetiton services rendered, at which point there is a risk that the utilities will discontinue service. Once the order is granted, the Company will still require additional time to issue checks to each of the utilities.   Given the tremendous amount of operational and administrative issues facing the Company's management during the early stages of these cases, I believe that it is critical that the Company be allowed an adequate period within which to attend to this matter.

76.    I believe that uninterrupted utility services to the Company's corporate headquarters, its retail stores, its merchandising department, and its distribution center are essential to its ongoing operations and the success of its reorganization.   Moreover, in light of the nature of the services provided, I believe that the Company cannot easily find replacement services.  Should any of the Utility Companies refuse or discontinue services, even for a brief period, the Company's business operations would be severely disrupted. The impact of this disruption on the Company's business and revenue would be extremely harmful and would jeopardize the Company's reorganization efforts.

LA\215377.4

## VIII.

## <u>NOTICE PROCEDURES</u>

77.    The *Emergency Motion for Order Establishing Notice Procedures* (the "Notice Procedures Motion") requests that the Court establish certain procedures designed to streamline the provision of notice to interested parties of various matters that may arise in these cases.  The Company has over 5,000 creditors, and hundreds of other parties are listed in its creditor matrices.  I believe that the mailing of notices of all matters to hundreds, sometimes thousands, of entities would be impractical, would impose an enormous administrative and financial burden upon these estates, would substantially delay the provision of notices in these cases, and would impede the consummation of transactions, negotiation of settlements, or granting of other relief that may be advantageous to the estates and creditors.

78.    I believe that the relief requested in the Notice Procedures Motion should be granted on an emergency basis.  Unless the Court promptly grants the Notice Procedures Motion, I believe that these estates will incur significant and unnecessary costs associated with noticing hundreds of entities of the numerous matters arising during the active early stages of these cases.  Moreover, I believe that the earlier that the Company can implement the notice procedures described in the Notice Procedures Motion, the great the savings will be the these estates and their creditors.

## IX.

## <u>SCHEDULE PREPARATION</u>

79.    The Company has filed a motion ( the "Schedules Extension Motion") requesting that the Court enter an order extending for 30 days the time within which the Company must file its schedules of assets and liabilities and related materials (the "Schedules").  Absent the relief requested, the Company must file its Schedules by no later than 14 days after the Petition Date.  I believe that it would be very difficult, if not impossible, for the Company to prepare the Schedules carefully, thoroughly, and

LA\215377.4

accurately within such a short period.  There are a large number of potential creditors and complex claims against these estates.  The Company's operations involve hundreds of contracts, leases, licenses, and other agreements.  Moreover, the Company must immediately focus its efforts on its store-closing program, and its efforts to rapidly finalize its chapter 11 plan.  Under the circumstances, sorting through the Company's business records to identify the information necessary to accurately complete the Schedules will be an especially challenging process.  Absent an immediate order extending the deadline for filing Schedules, the Company will be in jeopardy of noncompliance with the guidelines promulgated by the Office of the United States Trustee and will be forced to divert the resources of its key personnel from pressing operational matters, financing negotiations, and massive operational restructuring efforts being overseen by the Company's management.  I therefore believe that the relief requested in the Schedules Extension Motion should be granted on an emergency basis.

## X.

## JOINT ADMINISTRATION

80.    The *Emergency Motion for an Order Directing Joint Administration of Related Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015(B) and Local Bankruptcy Rule 1015-1(B)* (the "Joint Administration Motion") requests that the Court enter an order directing joint administration of the three chapter 11 cases filed by each of the Company's entities.  As set forth above, each of these entities has commenced a chapter 11 case that is pending before this Court, and all have joined in the request for joint administration.  By definition, the companies are all closely related, and they share common management and ultimate ownership.  Additionally, there is substantial overlap in their creditor bodies.

81.    I believe that jointly administering these estates will eliminate unnecessary and expensive duplication of effort by the three companies, their professionals, their creditors, parties in interest, and this Court.  Moreover, I believe that unless the Court

LA\215377.4

promptly grants the request for joint administration, these estates and their creditors will be saddled with expensive and unnecessary administrative expenses. I also believe that joint administration will greatly reduce the costs of administering these cases and will eliminate the substantial confusion and waste that would otherwise be created by maintaining separate dockets. Almost without exception, the only material differences between each set of pleadings that will be filed in these cases will be in the captions. Substantive matters affecting one estate typically will affect the other. I therefore believe that requiring the Companies to file separate pleadings in each case will entail considerable duplication at substantial cost, and I do not believe that this duplication will generate any additional benefit to creditors.

82. Finally, I believe that filing separate pleadings in all three cases would significantly burden the Clerk's office, which must process and store the pleadings that may be filed in these cases. Similarly, I believe that the Company's creditors will also be burdened by separate administration. Creditors would be required to file duplicate copies of pleadings in both cases for no reason other than to maintain separate dockets and files. By jointly administering the estates, creditors will receive notice of all matters involving all entities, thereby ensuring that they are fully informed of all matters potentially affecting there claims.

83. I therefore believe that the proposed joint administration of these cases should be authorized on an expedited basis, since the earlier the Company can implement

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

LA\215377.4

1    these streamlined procedures the greater the benefit and savings will be to its estates, its

2    creditors, and this Court.

3         I declare under penalty of perjury under the laws of the United States of America

4    that the foregoing is true and correct.

5         Executed this 7th day of December, 2009, at Santa Barbara, California.

6

7

8                                    ROBERTA J. MORRIS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 32 -

# EXHIBIT 1

# Other Bank Accounts
# Cash Management System

File name: P:/Accounting/Naomi/cashchart.xls

(effective 10/1/09)

Bank of America
Flexible Spending Account
Account # ending with 6456

United Healthcare Insurance
UHC Administered Plan for
The Walking Company

(employee FSA deductions are deposited
into this account & reimbursement checks
are administered by UHC)

Bank of America
Health Insurance Claims
Account # ending with 6443

United Healthcare Insurance
UHC Administered Plan for
The Walking Company

(employee health insurance claims
are paid out of this account.  Payments
are administered by UHC)

Fidelity Investments
Retirement Savings Plan
Plan #38854, Client ID 000738089

The Walking Company Holdings, Inc
Custodial Account

(employee 401k savings account)

Fidelity Investments
Retirement Savings Plan

Big Dog Holdings
Forfeiture Account

(employer match forfeited by employees)

# EXHIBIT 2

**Exhibit 2**

| Creditor Name | City | State | Account No. (Last Four Digits) | UST Approved (Y/N) |
|---|---|---|---|---|
| American Savings Bank | Honolulu | HI | 5350 | N |
| AMEX | Phoenix | AZ | 1502 | N |
| AmTrust Bank | Beachwood | OH | 5782 | N |
| B of A - Additional Contact | Santa Maria | CA | 2081 | Y |
| B of A - Additional Contact | Santa Maria | CA | 0841 | Y |
| B of A - Additional Contact | Santa Maria | CA | 5335 | Y |
| B of A - Additional Contact | Santa Maria | CA | 9509 | Y |
| Bank of America, N.A. | Woodland Hills | CA | 2081 | Y |
| Bank of America, N.A. | Woodland Hills | CA | 0841 | Y |
| Bank of America, N.A. | Woodland Hills | CA | 5335 | Y |
| Bank of America, N.A. | Woodland Hills | CA | 9509 | Y |
| Bank of Hawaii | Lahaina | HI | 6371 | N |
| Bank of the West | Centenial | CO | 3559 | Y |
| Branch Banking and Trust Company | Wilson | NC | 8303 | N |
| Capital One | New Orleans | LA | 8507 | N |
| Central Bank & Trust | Lexington | KY | 7755 | N |
| Chase Bank | Los Angeles | CA | 2541 | Y |
| Chase Bank | Los Angeles | CA | 6472 | Y |
| Chevy Chase Bank | Arlington | MD | 9791 | N |
| Citibank | Edison | NJ | 0808 | Y |
| Citizens Bank | Pittsburgh | PA | 7389 | N |
| Compass | South Houston | TX | 4660 | N |
| Discover | Phoenix | AZ | 4491 | n |
| Farmington Savings Bank | Farmington | CT | 7829 | N |
| Fidelity | Covington | KY | | N |

**Exhibit 2**

| Creditor Name | City | State | Account No. (Last Four Digits) | UST Approved (Y/N) |
|---|---|---|---|---|
| Fifth Third Bank | Lindhurst | OH | 1825 | N |
| First American Bank | Vernon Hills | IL | 2901 | N |
| First Data | Greenwood Villag | CO | 4886 | N |
| First Hawaiian Bank | Wailea | HI | 0363 | N |
| First National Bank | Broomfield | CO | 1297 | N |
| First State Bank | Lake St. Louis | MO | 2060 | N |
| FirstTennessee | Knoxville | TN | 9162 | Y |
| Glen Falls National Bank & Trust | Glens Falls | NY | 4934 | N |
| HSBC | Huntington Station | NY | 3412 | N |
| Huntington National Bank | Dublin | OH | 6886 | N |
| JCB International | Los Angeles | CA | Processed with V/MC | N |
| Key Bank | Cheektowaga | NY | 0883 | N |
| National City | Oak Brook | IL | 0503 | N |
| PNC Bank | Louisville | KY | 1665 | N |
| Regions Bank | Destin | FL | 9126 | N |
| Regions Bank | Panama City Bea | FL | 0990 | N |
| Sovereign Bank | Lancaster | PA | 1904 | N |
| Sovereign Bank | Boston | MA | 2296 | N |
| SunTrust Bank | Orlando | FL | 1081 | Y |
| US Bank | Cincinnati | OH | 3122 | Y |
| Wachovia Bank | Red Bank | NJ | 4350 | Y |
| Wells Fargo | Camarillo | CA | 3531 | Y |
| Wells Fargo | Camarillo | CA | 3689 | Y |
| Wells Fargo | Camarillo | CA | 3556 | Y |
| Wells Fargo | Camarillo | CA | 3549 | Y |
| Wells Fargo | Camarillo | CA | 4018 | Y |

**Exhibit 2**

| Creditor Name | City | State | Account No. (Last Four Digits) | UST Approved (Y/N) |
|---|---|---|---|---|
| Wells Fargo | Camarillo | CA | 4827 | Y |
| Wells Fargo | Camarillo | CA | 8061 | Y |
| Wells Fargo | Camarillo | CA | 8079 | Y |
| Wells Fargo | Camarillo | CA | 8087 | Y |
| Wells Fargo | Camarillo | CA | 8053 | Y |
| Wells Fargo | Camarillo | CA | 6415 | Y |
| Wells Fargo | Boston | MA | (All Wells Accounts) | Y |
| Wells Fargo | Boston | MA | (All Wells Accounts) | Y |
| Wells Fargo | Boston | MA | (All Wells Accounts) | Y |
| Wells Fargo | Boston | MA | (All Wells Accounts) | Y |

# EXHIBIT 3

**EXHIBIT 3**

| The Company's Taxes | Estimated Amount |
|---|---|
| Sales | $825K |
| Property | $125K |
| Miscellaneous, such as Franchise & License Taxes | $50K |

# EXHIBIT 4

Exhibit 4

| UTILITY COMPANY NAME | ACCOUNT NO. | TYPE | PREPETITION DEPOSIT | AVERAGE MONTHLY PAYMENT |
|---|---|---|---|---|
| ALL STATES MALL SVCS II | 050611860,030605840 | UTILITY | | $161.00 |
| ALLIANT ENERGY/ WP&L | 221413013 | UTILITY | $932.00 | $301.00 |
| ALLIED WASTE SVCS #175 | 301755922818 | UTILITY | | $60.00 |
| ALLIED WASTE SVCS #710 | 307100006308 | UTILITY | | $116.00 |
| AMEREN UE | 2268132002,1393141008,9648505221 | UTILITY | $557.00 | $655.00 |
| AMERICAN WATER & ENERGY | SHV039,212190 | UTILITY | | $30.00 |
| AT & T- UNIVERSAL BILLER | 171-767-6163 309 | UTILITY | | $5,008.00 |
| AT&T | 999 002-9441 160 | UTILITY | | $23.00 |
| AT&T | 205 987-38855 001 0549,504 522-9255 128 0461,561 626-0432 913 0454,704 599-6927 932 3197,766 242-2932 461 0448,904 519-6807 768 0569,615 463-5029 029 0472,704 366-9427 176 3194,770 350-8291 001 1866,770 422-3288 052 1882,865 769-9839 002 1868,901 377-3858 001 1674,919 467-1294 328 0367,954 537-2661 001 1800,954 792-2264 651 1808,225 768-9131 001 3401,407 370-9810 001 3146,706 736-2874 369 0635,305 932-9608-001 0440,404 816-9330 099 0353,407 859-5040 682 3145,502 428-1657 704 0483,772 692-0815 022 0458,850 236-3599 538 0589,864 234-7738 306 1973,561 391-8034 642 0456,561 793-0128 001 0455,954 346-7382 001 1806,904 845-0652 652 0588 | UTILITY | | $5,828.00 |
| AT&T | 314 727-7567 063 3,636 536-1492 903 2,713 340-1305 669 9,817 557-0781 048 6,817 595-0532 428 8,214 872-2358 301 8,816 795-2782 461 2,913 894-1359 155 0,512 263-0933 241 8,713 961-0465 437 7,816 561-0249 460 7 | UTILITY | | $2,039.00 |
| AT&T | 312 255-1300 477 4,312 274-0543 965 8,317 582-0297 251 9,616 534-4721 211 7,616 974-0234 883 9,734 997-9169 522 5,847 605-0173 902 8,812 478-9255 290 3,847 205-1693 424 1,630 218-1532 495 9,262 641-5352 664 3,317 634-1547 566 5,317 773-4494 184 0,317 885-8254 112 4,440 878-0172 311 0,586 226-9255 489 0,614 336-7874 877 5,630 739-1134 166 9,708 460-5207 858 5,248 374-6097 408 3,248 649-2913 607 6,414 774-9255 274 6,574 271-4354 768 0,614 431-9255 260 6,216 765-8133 676 6,317 582-0297 251 9,616 974-0234 883 9,734 997-9169 522 5,847 676-9255 523 5 | UTILITY | | $2,973.00 |
| AT&T | 203 396-0446 904,203 706-9948 906,660 561-8506 626 | UTILITY | | $396.00 |
| AT&T | 831-000-1289 115,8000-873-1632 | UTILITY | | $1,144.00 |
| AT&T | 650 324-9255 590 4,714 648-0370 274 7,619 702-9079 834 7,650 827-8942 665 9,816 546-6195 936 1,415 346-0093 844 1,310 286-6748 738 7,406 247-9114 186 9,760 743-6484 866 7,818 710-0973 780 6,856 677-0935 471 6,925 460-9255 904 7,415 945-9128 436 2 | UTILITY | | $1,672.00 |
| AT&T | BIGU -BIGNV01 | UTILITY | | $185.00 |
| AT&T | 865 906-6372 001 1660 | UTILITY | | $258.00 |
| AT&T | 0974018 | UTILITY | | $521.00 |
| AT&T  PHOENIX | 817 294-2505 398 6 | UTILITY | | $227.00 |
| AT&T | 999 002-9441 160 | UTILITY | | $30.00 |
| AT&T CHARLOTTE | 828 895-2800 001 3193,828 428-1490 001 3191,828 428-8202 465 3190,305 698-8866 828 0443 | UTILITY | | $3,635.00 |
| AT&T MOBILITY | 997044163 | UTILITY | | $4,165.00 |
| AT&T TELECONFERENCE SVCS | 43051875-00001 | UTILITY | | $2,416.00 |
| AT&T TELECONFERENCE SVCS | 94638789-00001 | UTILITY | | $261.00 |
| AT&T-NJ | MG2223 | UTILITY | | $245.00 |
| AT&T-PHOENIX | 057 763 9892 001,051 614 8761 001,051 666 2114 001,050 892 2197 001 | UTILITY | | $98.00 |
| AT&T-SACRAMENTO | 619 542-1351 857 8,406 984-1445 770 4,818 386-0428 146 4,949 364-5606 932 7,626 294-0232 190 6,714 850-0457 936 0,925 356-0297 365 7 | UTILITY | | $911.00 |
| AT&T-UNIVERSAL BILLER | 831-000-0554 031,831-000-0065 695,831-000-0110 764 | UTILITY | | $315.00 |
| AT&T-W SACRAM | 775 827-5937 248 0,775 827-8773 372 9,775 827-5936 102 0 | UTILITY | | $267.00 |
| AVAYA, INC. | 0100369281 | UTILITY | | $1,356.00 |
| AVISTA UTILITIES | 650038386 | UTILITY | | $229.00 |
| BELD BRAINTREE E/L DEPT | 490001468702 | UTILITY | | $525.00 |
| BENTON P.U.D. | 0208041260 | UTILITY | | $253.00 |
| BGE UTILITIES | 87719374471,1118823391 | UTILITY | $2,270.00 | $1,820.00 |
| BRIGHT HOUSE NETWORKS | 8234 13 012 0058029 | DSL | | $60.00 |
| BUCKS COUNTY WATER/SEWER | 202004400 | UTILITY | | $63.00 |
| CAPITAL WASTE, INC | 9879,5828 | UTILITY | | $181.00 |
| CENTERAL MAINE POWER CO. | 4411443077018 | UTILITY | $1,400.00 | $446.00 |
| CENTURYLINK | 408540154,406716136 | UTILITY | | $298.00 |
| CENTURYLINK | 702-850-9683-828,702-734-7150-539,702-385-7483-431 | UTILITY | | $971.00 |
| CENTURYLINK | 239-433-0360-057,239-947-2343-577,239-438-3929-216,850-650-4586-329 | UTILITY | | $674.00 |
| CHARTER COMMUNICATIONS | 8351 40 021 0380218 | UTILITY | | $33.00 |
| CINCINNATI BELL | 513-936-9091 757,859-371-2780 489 | UTILITY | | $446.00 |

Page 1 of 5

Exhibit 4

| UTILITY COMPANY NAME | ACCOUNT NO | TYPE | PREPETITION DEPOSIT | AVERAGE MONTHLY PAYMENT |
|---|---|---|---|---|
| CITY OF AUSTIN | 58920117 | UTILITY | | $533.00 |
| CITY OF BROOKFIELD UTI | 211055 | UTILITY | | $28.00 |
| CITY OF GRAND RAPIDS TREA | B2000220084 | UTILITY | | $24.00 |
| CITY OF HURST | 02004 | UTILITY | $80.00 | $44.00 |
| CITY OF KENNEWICK | 470067104 | UTILITY | | $45.00 |
| CITY OF LANCASTER | 415220 | UTILITY | | $6.00 |
| CITY OF PALO ALTO UTILITY | 300099144 | UTILITY | | $480.00 |
| CITY OF PIGEON FORGE UTIL | 0030234003 | UTILITY | | $24.00 |
| CITY OF ROSEVILLE | 245801480251 | UTILITY | | $134.00 |
| CITY OF SANTA BARBARA | 0003877037 50,027709713853 | UTILITY | | $954.00 |
| CITY OF SARASOTA | 8770343388 | UTILITY | | $52.00 |
| CITY OF SB WATER/TRASH | 000707703750,0003877037 50,027709713853 | UTILITY | | $1,172.00 |
| CITY OF SEATTLE DEPT FIN | 11301962403721,1135767 3308225 | UTILITY | | $375.00 |
| CITY TREASURER- TACOMA | 100540036 | UTILITY | | $238.00 |
| COMCAST - DSL | 900793576 | UTILITY | | $100.00 |
| COMCAST CABLE | 09508 750375-01-3 | UTILITY | | $100.00 |
| COMM SOLUTIONS COMPANY | C507876 | UTILITY | | $817.00 |
| COMMONWEALTH EDISON | 0394090049,69027670 42,2353106014,60769027 | UTILITY | $705.44 | $1,291.00 |
| CON EDISON | 42533217730 6045 | UTILITY | $575.00 | $250.00 |
| CONSOLIDATED EDISON | 42532317730 50 | UTILITY | | $1,548.00 |
| CORAL SPRINGS IMPROVEMENT | 460554916 | UTILITY | | $66.00 |
| COSERV | 0000308005 | UTILITY | | $463.00 |
| COUNTY OF SANTA BARBARA | BIGDOG001 | UTILITY | | $36.00 |
| COUNTY OF SANTA BARBARA | BIGDOG0001 | UTILITY | | $21.00 |
| COVAD COMM. | 559441 | UTILITY | | $87.00 |
| COX COMMUNICATIONS | 001 3011 022526402 | UTILITY | | $135.00 |
| COX COMMUNICATIONS, INC. | 0018610107271201 | UTILITY | | $67.00 |
| CUIVRE RIVER ELECTRIC | 152269001 | UTILITY | | $281.00 |
| DOMINION VIRGINIA POWER | 0255121195 | UTILITY | | $283.00 |
| DUKE ENERGY | 1613207526 | UTILITY | | $4,340.00 |
| DUKE ENERGY 150 | 62100793232 | UTILITY | | $494.00 |
| DUKE ENERGY 225 | 1739692865 | UTILITY | $850.00 | $353.00 |
| EBMUD EAST BAY MUNICIPAL | 50287434 | UTILITY | $25.00 | $17.00 |
| EFAX CORPORATE | 10823 | UTILITY | | $481.00 |
| EMBARQ | 407-238-9414-321,407-239-8787-561,850-850-8590-466 | UTILITY | | $256.00 |
| EMBARQ | 417-588-2108-865,763-407-8736-682 | UTILITY | | $177.00 |
| ENERGY MANAGMENT SYSTEMS | 1021090705,102109 0802 | UTILITY | | $683.00 |
| ENERGYWORKS LANCASTER LLC | P3067 | UTILITY | $2,712.80 | $2,541.00 |
| EPAX SYSTEMS, INC. | NONE | UTILITY | | $183.00 |
| EWEB EUGENE WATER/ELECT | 3003104699 | UTILITY | | $250.00 |
| FIRSTDIGITAL TELECOM | 8014560380 | UTILITY | | $213.00 |
| FPL FLORIDA P & L CO | 1214942433,0398113431,7856135434,9457708197,44029415989,737 3791347,0106241342,0979499399,5040882598,09887838232,440294 1589 | UTILITY | $9,115.00 | $4,910.00 |
| FRIT SAN JOSE TOWN & COUN | 1611271100,1611671100,1611071100,161147110 | UTILITY | | $1,355.00 |
| FRONTIER | 585-425-0116-100107-6 | UTILITY | | $120.00 |
| FRONTIER COMMU. | 10582903 | UTILITY | | $94.00 |
| GDS - HICKORY | 3157570501975 | UTILITY | | $477.00 |
| GEORGIA POWER CO. | 6443247001 | UTILITY | $5,565.00 | $801.00 |
| GRANITE TELECOMMUNICATION | 01942822 | UTILITY | | $3,633.00 |
| GRANITE TELECOMMUNICATION | 01992669, 01992673 | UTILITY | | $3,006.00 |
| GULF POWER | 3587361030,6585577000 | UTILITY | | $878.00 |
| GULF POWER COMPANY | 4745062019 | UTILITY | | $538.00 |
| HAWAII ELECTRIC LIGHT CO | 54002546005 | UTILITY | | $1,791.00 |
| HAWAIIAN ELECTRIC CO. | 8815565520 10,09000488001 | UTILITY | | $2,230.00 |
| HAWAIIAN TELCOM | 10402312920001 0,2000000000198941,2000000000162231,2000000000 66782,200000000 0162241,200000000 0166542,200000000010636 | UTILITY | $190.00 | $1,185.00 |
| HUNTSVILLE UTILITIES | 8565101219 | UTILITY | $1,900.00 | $303.00 |
| IDAHO POWER #329 | 1164683209 | UTILITY | | $265.00 |
| IEM INTER'L ENVIR'L MAGT | 20070047, 1707102, 1845245, 2064272, 2102107, 2412057, 2423065, 2589482, 2657431, 2763357, 2910022, 2931399, 2975938, 2987718, 3054376, 3064654, 3075381, 3094386, 3105449, 3145380, 3302128, 3323294, 3342136, 3372065, 3402284, 3412211, 3423209, 3461104, 3482190, 3492093, 3532168, 3872139, 3691113, 3802040, 3612237, 3621308, 3732135, 3832049, 3861035, 3951107, 4020166, 4040289, 4284034, 4490101, 4661215, 4702092, 4722205, 4772154, 4821121, 4841132, 4861128, 4950268, 4970217, 5020270, 5100362, 531139, 5521103, 5542067, 5571047, 5591081, 5861053, 1662092, 1707102, 3612237, 3772139, 2412067, 2657431, 5601136, 5571047, 6541130, 671116, 681134, 6801175 | UTILITY | | $7,266.00 |

Exhibit 4

| UTILITY COMPANY NAME | ACCOUNT NO | TYPE | PREPETITION DEPOSIT | AVERAGE MONTHLY PAYMENT |
|---|---|---|---|---|
| IEM INTER'L ENVIR'L MAGT | 20070047, 1707102, 1845245, 2084272, 2102107, 2412057, 2423085, 2589482, 2657431, 2783357, 2910022, 2931389, 2975938, 2987718, 3054378, 3084654, 3075381, 3094386, 3105449, 3145360, 3302128, 3323294, 3342136, 3372065, 3402284, 3412211, 3423209, 3451104, 3482190, 3492093, 3532168, 3572139, 3591113, 3602040, 3612237, 3621308, 3732135, 3832049, 3861035, 3951107, 4020166, 4040259, 4284034, 4490101, 4681215, 4702092, 4722205, 4772154, 4821121, 4841132, 4861128, 4950286, 4970217, 5020270, 5100352, 531139, 5521103, 5542097, 5571047, 5591081, 5861053, 1662092, 1707102, 3612237, 3772139, 2412057, 2657431, 5801136, 5571047, 6541130, 571116, 881134, 6801175 | UTILITY | | |
| IES-NY CORPORTATION | 34159 | UTILITY | | $109.00 |
| INTERNATIONAL ENERGY GRP | 20070047 | UTILITY | | $20.00 |
| IPL INDIANAPOLIS P/L CO | 1179470 | UTILITY | | $386.00 |
| JERSEY CTL P&L CO.(JCP&L) | 100072878372 | UTILITY | | $570.00 |
| JOHNSON COUNTY WASTEWATER | 0004034275 | UTILITY | | $5.00 |
| KANSAS CITY POWER & LIGHT | 4528906162 | UTILITY | | |
| KU, AN E-ON CO. | 2909920054,300006940831 | UTILITY | $2,867.50 | $647.00 |
| KUB(KNOXVILLE UTIL BOARD) | 2798194548 | UTILITY | $700.00 | $317.00 |
| LA DEPT. OF WATER & POWER | 3597306514008,3828483408800,4517680010250000137 | UTILITY | $1,116.00 | $738.00 |
| LAKE COUNTY DEPT. OF | 025010655 | UTILITY | | $1,996.00 |
| LEE COUNTY UTILITIES | 10648806 | UTILITY | | $32.00 |
| LG&E UTILITIES | 200106827770017 | UTILITY | | $31.00 |
| LINCOLN COUNTY | 4049621 | UTILITY | | $284.00 |
| LIPA LONG ISLAND POWER | 03951004328,002254004431 | UTILITY | $2,590.00 | $307.00 |
| MADISON GAS & ELECTRIC | 22461883 | UTILITY | | $1,372.00 |
| MADISON MUNICIPAL SVCS | 00011848 | UTILITY | | $32.00 |
| MARBORG INDUSTRIES | 1857837 | UTILITY | | $16.00 |
| MARTIN COUNTY UTILITIES | 5697714401 | UTILITY | | $187.00 |
| MCCRAE ENTERPRISES, INC. | NONE | UTILITY | $120.00 | $24.00 |
| MECO MAUI ELECT. CO., LTD | 00007468002 | UTILITY | | $202.00 |
| MEMPHIS LIGHT,GAS & WATER | 0007010311238741 | UTILITY | | $2,081.00 |
| MIAMI-DADE WATER & SEWER | 4903924524 | UTILITY | | $669.00 |
| MIELE SANITATION CO. | THE871224 | UTILITY | $100.00 | $34.00 |
| MISHAWAKA UTILITIES | 16373153628 | UTILITY | | $96.00 |
| NASHVILLE ELEC SVC | 09847430474737 | UTILITY | $1,000.00 | $532.00 |
| NATIONAL GRID | 6288827203 | UTILITY | | $334.00 |
| NATIONALGRID | 7681122044,9066124060,1310246033 | UTILITY | | $770.00 |
| | | UTILITY | $200.00 | $1,188.00 |
| NEW EDGE NETWORKS | 00022456 | | | $1,179.00 |
| NEW JERSEY AMERICAN WATER | 520255361 | UTILITY | | $26.00 |
| NEW PERCEPTIONS VOICE & | NONE | UTILITY | | $125.00 |
| NICOR GAS | 12669787502 | UTILITY | | $86.00 |
| NORTHWALES WATERAUTHORITY | 40186603 | UTILITY | | $30.00 |
| NSTAR ELECTRIC | 26339331014,26141781059,26218991086 | UTILITY | | $3,183.00 |
| NV ENERGY | 300022132932174632630002213293191800333000221329319810605 | UTILITY | | |
| OCEANIC TIME/WARNER, | 4-413968-01-2 | UTILITY | | $1,390.00 |
| OLYMPIC II MALL SERVICES | 30024961 | UTILITY | | $135.00 |
| OLYMPIC III MALL SERVICES | 030024961,150112295 | UTILITY | | $50.00 |
| OLYMPIC MALL SERVICES | 11031855,030024961 | UTILITY | | $74.00 |
| ORANGE & ROCKLAND | 0027019021 | UTILITY | | $78.00 |
| OUC ORLANDO UTILES COMMIS | 5523422906,745260001 | UTILITY | $1,785.00 | $463.00 |
| PA SCDU | 200566862 | UTILITY | | $748.00 |
| PELLITTERI WASTE SYSTEMS | 450695 | UTILITY | | $331.00 |
| PEPCO POTOMAC E & P CO | 0601016043,2017334075 | UTILITY | | $41.00 |
| | | UTILITY | $1,735.00 | $1,758.00 |
| PG&E | 4768006472,299483449999,77558823850,29110706438,25814207905 | UTILITY | | $1,362.00 |
| PG&E -SACR 212/228/251 | 04496502859,5832333666225625666324331955397174,5832338666 2 | UTILITY | | $1,944.00 |
| PG&E -SACR 997300 | 31827431649 | UTILITY | | $684.00 |
| PG&E -SACR 110 | 04496502859 | UTILITY | | $746.00 |
| PGE PORTLAND GEN'L ELEC | 0011434927586440,001143492829691 | UTILITY | | $508.00 |
| PIEDMONT NATURAL GAS | 0002602303001 | UTILITY | | $2,306.00 |
| POLARIS ENERGY SERVICES | 101F120247 | UTILITY | | $631.00 |
| PROGRESS ENERGY FL., INC. | 5569638068,89750651998342865664,1718771326,1718771326 | UTILITY | | $1,062.00 |
| PSE PUGET SOUND ENERGY, | 4316962906,3879673378,3879670796 | UTILITY | $1,010.00 | $1,042.00 |
| PSE&G CO. | 6730646601,6881332609,680521340885654601,4158140277 | UTILITY | | $1,378.00 |
| PUBLIC SVC OF N H | 21030017459,56856621076 | UTILITY | $500.00 | $901.00 |
| QWEST | 952 544-8663 687,952 854-1711 107,661 746-0250 075 | UTILITY | | $170.00 |

Exhibit 4

| UTILITY COMPANY NAME | ACCOUNT NO. | TYPE | PREPETITION DEPOSIT | AVERAGE MONTHLY PAYMENT |
|---|---|---|---|---|
| QWEST | 503-853-1260 969B,509-353-5277 793B,206-382-8599 233B,206-417-1886 112B,206-985-1477 862B,425-462-4795 820B,541-302-5811 937B,253-476-7856 558B,360-734-2945 280B,503-525-2074 954B,661 633-3208 266 | UTILITY | | $872.00 |
| QWEST - PHOENIX | 480-949-9255 639B,520-299-9667 313B,720-887-4967 045B,480-726-0678 964B,623-979-9723 164B,208-322-9714 013B,303-444-1394 321B,520-790-9767 859B,303-706-0251 726B,480-612-9835 735B,970 267-9548 200B | UTILITY | | $1,062.00 |
| RELIANT ENERGY HL&P | 1271303 | UTILITY | $1,245.00 | $918.00 |
| ROCKY MOUNTAIN POWER | 155674520012 | UTILITY | $685.00 | $246.00 |
| SAN DIEGO G&E/SDG&E | 08284347068,95818694935,73897741248,82738719883,9159356596 | UTILITY | $1,249.75 | $3,974.00 |
| SAN DIEGO GAS & ELECTRIC | 71282582367,82784944096 | UTILITY | | $588.00 |
| SANTA BARBARA WEB HOSTING | NONE | UTILITY | | $1,580.00 |
| SEVIER COUNTY ELEC SYSTEM | 4336201,4336203,4336204 | UTILITY | | $1,962.00 |
| SMUD SAC MUNI UTIL DIST | 2815508 | UTILITY | | $550.00 |
| SO CAL EDISON CO. | 2252007865,2252007865,2252007865,2252007865,2252007604,2252 007865,2291797397,3033139572,2302145123,2315813711 | UTILITY | $1,032.00 | $4,487.00 |
| SOUTH HUNTINGTON W.D. | 45167080 | UTILITY | | $21.00 |
| SOUTH WALTON UTILITY CO. | 50020000 | UTILITY | | $20.00 |
| SOUTHERN CALIF EDISON | 2268804596 | UTILITY | $17,200.00 | $7,468.00 |
| SOUTHWEST GAS CORP. | 2118880210002 | UTILITY | | $24.00 |
| SPRINT | 880174760,921191091 | UTILITY | | $79.00 |
| SPRINT | 453501649 | UTILITY | | $51.00 |
| ST CLAIR SERVICES INC | 633878385 | UTILITY | | $987.00 |
| ST CLAIR SERVICES INC. | 1999980000 | UTILITY | | $282.00 |
| ST. CLAIR SVCS, INC. | 1999990000,1999981000,1999972000 | UTILITY | | $2,013.00 |
| STERLING COMMERCE-73199 | 1999990000,1999972000,1999980000 | UTILITY | | $90.00 |
| STERLING COMMERCE-73199 | 529911 | UTILITY | | $1,320.00 |
| SUNSHINE RECYCLING, INC. | 199915,128380 | UTILITY | | $188.00 |
| SUREWEST | 694249-0001 | UTILITY | | $96.00 |
| TDS TELECOM | 606-526-0203 | UTILITY | | $134.00 |
| TECO TAMPA ELECTRIC | 0816142260 | UTILITY | $850.00 | $436.00 |
| THE GAS COMPANY | 16251455008,18351455003 | UTILITY | | $33.00 |
| THE ILLUMINATING CO. | 110043247864,110055285273 | UTILITY | $222.00 | $705.00 |
| THE UNITED ILLUMINATING | 0100000642092 | UTILITY | $1,456.00 | $1,001.00 |
| TIME WARNER CABLE | 8340 51 002 0518573 | UTILITY | | $90.00 |
| T-MOBILE | 414589507 | UTILITY | | $143.00 |
| T-MOBILE | 414589607 | NEW-J SWEET | | $42.00 |
| TOLEDO EDISON | 110058607325 | UTILITY | | $347.00 |
| TOMS RIVER MUNICPAL UTIL | 2447814 | UTILITY | | $30.00 |
| TOWN OF BURLINGTON | 9010012300123 | UTILITY | | $73.00 |
| TOWN OF HEMPSTEAD | 510142 | UTILITY | | $3.00 |
| TOWNSHIP OF FREEHOLD | 2299170 | UTILITY | | $42.00 |
| TUCSON E/P CO | 2237422880 | UTILITY | $150.00 | $1,493.00 |
| TW TELECOM-BILLING | 37174 | UTILITY | | $16,000.00 |
| TW TELECOM-CORRESPONDENCE | 37174 | | | |
| TXU ENERGY | 900011881333,900011881189 | UTILITY | $270.00 | $1,355.00 |
| TXU ENERGY | 900011881189 | UTILITY | | $500.00 |
| UNITED WATER TOMS RIVER | 04400998958288 | UTILITY | | $9.00 |
| UNTIL | 11457231058320 | UTILITY | | $589.00 |
| UPPER MERION SEWER REVENU | 0080020341 | UTILITY | | $14.00 |
| VERIZON | 000831554847 24Y,000011146430 16Y | UTILITY | | $188.00 |
| VERIZON - ALBANY | 212 355 3198 568 72 1,531 421 9255 456 27 3 | UTILITY | | $328.00 |
| VERIZON - ALBANY | 518 889 9206 094 24 5,716 684 9255 953 26 2 | UTILITY | | $330.00 |
| VERIZON - DALLAS | 000763950594 54Y,000750426523 72Y | UTILITY | | $192.00 |
| VERIZON - DALLAS | 215 361-1224 852 92Y,412 835-9255 011 03Y,412 833-3140 139 19Y,215 741-0212 164 90Y,302 368-4037 080 72Y | UTILITY | | $474.00 |
| VERIZON BUSINESS | V592990119 | UTILITY | | $399.00 |
| VERIZON CALIFORNIA | 01 2847 1198550148 05 | UTILITY | | $212.00 |
| VERIZON FLORIDA -DALLAS | 727 341-2995,813 654-9255 070215,941 388-0311 001016,813 907-9351 081016,941 388-9151 050713,941 906-8282 030715,727 398-3700 080409,863 424-8900 070509,727 398-7324 961211 | UTILITY | | $1,645.00 |
| VERIZON LEHIGH VALLEY | 610 642-3138 171 82Y,717 364-2157 280 81Y,610 265-1794 884 17Y | UTILITY | | $517.00 |
| VERIZON NORTHWEST | 01 1773 1108064614 07,01 1873 1290230439 02,03 0210 1008979956 03,01 1785 1146528494 08,01 1785 1290305056 08,01 2555 1166488837 00,13 4611 2604039578 09,01 1873 1281231193 04,01 1773 1104297699 06,01 1710 1280090367 03,01 2573 1100591390 08,03 0560 1009428962 04 | UTILITY | | $4,283.00 |

Exhibit 4

| UTILITY COMPANY NAME | ACCOUNT NO. | TYPE | PREPETITION DEPOSIT | AVERAGE MONTHLY PAYMENT |
|---|---|---|---|---|
| VERIZON ONLINE | 0094826436056,0072119362795,0084720604972,0072218216507,00 73318215151,0072118037237,0070518462183,0074418343073,0073 118954788,0080523110271,0093128225786,0080919687131,007221 8443948 | UTILITY | | $1,044.00 |
| VERIZON -TRENTON | 609 799-8851 232 14Y,908 252-1700 797 19Y,609 262-9255 323 29Y,732 825-9955 590 92Y,732 744-9255 519 11Y,201 368-0072 899 84Y,732 750-2280 049 46Y,973 376-8894 340 61Y | UTILITY | | $1,081.00 |
| VERIZON WIRELESS | 970466038-00001 | UTILITY | | $956.00 |
| VERIZON WIRELESS | 970077436-00001 | UTILITY | | $70.00 |
| VERIZON/FAIRPOINT COMM. | 007 301 8217 273,007 301 8217 801,603 224 0236 983,603 893 4175 383,207 772 9255 111 | UTILITY | | $547.00 |
| VERIZON/FAIRPOINT COMMU. | 603 893 4175 383 004 1,603 224 0236 983 004 4 | UTILITY | | $141.00 |
| VERIZON/FAIRPOINT COMMU. | 617 244 9255 383 001 1,978 977 9255 339 007 6,508 488 9255 599 007 7,617 536 9255 982 008 9 | UTILITY | | $341.00 |
| VILLAGE OF NYACK WATER | 5302548400 | UTILITY | | $7.00 |
| VILLAGE OF ORLAND PARK | 08-00011478 | UTILITY | | $12.00 |
| VIRGINIA NATURAL GAS | 6314001562 | UTILITY | | $17.00 |
| WASTE MAGT | 21101166802116 | UTILITY | | $79.00 |
| WASTE MAGT | 405003701422069,420810290020083,715012461817152,2110116688 02116,500019530905009,665000633423330,154090029821548 | UTILITY | | $386.00 |
| WASTE MAGT | 155005129601562,899002055610443 | UTILITY | | $78.00 |
| WASTE MAGT | 005000728724337,101000485727309 | UTILITY | | $713.00 |
| WASTE MAGT | 405003701422069 | UTILITY | | $37.00 |
| WASTE MAGT OF GASTONIA | 099005302520096 | UTILITY | | $85.00 |
| WASTE MAGT OF ILL. | 430001309220117,101000485727309,101003391227307,4218104675 20088,420810290920083,103000159627302 | UTILITY | | $370.00 |
| WASTE MAGT-MICHIGAN | 717005475717178 | UTILITY | | $104.00 |
| WASTE MAGT-PHILLY | 502003451505022,217073619222850,425002941524254,4400076505 24247,166002584120808,44001007502424,005000728724337 | UTILITY | | $891.00 |
| WASTE MANAGEMENT OF NW FL | 233000642122335 | UTILITY | | $288.00 |
| WASTE MGMT OF EASTERN NY | 965000131004491 | UTILITY | | $170.00 |
| WASTE MGMT-NORTHWEST | 01038370725145,155005129601562,502003771200502,20101767082 6779,572013109315716,585001705105854,573101624315749 | UTILITY | | $595.00 |
| WATER DIST. NO.1 | 400101914004 | UTILITY | | $18.00 |
| WE ENERGIES | 7663333316 | UTILITY | | $690.00 |
| WI SCTF | 010662855 | UTILITY | | $1,038.00 |
| WINDSTREAM  KY | 011 325 974 123,100665277,161 187 893 222 | UTILITY | | $587.00 |
| WITHLACOOCHEE RIVER ELEC | 1401250387890 | UTILITY | $870.00 | $382.00 |
| WSI WASTE SOLUTIONS, INC. | 0047001315 | UTILITY | | $106.00 |
| XCEL ENERGY - 121, 312 | 5333320666,5376217746 | UTILITY | | $1,135.00 |