Mette H. Kurth (SBN 187100)
Andy S. Kong (SBN 243933)
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013-1065
Telephone: 213.629.7400
Facsimile: 213.629.7401
E-mail: kurth.mette@arentfox.com
kong.andy@arentfox.com

*Proposed* Attorneys for Debtors and Debtors in Possession

Debtors' Mailing Address
121 Gray Avenue
Santa Barbara, CA 93101

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA BARBARA DIVISION**

In re:

**THE WALKING COMPANY**, a Delaware corporation, d/b/a Alan's Shoes, Footworks, Overland Trading Co., Sole Outdoors, and Martini Shoes, f/k/a TWC Acquisition Corporation,

Debtor.

Case No.: 09-bk-15138

Chapter 11

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL DIP ORDERS (A) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING; (B) GRANTING SUPERPRIORITY EXPENSE CLAIMS AND SECURITY INTERESTS; (C) AUTHORIZING USE OF CASH COLLATERAL; AND (D) GRANTING OTHER RELIEF UNDER 11.U.S.C. §§ 105, 361, 362, 363, AND 364, F.R.B.P. 2002 AND 4001; AND LBRS 2002-1 AND 4001-2; MEMORANDUM IN SUPPORT THEREOF**

**Hearing**

DATE: TBD

TIME: TBD

PLACE: 1415 State Street
Santa Barbara, CA 93101

## TABLE OF CONTENTS


Page

I. BACKGROUND FACTS .... 3
- A. Company Overview .... 3
  - 1. The Company's Business Segments and Retail Operations .... 3
  - 2. Big Dog USA, Inc., d/b/a Big Dog Sportswear .... 3
  - 3. The Walking Company .... 4
- B. The Expansion of The Walking Company's Retail Operation .... 4
- C. The Recession and Events Leading to These Chapter 11 Filings .... 5
- D. The Company's Substantial Progress in Pre-Negotiating a Plan of Reorganization .... 8

II. THE CONSOLIDATED BALANCE SHEET .... 10
- A. The Company's Assets .... 10
- B. The Company's Liabilities .... 11

III. THE IMMEDIATE AND CRITICAL NEED FOR FINANCING .... 14
- A. Negotiation of the DIP Financing Agreement .... 16
- B. The DIP Loan and Summary of Terms Contained in the DIP Financing Agreement .... 17
- C. Local Rule 4001-2 Disclosures .... 23
- D. The Proposed DIP Financing Represents the Best Financing Available to the Company Under the Circumstances .... 23

IV. RELIEF REQUESTED .... 24

V. BASIS FOR RELIEF REQUESTED .... 26
- A. Emergency Consideration of this Motion Is Appropriate .... 26
- B. Approving the DIP Financing Agreement Is Appropriate .... 27
- C. The Company Has Satisfied the Requirements Under Bankruptcy Code & 364(c) and Should Be Allowed to Borrow on a "Super-priority" and Senior Secured Basis .... 29
- D. The Company Has Satisfied the Requirements of Bankruptcy Code § 364(d) .... 30
- E. The DIP Facility Is Supported by the Exercise of Sound Business Judgment and Good Faith .... 31

VI. REQUEST FOR FINAL HEARING .... 34

VII. WAIVER OF BANKRUPTCY RULE 6004(H) .... 34

VIII. CONCLUSION .... 35

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) .......... 28

Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) .......... 28

Burchinal v. Cent. Washington Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1488 (9th Cir. 1987) .......... 32

FCX, Inc., 54 B.R. 833, 840 (Bankr. E.D.N.C. 1985) .......... 32

Keystone Camera Prods. Corp., 126 B.R. 177, 182-83 (Bankr. D.N.J. 1991) .......... 32

Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) .......... 28

Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.), 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) .......... 31

Richmond Leasing v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) .......... 31

Roblin Indus., Inc., 52 B.R. 241, 245 (Bankr. W.D.N.Y. 1985) .......... 33

Stacy Farms, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987) .......... 28

Stein & Day, Inc., 87 B.R. 290, 292 (Bankr. S.D.N.Y. 1988) .......... 32

Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 364 (W.D. Mich. 1986) .......... 32

Vanguard Diversified, Inc., 31 B.R. 364, 367 (Bankr. E.D.N.Y. 1983) .......... 33

## Federal Rules

Fed. R. Bankr. P. 4001(c)(2). .......... 27

**TO THE HONORABLE ROBIN L. RIBLET, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; THE DEBTORS' SECURED LENDER; THE DEBTORS' 20 LARGEST UNSECURED CREDITORS; THE NOTEHOLDERS AND OTHER SECURED CREDITORS; AND ALL PARTIES ENTITLED TO SPECIAL NOTICE:**

The Walking Company ("TWC")[1] hereby moves this Court, on an emergency basis, for entry of an order (the "Interim Order"), substantially in the form annexed hereto as Exhibit 2, approving certain postpetition financing, and following a final hearing (the "Final Hearing"), requests entry of a final order granting the relief requested herein (the "Final Order", and with the Interim Order, the "Financing Orders").

By this Motion, the Company seeks interim and final approval of the $30 million postpetition financing (the "DIP Facility") that it has negotiated with Wells Fargo Retail Finance, LLC, as Agent ("WFRF" or "DIP Agent"), substantially on the terms and conditions set forth in that certain Ratification and Amendment Agreement (the "DIP Financing Agreement") among the Company, WFRF, and the lenders party thereto (the "DIP Lenders"), a true and correct copy of which is attached hereto as **Exhibit 1**, and the proposed Interim Order, a true and correct copy of which is attached hereto as **Exhibit 2**.[2]

The Company is requesting that the Court set the hearing on this Motion at the earliest possible time on whatever notice the Court may direct, but in no event later than December 9, pursuant to the accompanying *Ex Parte Application for Order Shortening Time for Hearing on the Debtors' Emergency First Day Motions*. The Company does not have sufficient sources of working capital to carry on the operation of its business during this case without the DIP Facility. Uninterrupted operations are critical to a successful

---

[1] TWC's debtor affiliates are its parent company, The Walking Company Holdings, Inc., a Delaware corporation ("Holdings"), and its subsidiary, Big Dog USA, Inc., a California corporation ("Big Dog"). Holdings and Big Dog have filed joinders to this Motion. (TWC, Holdings and Big Dog are collectively referred to as the "Company" or the "Debtors").

[2] Any undefined capitalized terms in this motion shall have the meaning ascribed to them in the DIP Financing Agreement or the Interim Order.

reorganization, and the financing provided by the DIP Facility will ensure that the Company's vendors continue their business relationship with an operating company and allow the Company to restructure its lease portfolio and confirm a plan of reorganization. To expedite the parties' consideration of this Motion, the Company has already served a courtesy copy of this Motion on the parties identified above by overnight mail (or, if consent was provided, by electronic mail).

This Motion is based on the attached Memorandum of Points and Authorities (the "Memorandum"); the Declaration of Andrew D. Feshbach in Support of Emergency "First Day" Motions (the "Feshbach Declaration") and the Declaration of Roberta J. Morris in Support of Emergency "First Day" Motions (the "Morris Declaration"), filed with the Court concurrently herewith; and the arguments, evidence, and representations that may be presented at or prior to the hearing on this Motion.

**WHEREFORE**, the Company respectfully requests that the Court (i) following the Interim Hearing, enter the Interim Order approving the DIP Facility with WFRF under sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure 2002, 4001, 6004 and 9014, and Local Bankruptcy Rules 4001-2, 2002-2 and 9013, on the terms set forth in the DIP Financing Agreement; (ii) approve the form and scope of notice of the Final Hearing and schedule the Final Hearing on the Motion; (iii) following the Final Hearing, enter the Final Order; and (iv) grant such other and further relief as may be just and proper.

Dated: December 7, 2009

**ARENT FOX LLP**

By: */s/ Mette H. Kurth*
Mette H. Kurth
Andy S. Kong
*Proposed* Attorneys for the
Debtors and Debtors in Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## BACKGROUND FACTS

### A. Company Overview

#### 1. The Company's Business Segments and Retail Operations

a. Walking Company Holdings, Inc.

Holdings is a holding company trading on the pink sheets under the symbol "WALK." Holdings' assets consist primarily of the stock of its two operating subsidiaries and the trademarks, copyrights, and other intellectual property used in the operation of TWC and Big Dog, which Holdings licenses to its subsidiaries. The Company utilizes a variety of trademarks that it owns, including the U.S. registered trademarks THE WALKING COMPANY®, BIG DOGS®, BIG DOG SPORTSWEAR®, and a dog logo.

Fred Kayne, who is also the Chairman of the Board of Directors of Holdings, controls Holdings through his ownership of approximately 56% of Holdings' outstanding stock. Fred Kayne's brother, Richard Kayne, owns approximately 9% of Holdings' outstanding stock, and Andrew Feshbach owns approximately 7% of the outstanding stock.

#### 2. Big Dog USA, Inc., d/b/a Big Dog Sportswear

Big Dog products have been sold since 1983, but until Big Dog and its business were acquired by Holdings in 1992, its operations were limited. Big Dog's product line originally concentrated on its branded collection of T-shirts, shorts, and other casual sportswear featuring graphic designs focused on the BIG DOGS® trademark and a dog character known as "Big Dog." Big Dog develops, markets, and retails this clothing line and related accessories and gifts for men, women, and children. In the years following its acquisition, Big Dog leveraged the Big Dog brand through expansion of its product line and growth of its retail chain in outlet malls throughout the United States, as well through a catalog and internet business and certain other venues. At its height, Big Dog revenues exceeded $100 million annually, and it operated more than 200 stores.

After years of early growth, Big Dog reached a level of maturity in its number of stores and breadth of product. In 2007 and 2008, Big Dog began to incur significant losses as customer traffic and sales in its outlet-based stores declined. After attempts to sell Big Dog in the fall 2007 and early 2008 were unsuccessful, in mid-2008 Big Dog achieved a successful out-of-court workout, through which Big Dog was able to stem further losses by reducing the chain from over 140 stores to the eight stores that remain at present, all of which are scheduled to be closed by year end. After the shutdown of its remaining stores, Big Dog operations will be limited, consisting mainly of internet sales. The Company has under consideration a business plan to reopen Big Dog stores on a limited basis.

Although the shutdown of the Big Dog retail chain stemmed further operating losses, it imposed on the Company a workout cost of over $3 million, reduced overall revenue, created illiquidity, and burdened TWC with a greater share of the Company's overhead costs.

3. The Walking Company

Founded in 1991, TWC is a retailer of high-quality, technically designed comfort footwear and accessories for men and women featuring leading comfort brands from around the world, including ECCO®, Dansko®, UGG®, MBT®, and Aetrex®. When TWC was acquired by Holdings, it was comprised of 72 retail stores located primarily in regional malls.

**B. The Expansion of The Walking Company's Retail Operation**

After acquiring TWC the year before, in 2005 the Company tested the expansion of TWC's retail stores by opening 12 new stores featuring an updated look and appeal. This new look was a key part of TWC's implementation of an effective, coherent marketing image and strategy. This strategy has been implemented through a newly-developed store design and supporting marketing endeavors. Through new store development and refitting old stores, the large majority of the chain now has the new design. TWC further continues its brand awareness through consistent store layout and image, collateral

materials (in-store posters, etc.), and development of brand-identifying trademarks and slogans.

Encouraged by strong sales results and profitability in its test stores, TWC entered a period of strategic expansion of its store chain, opening approximately 140 new stores and more than doubling in size from 2006 though 2008 by leasing and building-out new stores as well as by acquiring existing retail footwear stores for conversion into TWC stores. In September 2005, TWC acquired the assets of Footworks, a division of the privately held shoe retailer Bianca of Nevada, Inc. In January 2006, it acquired substantially all the assets of Steve's Shoes, Inc., one of the largest independent comfort shoe retailers in the country, through a bankruptcy auction. And in January 2008, it acquired substantially all assets of Natural Comfort Footwear, Inc., one of the largest independent comfort shoe retailers in Florida. All of these stores were converted to The Walking Company stores. TWC has also developed an internet presence to generate sales and promote its store-based business.

TWC's cost to open a store in 2007, including leasehold improvements and furniture and fixtures, was approximately $293,000. The average per store initial inventory for the new 2007 stores was approximately $201,000 and pre-opening expenses averaged approximately $18,000 per store. TWC financed the capital costs of its expansion from its revenues and also through the issuance in 2007 of $18.5 million of 8.375% Convertible Notes due 2015 (the "Notes").

During this period of expansion, the Company built up its infrastructure and overhead to accommodate the expanded TWC chain. Today, TWC is the nation's leading specialty retailer of authentic comfort footwear, operating 210 stores in premium malls across the nation.

### C. <u>The Recession and Events Leading to These Chapter 11 Filings</u>

From 2005 through 2008, as the Company expanded its TWC operations across the country, it also experienced significant growth in TWC product sales. TWC's total net annual sales increased from $179.1 million in 2005, to $218.6 million in 2006, to $233.3

million in 2007, and to $241.5 million in 2008. TWC's gross profits for this period increased from $98.8 million in 2005, to $116.9 million in 2006, to $122.4 million in 2007, and decreased to $117.5 million in 2008.

During this period of expansion, the Company agreed to the high rent levels then required by landlords based on industry-wide customer traffic and sale assumptions. However, these assumptions failed to materialize when the economy in general, and the retail business in particular, went into serious decline in 2008 and 2009. The Company's total net annual sales for 2008 of approximately $242 million—while still representing an increase over 2007 sales—were lower than had been projected. When combined with significant expansion costs related to the growth of TWC, as well as the one-time costs associated with the downsizing of Big Dog, the Company generated a loss from operations of $5.3 million in 2008.

Mall traffic and retail sales have continued to be weak throughout 2009. As the retail and real estate markets have continued to decline, the vast majority of the Company's leases became burdened with substantially over-market rents. And for the first time during this period, the Company's gross sales have decreased. Through the third quarter of 2009, the Company's gross sales were $126 million, and the Company generated a loss from operations of $14.1 million. The Company projects that gross sales for the full year 2009 will be approximately $193 million. (However, this projection is based on the assumption that the Company's proposed store-closing sales are permitted by this Court and can proceed as anticipated. If these steps are not promptly approved, sales projections will have to be reduced accordingly.)

Meanwhile, as TWC began incurring losses in 2008, which continued throughout 2009, its borrowing base diminished and the Company's availability under its credit line with WFRF was reduced accordingly. In early 2009, the Company concluded that it would not be able to weather the continuing economic recession and the depressed retail environment without strengthening its financial capital position. In early 2009, the Company made inquiries to various financial firms about a possible capital infusion.

Those efforts were unsuccessful largely due to concerns about the Company's now-current lack of operating profits and the locked-in high rents in its lease portfolio. The Company also made inquiries within the retail industry in early 2009 regarding potential interest in the purchase of the Company. But potential acquirers expressed similar concerns about the Company's lack of operating profits and over-market lease rents, especially with respect to the Company's newer stores.

While pursuing these options during early 2009, the Company also proceeded to develop and sought to implement a turn-around plan for TWC in an effort to strengthen its financial capital position. As discussed in the Feshbach Declaration, some of the key elements of the turn-around plan, which has focused on cost cutting, financial restructuring, and efforts to renegotiate its lease obligations.

While the Company was successful in implementing all other elements of its turn-around plan and achieving significant cost reductions, its landlords have largely refused to provide meaningful rent reductions. After originally proposing rent reductions to the landlords in early spring of 2009, members of the Company's management team spent the entire balance of 2009 though the Petition Date persistently seeking much needed rent reductions, but without meaningful success. TWC's landlords, while acknowledging that many of TWC's rents are above-market and/or above the percentage of sales at which they were originally set, have largely refused the requested reductions.

Accordingly, it is now apparent that the Company cannot consensually obtain the rent concessions that would be needed to strengthen its financial capital position sufficiently to weather the continuing economic recession. With its turn-around plan hindered by a lack of landlord cooperation, and with the capital markets and buyout environment remaining dormant, there are few practical alternatives for the Company. In consultation with the Company's financial advisors, the Company has concluded that it is now necessary for the Company to pursue a "right sizing" strategy that will permit it to adjust its lease portfolio, reorganize around its profitable stores, and eliminate those stores whose continued operation would prevent a successful reorganization.

**D. The Company's Substantial Progress in Pre-Negotiating a Plan of Reorganization**

As noted above, TWC more than doubled in size by adding 140 stores to its portfolio from 2006 through 2008, which is now widely recognized as having been the height of the commercial real estate market. Today, the large majority of TWC's leases have over-market rents. The Company has developed a turnaround plan, outlined in greater detail below, through which it intends to divest its unprofitable and marginal leases, and retain those stores that are profitable and contributing significantly to the Company's revenue, as well as its internet sale portal. The Company believes that this right-sizing of TWC's lease portfolio will enable the Company to emerge from chapter 11 with profitable operations and generating $140 million in annual revenue.

The key element to implementing this right-sizing plan in an orderly fashion that preserves the value of the Company is that the Company be allowed immediately to conduct store-closing sales during the current holiday season. In order to efficiently manage the shutdown of such a large number of stores it is critical that the Company reduce inventory levels in such stores to a manageable level without having to deeply discount such inventory. The Company believes that customer demand will drop off sharply after the current holiday season. Therefore if the Company is required to delay store-closing sales until the early winter months of 2010, it will be required to more drastically cut pricing in order to reduce inventory levels and do more "down to the bare-bones" store-closing sales. Having to conduct inventory "fire sales" will reduce revenues to the estate, harm the Company's relationship with key vendors (whose products are being discounted) and likely prompt considerable landlord opposition. And as a result, any delay in allowing the store-closing sales will likely cause them to fail and thereby jeopardize the Company's entire plan of reorganization.

Generating higher revenues by conducting store-closing sales during the holiday season will also allow the Company to pay down a greater amount of its obligations to WFRF. With the WFRF obligations "right sized" as well, so that they are consistent with

the Company's smaller scale of operations following its exit from chapter 11, the Company anticipates that WFRF will provide the exit financing needed to support the Company going forward.

In fact, over the last several months the Company and its advisors have been negotiating the terms of a reorganization plan for the Company in the event that landlord negotiations proved to be unsuccessful. After substantial negotiations, and after fully vetting the Company's plans for right-sizing its lease portfolio and the benefits of a reorganization through chapter 11, the Company has obtained a commitment in principle with respect to the key terms of a chapter 11 plan under which, among other things, $10 million in new capital will be provided to the reorganized company by an investor group lead by Richard Kayne of Kayne Anderson Capital Advisors, LP ("Kayne Anderson") pursuant to a confirmed plan of reorganization, in exchange for which the investor group will receive the equity in the reorganized company. All old equity interests will be cancelled. Of this new value investment, approximately $2 million will be made immediately available to make distributions to unsecured creditors under the plan. The remaining $8 million will be used first to pay for the Company's reorganization costs, including an estimated $6 million in administrative and priority claims, with the remaining balance, estimated to be $2 million, to be retained as working capital for the reorganized company.

The Company, together with its financial advisors, have also spent the last month negotiating with WFRF to secure post-petition and exit financing for the Company. The Company has obtained support, in principle, for the reorganization plan outlined above from WFRF and other key secured creditors. WFRF has agreed to provide the Company with debtor-in-possession financing to support its reorganization effort, and the Company and WFRF are engaged in constructive and on-going discussions regarding exit financing, which the Company anticipates will also be provided by WFRF.

The Company, as well as the Company's legal advisors, have also had positive discussions with the Company's key trade vendors during the last two months. Certain of

these vendors began forming an *ad hoc* trade committee during the weeks prior to the filing of these cases in order to be further involved in the negotiations regarding the Company's chapter 11 plan. Discussions with these vendors have been very constructive. The Company has obtained commitments from key vendors to continue to ship product to the Company during the course of these chapter 11 cases, and the vendors have indicated that they are generally supportive of the Company's plans for reorganization.

With these pre-negotiated commitments and financings in place, if the Company is allowed to restructure its lease portfolio as proposed and to begin immediately advertising its store-closing sales so as to maximize the value of its inventory during the critical 2009 holiday shopping season, the Company can emerge from chapter 11 as a strong, recapitalized, and profitable business.

To implement its reorganization strategy, on December 7, 2009, the Company filed voluntary petitions for relief under the Bankruptcy Code. The Company is continuing to operate its business and manage its affairs as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. The Company and its legal and financial advisors plan to rapidly finalize a reorganization plan consistent with the agreements that have already been reached with the Company's key constituencies. The Company intends to file this plan of reorganization with the Court by the end of December 2009, and the Company will be seeking confirmation of its plan promptly thereafter, with an anticipated exit from Chapter 11 as early as the end of the first quarter of 2010.

## II.

## THE CONSOLIDATED BALANCE SHEET

### A. The Company's Assets

Based on the Company's books and records, as of September 30, 2009, the Company's unaudited balance-sheet assets totaled approximately $110.1 million. Of this amount, the Company held, on a book value basis, approximately $49.7 million in net inventories; fixed assets (including property and equipment) of $35.1 million, net of

depreciation; $14.0 million in deferred income taxes; $2.9 million in intangible assets (including intellectual property); $1.4 million in net accounts receivable; prepaid expenses of $0.9 million; $0.5 million in cash; and other assets totaling $5.6 million. While the Company has not yet closed its books for November 2009, it estimates that the total assets as of that date, and the Petition Date, will be approximately $103 million, representing a slight reduction in inventory as a result of usual back-to-school and pre-holiday sales.

**B. The Company's Liabilities**

Based on its books and records, as of September 30, 2009, the Company's unaudited, balance-sheet liabilities totaled approximately $84.5 million. This amount includes the $30.6 million outstanding under the secured prepetition credit facility and other agreements owing to WFRF; $18.5 million in principal owing under the Notes; approximately $12.3 million in trade debts; $11.6 million in deferred rent and lease incentives; $1.7 million due under an unsecured term note; $1.5 million in capital lease obligations; $1.0 million in insider stock option notes; and $7.3 million in accrued expenses and other current liabilities. Although the Company has not yet closed its books for November 2009, it estimates that the total liabilities as of that date, and the Petition Date, will be approximately $76 million, representing a slight reduction in obligations to WFRF and accounts payable as fall inventory has been liquidated through ordinary, seasonal sales. Some of the Company's more significant liabilities are described in more detail, below.

***The Prepetition Pre-Petition Facility.*** Wells Fargo Retail Finance, LLC (as successor in interest to Wells Fargo Retail Finance II, LLC), a Delaware limited liability company, as arranger and administrative agent for the lenders, and the Company (including each subsidiary) are parties to a *First Amended, Restated, and Consolidated Loan and Security Agreement, dated as of July 7, 2005* (as amended by nine amendments thereto, the "Pre-Petition Financing Agreement"). The Pre-Petition Financing Agreement provides for a total commitment of $60 million (the "Pre-Petition Facility"), with the ability for the Company to issue documentary and standby letters of credit of up to $8

million. The Company's ability to borrow under the facility is determined using an availability formula based on eligible assets, and pursuant to this formula, the Company had approximately $100,000 in availability under the Pre-Petition Financing Agreement on December 4, 2009. As part of the earlier attempt to turn-around the Company outside of bankruptcy, in March 2009 Fred Kayne and Andrew Feshbach provided personal guaranties of the Company's obligations to WFRF in order to obtain an over-advance facility. Such over-advance facilities having been paid in full by the Company in October 2009, the guaranties were then withdrawn.

As of the Petition Date, the approximate loan balance under the WFRF Pre-Petition Facility is approximately $25 million and there are no outstanding letters of credit. The interest rate under the Pre-Petition Financing Agreement ranges from the bank's base rate plus a margin of 0.5% or a LIBOR loan rate plus a margin ranging between 1.75% and 2.25% depending upon the average excess availability under the WFRF Pre-Petition Facility. As of the Petition Date, the interest rate for the outstanding base rate loans was 3.75% and the interest rate for the outstanding LIBOR rate loans was between 2.489% and 2.492%.

The WFRF Pre-Petition Facility is collateralized by substantially all of the Company's assets and requires daily, weekly and monthly financial reporting as well as compliance with financial, affirmative, and negative covenants. Based on the value of WFRF's collateral, which includes approximately $49.6 million in net inventories, the outstanding indebtedness owing under the Pre-Petition Financing Agreement is more than fully secured.

***8.375% Convertible Notes due 2015.*** On April 3, 2007, the Company entered into a *Convertible Note Purchase Agreement* with certain purchasers pursuant to which the Company issued and sold $18.5 million of Notes. Among other features of the Notes, they are convertible into fully paid and nonassessable shares of the Company's common stock to an aggregate of up to 1,027,777 shares at any time after the issuance date, at an initial conversion price of $18.00 per share.

If the Notes are not converted before their maturity, the Notes will be redeemed by the Company on the maturity date at a redemption price equal to 100% of the principal amount of the Notes then outstanding, plus any accrued and unpaid interest. The net proceeds of the Notes, after debt issuance costs, were used to reduce the outstanding balance of Company's Pre-Petition Facility with WFRF, and thereby to support TWC's store expansion throughout 2006 and 2007.

Effective as of April 1, 2009, as noted above, the Company negotiated with the holders of the Notes (the "Noteholders") an agreement to amend the Notes to provide that the interest on the Notes could be paid through "PIK Interest" for up to eight quarters, at the Company's option, beginning with interest accrued from January 1, 2009, and to extend the maturity of the Notes by three years. In exchange for these concessions, among other things, the Noteholders required that the Company secure its obligations under the Notes with a junior security interest in substantially all of its assets (excluding certain trademarks and other intellectual property relating to Big Dog), subject and subordinated to the security interests of WFRF under the Pre-Petition Financing Agreement.

In addition, the following Noteholders—Kayne Anderson Capital Income Partners (QP), LP; the Cotsen Family Foundation; The Kayne Foundation, Richard A. Kayne, Trustee; and Richard & Suzanne Kayne Living Trust dated 1/14/99—who are collectively owed approximately $12 million in principal amount of Notes, agreed to amend their Notes to provide that the outstanding principal amount of the Notes would be reduced by 25%, conditioned upon the Company's landlords agreeing to grant certain rent concessions to the Company no later than December 1, 2009. The Company was not able to achieve these rent concessions.

***Deferred Rent and Lease Incentives.*** In response to the Company's requests for rent relief, which began in the spring of 2009, landlords generally refused to provide actual rent reductions. Some landlords agreed to defer a portion of TWC's monthly rent for a certain number of months in 2009, with TWC to pay back that deferred-rent amount

in 2010, or in later years. In some cases, interest was required on the deferred rent. Various concessions were required of the Company in order to obtain these rent deferrals, such as agreements to open new, temporary stores or waivers of options. Some landlords, without any written agreement, did not enforce their rights under their leases when TWC had no option but to take unilateral rent reductions. Some of these landlords expressly reserved the right to declare a default at any time if the Company did not eventually pay the landlord the unpaid rent.

***The Term Note.*** As part of the acquisition of Natural Comfort, Inc., TWC issued a $1,700,000 three-year unsecured promissory note to the seller. The principal on this note is payable on January 15, 2011. The note bears an interest rate of 7.0% and accrued interest is payable quarterly.

**III.**

**THE IMMEDIATE AND CRITICAL NEED FOR FINANCING**

As described above, the deteriorating economy had a sharp adverse impact upon the Company's sales. That drop coupled with the above-market rents it is paying to its landlords, has left the Company with insufficient liquidity under the Pre-Petition Facility to fund its ongoing obligations in the ordinary course of business. The Company requires immediate postpetition financing to maintain its operations, preserve the value of its operations, preserve the value of its assets, and preserve the value of its business as a going concern pending effectuation of its reorganization plan.

Given the Company's liquidity shortfall, there is no reason to believe that the Company would be able to operate solely in reliance on its cash collateral. Prior to filing for chapter 11, the Company approached WFRF, its existing lender about providing financing for the Company's restructuring effort. Because of the unavailability of debtor-in-possession generally, and in particular with respect to retail companies, the Company developed a reorganization plan that was specifically designed to overcome this lack of debtor-in-possession by meeting the needs of its existing pre-petition lender. The

Company's plan, in part, provides for a rapid, careful downsizing of its operations that will enable it to quickly reduce its outstanding obligations to WFRF, accompanied by a very aggressive timetable for confirmation that will ensure that the Company exits from chapter 11 well in advance of deadlines for assuming or rejecting its real property leases. WFRF has agreed to provide the DIP Facility in support of this plan. In exchange, the Company believes that the WFRF financing proposal addresses the Company's working capital and liquidity needs and will allow the Company the financing needed to restructure its lease portfolio and confirm a plan of reorganization.

The Company and WFRF engaged in good faith and extensive arm's length negotiations. The terms of the DIP Facility are set forth in the DIP Financing Agreement, as well as in the proposed Interim Order. The availability of the DIP Facility will provide more than just the necessary cash for the Company to operate its business. Equally important is the sense of confidence that the financing will instill in the Company's suppliers, customers, and employees. If the Company's suppliers failed to extend credit and services to the Company at this crucial time during the busy Christmas holiday season, the loss of customers and the impact on employee morale could have a profound negative impact on the Company's ability to reorganize and preserve value pending a reorganization of the Company's business.

It is also important to note that the approval of the DIP Financing Agreement will avoid the cost, delay, expense, and risk of a contested cash collateral battle. WFRF has indicated to the Company that it is not willing to consent to the Company's use of its cash collateral and would only extend financing under the terms set forth in the DIP Financing Agreement. The Company is currently negotiating an exit facility with WFRF. Given the status of these negotiations and the lack of alternative lenders willing to extend such financing, the Company is not willing to engage in a contested cash collateral fight when there are no assurances that it could find replacement exit financing in this current economic environment.

If the Company were to cease operations, its going concern value would be lost. The loss of potentially all of the Company's retail business, and related damage to its brand name during this critical 2009 holiday shopping season, would be devastating. The Company needs cash immediately, and it is critical that the Court consider and grant approval of the DIP Financing Agreement on an emergency basis. In particular, the Company has a critical need for cash to meet the payroll that is due for over 1,600 permanent employees on Friday, December 11, 2009. As discussed more fully below, failure to meet this regularly scheduled payroll may result in attrition, and the irreparable loss of many talented Company employees. If the Company does not obtain an immediate infusion of cash under the DIP Financing Agreement, the Company will not have the necessary funds to pay its employees for the work that they have performed in the last week or so, or for the work that is necessary now to preserve and protect the Company's retail business.

Equally important, the Company requires financing on a long-term basis in order to meet future payroll obligations for its employees, to pay for the costs of operating its business, to pay vendors and suppliers for inventory shipments, and to pay its obligations to taxing authorities. Without this financing, the Company's operations would grind to a halt and, as outlined herein, would decimate the value of the Company's going concern assets. There is no question that a cessation of operations and the liquidation of the Company's assets would result in a significant loss in value.

### A. Negotiation of the DIP Financing Agreement

The DIP Facility was negotiated over the last four weeks. WFRF is not affiliated with the Company. The negotiations were conducted at arms' length and in good faith. At all times, the Company sought to maximize the interests of the Company under the agreement and believes that the DIP Facility represents the best overall agreement for the Company that could be negotiated and available under the circumstances.

**B. The DIP Loan and Summary of Terms Contained in the DIP Financing Agreement**

Under the DIP Financing Agreement, TWC and Big Dog (collectively, the "Borrowers") will obtain from the DIP Agent, cash advances and other extensions of credit in an aggregate principal amount of up to $30 million on a revolving credit basis. Holdings will guarantee the obligations of the Borrowers under the DIP Financing Agreement. Borrowings under the DIP Financing Agreement are subject to a budget (the "Budget"), a copy of which is attached hereto as **Exhibit 3**. The principal terms of the DIP Facility, and a comparison of those terms with the Pre-Petition Facility are summarized as follows:[3]

| PROVISION | CONTENT | PREPETITION CONTENT |
|---|---|---|
| Borrowers | The Borrowers | Same |
| Guarantor | Holdings | Same |
| Lender | WFRF as agent for the DIP Lenders | Same |
| Total Commitment | Up to a maximum of $30,000,000 subject to availability based on borrowing base (less amount outstanding under the prepetition facility) with a $2,000,000 sublimit for letters of credit | Up to a maximum of $60,000,000 subject to availability based on borrowing base with a $8,000,000 sublimit for letters of credit |
| Borrowing Base | Established as a percentage of the Borrower's Eligible Inventory, plus Eligible Third Party Credit Card Receivables, less amounts outstanding under the Existing Revolving Loans, less reserves | Substantially the same |
| Uses of Funds | (i) To pay transaction fees and expenses associated with the DIP Financing Agreement, (ii) to finance working capital and general corporate | Typical and customary use restrictions similar to those found in comparable loan agreements. |

3 The discussion contained herein is intended as a summary of the terms and provisions of the DIP Financing Agreement. To the extent there is any discrepancy between the DIP Financing Agreement and this Motion, the terms of the DIP Financing Agreement as modified by the Financing Orders shall control. For the purposes of this summary, any undefined capitalized terms shall have the meaning ascribed to them in the DIP Financing Agreement or the Interim Order.

| PROVISION | CONTENT | PREPETITION CONTENT |
|---|---|---|
| | purposes of the Borrowers, (iii) to pay expenses arising in the Borrowers' Chapter 11 cases as may be approved by the bankruptcy court, and (iv) to pay down with collections the obligations under the Pre-Petition Facility | |
| Interest | **Non-Default Interest Rate**: LIBOR + 3.5%<br><br>**Default Interest Rate**: LIBOR + 5.5%. | **Non-Default Interest Rate**: LIBOR + 2.25% or Prime + 0.5%<br><br>**Default Interest Rate**: Non-Default Rate + 2.0%. |
| Maturity | Earliest of (i) April 15, 2010 (ii) a continuing event of default by Borrower as specified under the proposed DIP Financing Agreement; or (iii) emergence from Chapter 11 | October 23, 2011 |
| Events of Default | In addition to the events of default under the Pre-Petition Financing Agreement:<br>(i) **Breach or Non-Compliance**. Any Debtor's breach, default, violation or failure to timely and fully comply with any covenant or agreement set forth in the DIP Financing Agreement or any other agreement, document or instrument executed in connection therewith;<br>(ii) **Budget**. Failure to comply with the Budget (subject to permitted variances), including, without limitation, as to disbursements, cash receipts and inventory levels;<br>(iii) **Unauthorized Sale**. The sale or liquidation of Borrowers' equity, assets or business operations, except as contemplated under the DIP Financing Agreement;<br>(iv) **Financing Orders**. A breach or failure to comply with any term, covenant, representation, warranty or | Typical and customary events of default found in comparable loan agreements. |

| PROVISION | CONTENT | PREPETITION CONTENT |
|---|---|---|
| | requirement of any Financing Order or any other material order of the Bankruptcy Court;<br>(v) **Liens**. The granting in favor of any Person other than the DIP Agent of a security interest or Lien upon any property of any Debtor or any Debtor's estate, or a claim against any Debtor having priority over other security interests, Liens or claims in favor of the DIP Agent, except (i) to the extent that such Person had a security interest or Lien upon any property of such Debtor on the Petition Date which had priority over the security interests, Liens or claims of the DIP Agent existing on the Petition Date; or (ii) to the extent otherwise required or permitted under any Financing Order or any other order of the Bankruptcy Court;<br>(vi) **Stay Relief**. The granting in favor of any Person other than the DIP Agent or DIP Lenders of relief from the automatic stay if such relief could reasonably be expected to result in a Material Adverse Change;<br>(vii) **Conversion of Case**. The entry of an order converting the Case to a case under Chapter 7 of the Bankruptcy Code;<br>(viii) **Appointment of Trustee or Examiner**. The entry of an order appointing a trustee or an examiner with expanded powers in the Case;<br>(ix) **Non- Renewal; Reversal of Financing Orders**. The termination or non-renewal of the DIP Financing Agreement or the Financing Orders as a result of the objection of any third party being sustained by the Bankruptcy Court unless such objection is stayed on timely appeal, | |

| PROVISION | CONTENT | PREPETITION CONTENT |
|---|---|---|
| | or if the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Court without the prior written consent of the DIP Agent and DIP Lenders;<br>(x) **Claims Against Agent or Lenders**. Any claim is asserted against DIP Agent or DIP Lenders pursuant to Section 7 of the Interim Order or any successor provision in any subsequent Financing Order;<br>(xi) **Final Order**. The failure of a Final Order approving the financing contemplated by the Loan Agreement, as amended by this Amendment, be entered on or before 4:00 p.m. (Pacific Standard Time) on or before January 8, 2010;<br>(xii) **Termination Date**. The occurrence of any condition or event that permits the DIP Agent and/or the DIP Lenders to exercise any of the remedies set forth in the Financing Orders, including, without limitation, any event which causes the occurrence of the "Commitment Termination Date" as such term is defined in the Financing Orders, in each case without any notice, grace and/or cure period of any kind (except to the extent, if any, required or permitted under any Financing Orders or any other order of the Bankruptcy Court); and<br>(xiii) **Material Adverse Effect**. Any act, condition or event occurring after the date of the commencement of the Case that has a Material Adverse Effect upon the assets of any Debtor or the DIP Collateral or the rights and remedies of the DIP Agent and/or the DIP Lenders under the DIP | |

| PROVISION | CONTENT | PREPETITION CONTENT |
|---|---|---|
| | Financing Agreement or other Loan Documents;<br>(xiv) **Case Filing Deadlines.** (a) obtain a Final Order approving the DIP Financing Documents on or before January 8, 2010, (b) file a motion to reject the leases at the Targeted Stores by December 11, 2009 and obtain approval for such motion by December 22, 2009, (c) file a plan of reorganization and accompanying disclosure statement by December 31, 2009, in form and substance satisfactory to DIP Agent, (d) obtain approval of the disclosure statement for such plan by January 31, 2010, (e) achieve confirmation of such plan by March 15, 2010, and (f) have the effective date of such plan occur by April 15, 2010; and<br>(xv) **Financial Reporting.** Failure to comply with the financial reporting requirements identified in the DIP Financing Agreement. | |
| Liens/Collateral | Valid and perfected first priority priming liens on and security interests in substantially all assets owned by Debtors, except avoidance actions other than avoidance actions under section 549 of the Bankruptcy Code (the "**DIP Collateral**"), subject only to certain permitted liens and a professional fee carveout as described herein. | Valid and perfected first priority liens on and security interests in substantially all assets owned by Debtors, subject only to certain permitted liens |
| Fees | **Closing Fee**: $300,000<br><br>**Unused Line Fee:** 0.75%<br><br>**Monthly Administrative Fee**: $2,500<br><br>**Standby Letters of Credit Fee:** | <br><br>**Unused Line Fee:** 0.375%<br><br>**Monthly Administrative Fee**: same<br><br>**Standby Letters of Credit** |

| **PROVISION** | **CONTENT** | **PREPETITION CONTENT** |
|---|---|---|
| | 3.5%<br><br>**Documentary Letters of Credit Fee:** 3.0% | **Fee:** 1.0%<br><br>**Documentary Letters of Credit Fee:** 0.5% |
| Grant of super-priority claim or lien pursuant to §§364(c) and (d) to DIP Lender | **Super-priority administrative expense claim pursuant to § 364(c)(1):** DIP Agent is granted a super-priority administrative expense claims, including with respect to avoidance action claims and recoveries, subject to the Carve Out; no exclusion for proceeds of avoidance actions<br><br>**First-priority lien on substantially all of the property of the estate**: DIP Agent is granted a first-priority priming lien on all of the Debtors' assets, subject only to certain permitted liens and the Carve Out; no exclusion for proceeds of avoidance actions | N/A |
| Grant of super-priority adequate protection claim or lien pursuant to §§ 364(c) and (d) to Pre-Petition Lender | **Super-priority administrative expense claim pursuant to § 364(c)(1):** Pre-Petition Agent is granted a super-priority administrative expense claim to the extent of any diminution in the value of the prepetition collateral, subject only to the super-priority claim granted to the DIP Agent and the Carve Out; no exclusion for proceeds of avoidance actions<br><br>**Adequate protection/replacement lien to Pre-Petition Agent**: The Pre-Petition Agent is granted adequate protection/replacement liens on same collateral that is subject to DIP Lien to the extent of any diminution in value of the prepetition collateral, subject only to the DIP Liens, certain | |

| PROVISION | CONTENT | PREPETITION CONTENT |
|---|---|---|
| | permitted liens, and the Carve Out | |
| Professional Fee Carve-Out | Carve Out for (i) all court and U.S. Trustee fees under 28 U.S.C. §1930(a) and (ii) post-termination date professional fees and expenses of up to $200,000 for estates' professionals. In addition, as reflected in the Budget, $200,000 per week will be funded into escrow for payment of pre-termination date fees and expenses of estates' and the DIP Agent's professionals | |
| Release or waiver of surcharge claim under § 506(c) | Upon entry of the Final Order, surcharge is prohibited, except for Carve Out. | |

### C. Local Rule 4001-2 Disclosures

Local Rule 4001-2 requires that the Company highlight certain "extraordinary" provisions contained within the DIP Financing Agreement or the Financing Orders being requested in connection with the Motion. These provisions are identified in Form F 4001-2, which is attached hereto as **Exhibit 4**. The DIP Agent and the DIP Lenders would not have agreed to provide financing to the Company absent these provisions.

### D. The Proposed DIP Financing Represents the Best Financing Available to the Company Under the Circumstances

As discussed above and in the Feshbach Declaration, the Company has been actively seeking a capital infusion and additional financing through 2009. However, it has been hampered not only by above-market rents and a drop off in sales revenue but also by the lack of capital and financing in today's economy. In particular, most lenders have been unwilling to provide financing to support a retailer's reorganization efforts since the Bankruptcy Code was amended in 2005, which amendments imposed significant obstacles to retailer restructurings, including aggressive and inflexible deadlines for the assumption or rejection of their real estate leases. Based on its experience throughout 2009, and after

consulting with its legal and financial advisors, the Company concluded that it would be extremely difficult, if not impossible, to obtain financing from anyone other than its existing lender.

After the Company presented the DIP Agent with its plans for reorganization, hinging in part on a very rapid emergence from chapter 11, the Company succeeded in securing a financing proposal. The Company believes that the available financing represents its only real opportunity to meet the various and urgent financing needs within the Company's time constraints. As negotiated, the DIP Financing Agreement will enable the Company to purchase inventory, compensate its employees, pay its postpetition creditors, operate its various stores, and maximize the value of its business and operations. The Company's ability to reorganize or realize the maximum value for its assets is dependent upon its ability to obtain the postpetition credit sought herein, and the DIP Facility appears to be the only viable alternative available.

The Company negotiated the terms of the DIP Facility and the DIP Financing Agreement with the DIP Agent in good faith (as defined in section 364(e) of the Bankruptcy Code), with all parties represented by experienced counsel. The Company believes that the negotiated terms are fair and reasonable under the circumstances of these cases.

## IV.

## RELIEF REQUESTED

By this Motion, the Company seeks entry of orders (the "Financing Orders"), pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014, to:

(i) Obtain credit and incur debt, pursuant to sections 363, 364(c) and 364(d) of the Bankruptcy Code, on an interim and final basis up to the aggregate committed amount of $30,000,000 (on terms and conditions more fully described herein), including the Partial Roll-Up of the outstanding balance of the Pre-Petition Facility, secured by first priority, valid, priming,

perfected and enforceable Liens (as defined in section 101(37) of the Bankruptcy Code on property of the Debtors' estate pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, subject only to Permitted Prior Liens, and with priority over all other administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii) (a) Establish the DIP Facility, including a Partial Roll-Up of the outstanding balance of the Pre-Petition Facility pursuant to (I) the terms of the Pre-Petition Financing Agreement, as amended by the DIP Financing Agreement, substantially in the form of Exhibit 1 to the DIP Motion, by and among Big Dog and TWC, each as a borrower, the DIP Agent, and the DIP Lenders, and (II) the DIP Financing Documents; and (b) incur the obligations under the DIP Financing Agreement;

(iii) Authorize (a) the use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Documents) in each case in a manner consistent with the terms and conditions of the DIP Financing Documents, and in accordance with the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Financing Agreement) solely for (1) working capital and general corporate purposes, (2) payment of costs of administration of these Cases, to the extent set forth in the Budget, and (b) upon entry of the Financing Orders, the automatic conversion of all pre-petition Letters of Credit issued under the Pre-Petition Financing Agreements to Letters of Credit deemed issued under the DIP Financing Documents, and (c) the payment in full of the Pre-Petition Debt in accordance with the terms of this Interim Order and the DIP Financing Documents, subject to the rights of any statutory committee appointed pursuant to section 1102 of the Bankruptcy Code or any other party in interest other than the Debtors.

(iv) Authorize the Pre-Petition Agent (for the benefit of the Pre-Petition Lenders) to apply all Collections (as defined in the Pre-Petition Financing Agreements as such term is defined below) received in the ordinary course of business from and after the Petition Date and prior to the occurrence of the Commitment Termination Date: (a) first, to reduce the Pre-Petition Debt, and (b) second, to reduce the obligations under the DIP Facility pursuant and subject to the provisions of the Financing Orders;

(v) Grant, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Secured Parties) first priority priming, valid, perfected and enforceable Liens, subject only to the Carve-Out and the Permitted Prior Liens, upon all of the Debtors' real and personal property except for Avoidance Actions as

provided in and as contemplated by the Financing Orders, the DIP Facility and the DIP Financing Agreement;

(vi) Grant, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders) super-priority administrative claim status in respect of all obligations under the DIP Facility, subject to the Carve Out as provided herein;

(vii) Authorize the use of "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral") in which the DIP Agent and the DIP Lenders have an interest;

(viii) (A) Grant the Pre-Petition Agent (for the benefit of the Pre-Petition Lenders) pre-petition replacement liens and pre-petition super-priority claims to the extent of any pre-petition diminution in value of the Pre-Petition Agent's interest in the Pre-Petition Collateral as adequate protection for the granting of the DIP Liens to the DIP Agent, the use of Cash Collateral, and for the imposition of the automatic stay; and (B) make adequate protection payments;

(ix) Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Documents and the Interim Order;

(x) Schedule the Final Hearing to consider entry of the Final Order granting the relief requested in this Motion on a final basis; and

(xi) Waive the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 6004(h) and provide for immediate effectiveness of the Financing.

**V.**

**BASIS FOR RELIEF REQUESTED**

**A. Emergency Consideration of this Motion Is Appropriate**

Bankruptcy Rule 4001(c) governs the procedure for consideration of motions to obtain post-petition financing. Subsection (c)(2) provides for an expedited consideration of the Motion:

> If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid

> immediate and irreparable harm to the estate pending a final hearing.[4]

Local Bankruptcy Rule 2081-1(a)(9) also provides for an expedited consideration of the Motion.

The DIP Facility is needed to pay the Company's essential operating expenses. If the Company is not authorized to obtain financing under the DIP Facility and the DIP Financing Agreement on an interim and final basis, the Company will be unable to purchase inventories, goods and services, meet the needs of customers, or pay their ordinary operating expenses. Without the proposed financing, therefore, the Company will be unable to preserve its value as a going concern pending the restructuring of its lease portfolio and consummation of its reorganization plan. Indeed, absent such financing the Company would be faced with an uncertain and contentious cash collateral fight with the DIP Agent, at best, or the possibility of conversion of the Case to a case under Chapter 7 of the Bankruptcy Code. The Company's continued viability and its ability to reorganize successfully or recognize maximum going concern value of its business depends heavily upon the timely approval of the DIP Facility and the DIP Financing Agreement and the related relief requested herein.

**B. Approving the DIP Financing Agreement Is Appropriate**

As a debtor in possession, the Company is authorized to operate its business under section 1108 of the Bankruptcy Code. As part of that operation, the Company may incur unsecured debt in the ordinary course of business. *See* 11 U.S.C. § 364(a). The Bankruptcy Code offers a debtor in possession additional flexibility to the extent it needs additional credit, but cannot attract such credit on unsecured terms. Section 364 provides a progression of various protections to induce a post-petition lender to extend credit to a debtor in possession.

To justify a post-petition credit on "super-priority" basis or by granting a priming lien, the Company must show that it is unable to obtain the necessary credit otherwise and

[4] *See* Fed. R. Bankr. P. 4001(c)(2).

the lienholder to be primed (to the extent that such priming is not consensual) is adequately protected. Section 364, however, does not impose upon a debtor in possession the onerous duty to seek credit from every possible lender before concluding that such credit is available.[5] Instead, a good faith effort to obtain less burdensome credit from other sources is all that is required of a debtor, especially when time is of the essence.[6]

The DIP Agent is the only lender who is likely to make a working capital loan to the Company – and certainly the only one able to do so in time to fund the Company's payroll on December 11, 2009. The global economic crisis that struck in the fall of 2008 and its continuing impact on the availability of financing have stymied all efforts by the Company to raise the necessary funds for the past year. With the credit markets still in turmoil, the Company has been unable to raise capital or obtain other viable offers of financing.

The Company does not have sufficient sources of working capital to carry on the operation of its business during this case without the DIP Facility. Uninterrupted operations are critical to a successful reorganization, and the financing provided by the DIP Facility will ensure that the Company's vendors continue their business relationship with an operating company and allow the Company to keep its stores open. Because a successful reorganization process will require the Company to maintain its ongoing operations until the process has been completed, the relief requested in the Motion is essential to preserving the Company's estate. The terms and conditions of the proposed DIP Facility, as set forth in further detail herein, are fair and reasonable under the circumstances.

---

[5] *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that contacting four financial institutions regarding a loan satisfied the requirements of § 364(d)(1)(A)).

[6] *See, e.g., In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987); *In re Stacy Farms*, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987).

**C. The Company Has Satisfied the Requirements Under Bankruptcy Code & 364(c) and Should Be Allowed to Borrow on a "Super-priority" and Senior Secured Basis**

The DIP Financing Agreement provides the DIP Lenders with the following protections:

a. A super-priority administrative expense claim pursuant to §364(c)(1), subject to the Carve Out, with priority over any and all administrative expenses, and payable from all assets of the estate, including proceeds of avoidance actions; and

b. A valid and perfected first-priority priming lien on all of the Company's property (other than proceeds of avoidance actions) pursuant to §364(d), subject to Permitted Prior Liens and the Carve Out.

Other than the requirement of "notice and a hearing," the only statutory prerequisite for obtaining secured credit on a "super-priority" basis under 364(c)(1)-(3) is that "the [debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense." This threshold test is satisfied here.

As set forth above and in the Feshbach Declaration, despite its efforts, the Company, as of the Petition Date, was unable to obtain unsecured credit sufficient to finance its operations. Moreover, the Company simply cannot obtain alternative financing of the magnitude proposed under the DIP Financing Agreement on an unsecured basis, even if the resulting claim were to be allowed as an administrative claim, because the Company is likely to be unable to pay any such administrative claim without the consent of the Pre-Petition Agent, which has a lien on substantially all the Company's assets. The Company has evaluated alternative post-petition financing concepts, none of which contemplate a financing on anything other than a fully secured basis. And even the DIP Agent has agreed to provide funding to the Company only if it is given the added protection and benefits provided by the DIP Financing Agreement. Consequently, the Company should be permitted to borrow under the DIP Financing Agreement on a "super-

priority," senior secured, and junior secured basis under § 364(c)(1)-(3), as such borrowing is the only source of funds available to the Company at this time.

**D. The Company Has Satisfied the Requirements of Bankruptcy Code § 364(d)**

Under the DIP Financing Agreement, the DIP Agent is requiring that the funds advanced under the DIP Facility be secured by a lien that has priority over the Pre-Petition Liens and all other liens, subject only to Permitted Prior Liens and the Carve Out.

The only statutory prerequisites for obtaining credit on a priming lien basis under §364(d) are that "the [debtor in possession] is unable to obtain such credit otherwise" and that, absent the consent of the secured creditor sought to be primed, "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." Each of these tests is satisfied in this case.

As set forth above, the Company simply cannot obtain alternative financing of the magnitude proposed under the DIP Facility on an unsecured basis. The Company is unable to obtain unencumbered access to its receivables because of the Pre-Petition Liens, and the Company otherwise does not have unencumbered sources of cash to fund its operations. Due to the uncertainty created by the current economic crisis, even the DIP Agent has refused to extend credit post-petition without the "super-priority" and the "priming" protections afforded by §§ 364(c)(1) and (d), and the Company has been unable to obtain financing on any other feasible and more favorable terms. The DIP Agent has specifically required that the DIP Lien "prime" the Pre-Petition Lien.

As set forth in the proposed Financing Orders, in exchange for replacement liens, the Pre-Petition Agent and the Noteholders have agreed to subordinate their prepetition lien to the competing liens arising in connection with the DIP Facility. However, Pre-Petition Agent has conditioned its consent to be primed upon the provision of such protections as described in the Financing Orders, including that, without limitation, the Company has agreed to provide the Pre-Petition Agent with replacement liens and super-

priority claims, junior only to the liens and claims of the DIP Agent, but subject to the Permitted Prior Liens and the Carve Out, to adequately protect it from any diminution in value of its security interests. The Pre-Petition Agent is also protected by the advance of funds under the DIP Facility that will be used to achieve the Partial Roll-Up.

### E. **The DIP Facility Is Supported by the Exercise of Sound Business Judgment and Good Faith**

The fact that the Company has satisfied the requirements of § 364 of the Bankruptcy Code, of course, does not end the inquiry, as these sections are permissive, not mandatory. *See* 11 U.S.C. § 364(c) and (d)(1) ("*after notice and a hearing*", the court "*may* authorize the obtaining of credit or the incurring of debt") (emphasis added). Generally, however, courts give broad deference to business decisions of a debtor in possession.[7] Moreover, a bankruptcy court generally will respect a debtor in possession's business judgment regarding the need for and the proposed use of funds. As the court noted in *In re Ames Department Stores, Inc.*,

> [T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.[8]

The power of the debtor in possession to incur secured debt follows necessarily from the general power of the debtor in possession to operate its business in the exercise of its business judgment pursuant to section 1108 of the Bankruptcy Code. Without the ability to incur secured debt, the debtor in possession would be placed at a significant competitive disadvantage and its efforts to reorganize could be seriously impaired.

---

[7] *See Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992); *Richmond Leasing v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

[8] 115 B.R. at 40.

In the present case, the Company's decision to enter into the DIP Financing Agreement represents an exercise of sound business judgment in the continued operation of the Company's business and preservation of its going concern value and the possibility of reorganization. Moreover, the terms of the proposed transaction are fair, reasonable, and adequate given the circumstances of the Company. Like most business decisions, the Company's decision to enter into the DIP Financing Agreement will both confer a number of benefits on the Company and impose several tradeoffs. The DIP Facility should provide the Company with sufficient capital to operate its business in the ordinary course, pending the formulation and confirmation of a plan of reorganization. The DIP Agent also agreed to fund certain carve-outs for payment of statutory fees, professional fees, and other necessary expenses. Further, the terms of the DIP Facility have been negotiated in good faith and at arms' length by and between the parties, with all parties represented by counsel. Any credit extended under the DIP Facility should be held to qualify as having been extended in good faith by the DIP Agent as that term is used in section 364(e) of the Bankruptcy Code.

The concessions that the Company has made in exchange for the DIP Facility are common in complex financing arrangements and are amply justified here in light of the benefits conferred upon the Company under the DIP Facility and the absence of any other likely financing. In fact, bankruptcy courts routinely recognize that concessions by debtors similar (or even greater) to those made here are often included in both debtor-in-possession financing and cash collateral arrangements.[9] Such concessions are especially

[9] *See, e.g.*, *Burchinal v. Cent. Washington Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1488 (9th Cir. 1987) ("[S]ection 364 was designed to provide a debtor a means to obtain credit after filing bankruptcy. As such, cross-collateralization clauses appear to be covered by section 364 . . . ."); *In re Keystone Camera Prods. Corp.*, 126 B.R. 177, 182-83 (Bankr. D.N.J. 1991); *In re Stein & Day, Inc.*, 87 B.R. 290, 292 (Bankr. S.D.N.Y. 1988) (providing for payment of pre-petition debt); *Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 364 (W.D. Mich. 1986), *aff'd*, 834 F.2d 599, 602, 605 (6th Cir.1987) ("Cross-collateralization . . . although controversial, is often used, and even the courts that discourage it have approved its use."); *In re FCX, Inc.*, 54 B.R. 833, 840 (Bankr. E.D.N.C. 1985) (approving cross collateralization).

justified in cases where the failure to approve the requested financing threatens to doom any prospects the debtor has for a successful restructuring.[10]

The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent to exercise certain rights and remedies as provided for in the DIP Financing Agreement without further order of or application to the Court. However, except with respect to certain rights available on the Commitment Termination Date, under the terms of the proposed Interim Order, the DIP Agent must provide the Company, the United States Trustee, and counsel for any creditors committee with five business days' notice prior to exercising any such rights or remedies under the DIP Financing Agreement. Moreover, the Company and any other parties in interest may seek within such notice period an expedited hearing before this Court solely for the purpose of considering whether, in fact, an Event of Default (as defined in the DIP Financing Agreement) has occurred. Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in the Company's business judgment, are reasonable under the present circumstances.

In sum, the substantial benefits the Company will derive from the proposed financing amply justify the Company's decision to enter into the DIP Financing Agreement, a decision that the Court should approve as being in the best interests of the Company and its estate.

---

[10] *See, e.g.*, *In re Roblin Indus., Inc.*, 52 B.R. 241, 245 (Bankr. W.D.N.Y. 1985) (approving cross-collateralization; "if in fact [the lenders] are undersecured [and] absent financing the debtor would in all likelihood shut down, [then] liquidation would follow, and unsecured creditors would receive no distribution from the debtor's estate"); *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 367 (Bankr. E.D.N.Y. 1983) (approving cross collateralization and the granting of a super-administrative priority claim in favor of a pre-petition lender where, among other things, failure to provide such financing would result in the failure of the chapter 11 case and the value of the encumbered assets at liquidation were less than the lenders' claims).

VI.

**REQUEST FOR FINAL HEARING**

Pursuant to Bankruptcy Rule 4001(c), the Company respectfully requests that the Court schedule a Final Hearing no later than twenty (20) days from the date that the Court enters the Interim Order. The DIP Financing Agreement requires that the Final Order be entered no later than January 8, 2009. The Company's request for interim approval of the DIP Financing Agreement is intended to provide an amount of cash sufficient to permit the Company to continue to operate during the near term and maintain the confidence of vendors and employees. Accordingly, in order to maintain their operations and the confidence of their vendors and employees, the Company will need prompt final approval of the DIP Financing Agreement.

The Company requests that it be permitted to serve notice of the Motion, the Interim Order, and the Final Hearing by telecopy, overnight delivery service, hand delivery or U.S. mail to (a) the United States Trustee; (b) counsel for the Pre-Petition Agent, (c) counsel for the Noteholders, (d) the Twenty Largest Unsecured Creditors as set forth in the list filed by Company pursuant to Bankruptcy Rule 1007(d), (e) all parties in interest on whom service is required by the Debtors' order limiting notice entered in this Case and their counsel, (e) all other known holders of liens on the Company's assets, and (f) on the applicable state and local taxing agencies. The Company requests that the Court determine such notice to be good and sufficient notice of the Final Hearing under Bankruptcy Rule 4001. The Company also requests that such notice of approval of the Interim Order shall state that any party in interest objecting to the DIP Facility or the terms of the Final Order shall file written objections with the Court no later than ten calendar days prior to the Final Hearing.

VII.

**WAIVER OF BANKRUPTCY RULE 6004(h)**

The Company further seeks a waiver of any stay of the effectiveness of the Interim Order. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, authorizing the DIP Facility on an interim basis is necessary because the Company does not have enough working capital to carry on the operation of its business, and the interim financing will preserve Company operations in the very near term. Accordingly, the Company submits that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## VIII.

## CONCLUSION

**WHEREFORE**, the Company respectfully requests that the Court (i) following the Interim Hearing, enter the Interim Order approving the DIP Facility with the DIP Agent under sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 4001, 6004 and 9014, and Local Bankruptcy Rules 4001-2, 2002-2 and 9013, on the terms set forth in the DIP Financing Agreement; (ii) approve the form and scope of notice of the Final Hearing and schedule the Final Hearing on the Motion; (iii) following the Final Hearing, enter the Final Order; and (iv) grant such other and further relief as may be just and proper.

Dated: December 7, 2009

**ARENT FOX LLP**

By: */s/ Mette H. Kurth*
Mette H. Kurth
Andy S. Kong
*Proposed* Attorneys for the
Debtors and Debtors in Possession