1  Mette H. Kurth (SBN 187100)
   Andy S. Kong (SBN 243933)
2  M. Douglas Flahaut (SBN 245558)
   **ARENT FOX LLP**
3  555 West Fifth Street, 48th Floor
   Los Angeles, CA 90013-1065
4  Telephone:   213.629.7400
   Facsimile:   213.629.7401
5  E-mail:      kurth.mette@arentfox.com
                kong.andy@arentfox.com
6               flahaut.douglas@arentfox.com

7  *Proposed* Attorneys for Debtors and Debtors in Possession

8  Debtors' Mailing Address
   121 Gray Avenue
9  Santa Barbara, CA 93101

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12              **SANTA BARBARA DIVISION**

13  In re:                                  Case No.: 9:09-bk-15138-RR

14  **THE WALKING COMPANY**, a              [Jointly Administered with Case Nos.: 9:09-bk-
    Delaware corporation, d/b/a Alan's Shoes,  15137-RR; 9:09-bk-15139-RR]
15  Footworks, Overland Trading Co., Sole
    Outdoors, and Martini Shoes; f/k/a TWC  **MOTION FOR ORDER: (1)**
16  Acquisition Corporation; **BIG DOG USA,**  **ESTABLISHING "POST-HOLIDAY"**
    **INC.**, a California corporation, d/b/a Big  **STORE CLOSING PROCEDURES; AND**
17  Dog Sportswear; f/k/a Fortune Dogs, Inc.;  **(2) AUTHORIZING THE DEBTORS TO**
    and **THE WALKING COMPANY**         **INITIATE ADDITIONAL STORE**
18  **HOLDINGS, INC.**, a Delaware           **CLOSING SALES; MEMORANDUM OF**
    corporation, f/k/a Big Dog Holdings, Inc.  **POINTS AND AUTHORITIES**
19  and 190th Shelf Corporation,

20                          Debtors.         Hearing

21  ┌─────────────────────────────────       DATE:    TBD
    [X] Affects all Debtors                  TIME:    TBD
22                                           PLACE:   1415 State Street
    [ ] Applies only to The Walking                   Santa Barbara, CA 93101
23      Company

24  [ ] Applies only to Big Dog USA, Inc.

25  [ ] Applies only to The Walking
        Company Holdings, Inc.
26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | BACKGROUND | 7 |
|  | A. General Background | 7 |
|  | B. The Company's Progress in the Initial Phase of its "Right Sizing" Efforts and Store Closings | 7 |
|  | C. The Need for Additional Store Closings | 8 |
|  | D. The Post-Holiday Phase of the Company's Store Closing Sales | 10 |
| II. | ARGUMENT | 11 |
|  | A. The Post-Holiday Store Closing Procedures Represent an Exercise of the Company's Reasonable Business Judgment and Should Be Approved Pursuant to Bankruptcy Code Sections 105(a) and 363(b) | 11 |
|  | B. The Company Has Proposed Reasonable Procedures to Ensure That the Post-Holiday Store Closing Procedures Comply with Any State Laws Restricting Store-Closing Sales | 13 |
| III. | CONCLUSION | 16 |

1

# TABLE OF AUTHORITIES

2

**Page**

3

4

<u>**Federal Cases**</u>

*Baker & Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake, Inc.)*,
   35 F.3d 1348 (9th Cir. 1994) ............................ .................. 15

*Belculfine v. Aloe (In re Shenango Group, Inc.)*,
   186 B.R. 623 (Bankr. W.D. Pa. 1995), *aff'd,* 112 F.3d 633 (3d Cir. 1997).................. 15

*California State Bd. of Equalization v. Goggin*,
   191 F.2d 726 (9th Cir. 1951) ............................ .................. 14

Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
   *722 F.2d 1063 (2d Cir. 1983)* ............................................ 12

*In re Abbotts Dairies of Pennsylvania, Inc.*,
   788 F.2d 143 (3d Cir. 1986) ............................................ 12

*In re Am. Dev. Corp.*,
   95 B.R. 735 (Bankr. C.D. Cal. 1989) ............................................ 12

*In re Ames Dept. Stores, Inc.*,
   136 B.R. 357 (Bankr. S.D.N.Y. 1992) ............................ .................. 12, 13

*In re Borne Chemical Co., Inc.*,
   54 B.R. 126 (Bankr. D.N.J. 1984) ............................................ 14

*In re Canyon Partnership*,
   *55 B.R. 520 (Bankr. S.D. Cal. 1985)* ............................................ 12

*In re Global Home Prods., LLC*,
   369 B.R. 778 (Bankr. D. Del. 2007) ............................................ 12

*In re Lisbon Shops, Inc.*,
   24 B.R. 693 (Bankr. E.D. Mo. 1982) ............................................ 13

*In re Martin (Myers v. Martin)*,
   *91 F.3d 389 (3d Cir. 1996)* ............................................ 12

*In re Moore*,
   110 B.R. 924 (Bankr. C.D. Cal. 1990) ............................................ 12

*In re R. H. Macy and Co., Inc.*,
   170 B.R. 69 (Bankr. S.D.N.Y. 1994) ............................................ 13

*In re Scott Housing Sys. Inc.*,
   91 B.R. 190 (Bankr. S.D. Ga. 1988) ............................................ 15

*In re Tobago Bay Trading Co.*,
   112 B.R. 463 (Bankr. N.D. Ga. 1990) ............................................ 13

*In re White Crane Trading Co Inc.*,
   170 B.R. 694 (Bankr. E.D. Cal. 1994) ............................................ 14

*Official Committee of Subordinated Bondholders v. Integrated Res., Inc.*
   *(In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1990)............................ 12

27

28

# TABLE OF AUTHORITIES
### (continued)

                                                                            **Page**

**Federal Statutes**

11 U.S.C. § 363(b) .................................................................. 11, 12, 15

28 U.S.C. § 959 ............................................................................ 13

28 U.S.C. § 1334 ........................................................................... 15

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

**TO THE HONORABLE ROBIN L. RIBLET, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; THE LANDLORDS AFFECTED BY THIS MOTION; THE ATTORNEYS GENERAL AND OTHER RELAVENT GOVERNMENTAL AGENCIES; THE DEBTORS' SECURED CREDITORS; COUNSEL FOR THE CREDITORS COMMITTEE; AND ALL PARTIES ENTITLED TO SPECIAL NOTICE:**

As set forth in the *Emergency Motion for Order (1) Authorizing the Debtors to Conduct Store Closing Sales; (2) Establishing Procedures for the Rejection of Non-Residential Real Property Leases; and (3) Authorizing the Immediate Rejection of Certain Nonresidential Real Property Leases* (the "Initial Store Closing Motion") [Docket No. 3], The Walking Company and its debtor affiliates, The Walking Company Holdings, Inc. and Big Dog USA, Inc. (collectively, the "Company"), commenced these chapter 11 cases principally to pursue a "right sizing" strategy that will enable them to reorganize around their profitable stores. As the first step in this process, the Initial Store Closing Motion sought authority for the Company to immediately commence store-closing sales at approximately 90 locations (the "Initial Stores") in accordance with certain "holiday" or "soft closing" sale procedures. These holiday store closing sales differed from the Company's usual holiday sales in only one material respect, *e.g.*, the Company placed "store closing" window signage in the stores to be closed. As indicated in the Initial Store Closing Motion, with the holiday shopping season concluded, it is now necessary for the Company to seek authority to use more aggressive sales tactics to complete the closure of its underperforming stores.

Accordingly, the Company hereby moves this Court for entry of an order authorizing it to adopt customary inventory liquidation and store closing procedures, as set forth at Exhibit 1 hereto (the "Post-Holiday Store Closing Procedures") and as discussed in the annexed Memorandum of Points and Authorities. The Company has also identified approximately forty (40) additional stores for possible closure, and it hereby moves this Court for authority, in its discretion, to close these additional stores in

1 accordance with the Post-Holiday Store Closing Procedures. These additional store

2 locations (the "Additional Stores") are identified at Exhibit 2 to Andrew Feshbach's

3 Declaration in support of this motion. As discussed in greater detail in the annexed

4 Memorandum of Points and Authorities, there are good and sufficient grounds for

5 granting this Motion pursuant to Bankruptcy Code sections 105, 363, and 554.

6     **WHEREFORE**, the Company respectfully requests that the Court enter an order:

7 (1) approving the Post-Holiday Store Closing Procedures with respect to any store

8 closings to be conducted at either the Initial Stores or the Additional Stores (collectively,

9 the "Underperforming Stores"); (2) authorizing, but not directing, the Company to

10 conduct store closing sales at the Additional Stores in the exercise of its reasonable

11 business judgment; and (3) granting to the Company such other and further relief as is

12 necessary and appropriate.

13

14 Dated: January 15, 2010                **ARENT FOX LLP**

15

16                                        By: /s/ Mette H. Kurth

17                                        Mette H. Kurth
                                          *Proposed* Attorneys for the
18                                        Debtors and Debtors in Possession

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**BACKGROUND**

    **A.**    **General Background**

Headquartered in Santa Barbara, California, the Company consists of two distinct retail operations. The Company's operations are largely focused on The Walking Company, which is a leading specialty retailer of authentic comfort footwear. As of December 7, 2009 (the "Petition Date"), The Walking Company operated 210 stores in premium malls across the nation, and it generated approximately 93% of the Company's sales in 2009. Big Dog USA, Inc. is a retailer of a lifestyle collection of popular-priced T-shirts, casual sportswear, and accessories featuring the Big Dogs trademark. On a consolidated basis, the Company employs over 1,600 individuals across the country.

As set forth in greater detail in the *Declaration of Andrew D. Feshbach in Support of Emergency "First Day" Motions* [Docket No. 15] and the annexed declaration of Andrew D. Feshbach in support of this motion, the Company engaged in a period of significant expansion throughout 2006, 2007, and 2008. Following the deterioration of the economy in the fall of 2008, the Company now finds itself with a significant number of over-market leases and underperforming stores. Accordingly, the Company commenced these chapter 11 cases principally to pursue a "right sizing" strategy that will enable it to reorganize around its profitable stores and eliminate those whose continued operation would inhibit a successful reorganization.

    **B.**    **The Company's Progress in the Initial Phase of its "Right Sizing" Efforts and Store Closings.**

As set forth in detail in the Initial Store Closing Motion, the Company can no longer generate the funds needed to continue to operate all of its stores, and the approximately 90 underperforming stores identified therein, in particular, have represented a significant drain on the Company's resources. Accordingly, immediately following the Petition Date, the Company began to move forward with its planned store

1  closings in order to reduce its administrative expenses while simultaneously generating

2  cash through inventory liquidations.

3       Although the Company had little success renegotiating store leases prior to the

4  commencement of these cases, the Company resumed these efforts following the Petition

5  Date in an effort to maximize the number of stores that can be preserved through this

6  reorganization effort and, thereby, to maximize the Company's going concern value and

7  recoveries to its creditors.  In fact, immediately after the Official Committee of Unsecured

8  Creditors (the "Committee") was appointed in these cases, the Committee as well as

9  various individual landlords began encouraging the Company to slow the rate of its store

10  closings, even at the cost of additional administrative expenses, in order to attempt to

11  preserve a larger number of stores.  As the Company has rapidly and aggressively pursued

12  the renegotiation of its leases—partly in response to the Committee's position—the

13  Company has enjoyed significant success in its preliminary negotiations.  The Company,

14  in consultation with the Committee, is continuing to evaluate and renegotiate its store

15  leases and to initiate further store closings as appropriate.  While the Company is

16  optimistic that many stores will remain open through this process, in order to minimize

17  administrative expenses for these estates, it is imperative that the Company be authorized

18  to proceed with store closings in those cases where lease negotiations are unsuccessful.

19       **C.    The Need for Additional Store Closings.**

20       As set forth in the Initial Store Closing Motion, the Company's profitable store

21  locations no longer generate enough cash to support its operations at various unprofitable

22  store locations.  The 90 Initial Stores that were targeted for closure represented the most

23  significant drain on the Company's resources.  In addition, the 40 Additional Stores have

24  operations that are either unprofitable or only marginally profitable.  The aggregate

25  monthly rent for these Additional Stores is approximately $650,000.  While rent

26  negotiations are ongoing, the Company now seeks authority to initiate store closing sales

27  at any of these Additional Stores as follows:

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1.  Upon determining that an Additional Store should be closed, the Company will provide counsel for the Committee and counsel for its secured lender, Wells Fargo Retail Finance, LLC ("WFRF"), with at least one week's notice of the pending closure, together with store-level financial information regarding the store's historical performance and its projected performance for 2010;

2.  If neither the Committee nor WFRF notifies the Company and its counsel of an objection to the proposed store closing, then the Company may proceed with the store closing without further order of the Court;

3.  If the Committee or WFRF timely notify the Company of an objection to the proposed store closing and the parties are unable to consensually resolve such objection, then the parties may seek a hearing before this Court, on an expedited basis, to resolve such objection, and no store closing sale will be initiated for the Additional Store that is subject to the objection absent further order of the Court.

Failure to allow the Company to promptly commence store closing sales in preparation for a rejection of the associated real estate leases will prolong the period of time during which the Company must incur administrative expenses in connection with these Additional Stores and may cause the Company to violate the budgeted financial covenants contained within its post-petition financing agreement with Wells Fargo (the "DIP Financing Agreement"), as approved by this court on a final basis by court order entered January 14, 2010 [Docket #160].[1]  The Company believes that the procedure outlined above—which is substantially similar to procedures already in place with respect to certain of the Initial Stores—will allow the Company to move forward expeditiously with any necessary store closings without unduly burdening this Court with individual hearings, while also establishing a reasonable procedure for the Committee and WFRF to

---

[1] The Company's failure to obtain approval of the store closing sales and to diligently prosecute store closing sales at each of the Underperforming Stores would constitute a default under the DIP Financing Agreement. *See* § 6.23 of Exhibit C to the January 14, 2010 order [Docket # 156.]

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1   evaluate any such store closings before they are implemented.

2       **D.**    <u>**The Post-Holiday Phase of the Company's Store Closing Sales.**</u>

3       As indicated in the Initial Store Closing Motion, to maximize the value of its
4   inventory and its brand, the Company developed a two phase strategy for liquidating its
5   inventory at stores slated for closure.  The "holiday" or "soft closing" phase, which
6   focused primarily on the hanging of "store closing" signs in store locations targeted for
7   closure, is now complete.  The second phase, which will utilize more traditional
8   "inventory liquidation" techniques, is the subject of this Motion.

9       The Company has conferred with its liquidation consultant, Tiger Capital Group
10  LLC ("Tiger"), regarding the need to conduct these traditional inventory liquidations, at
11  lower margins, to empty those stores that remain slated for closure, and the Post-Holiday
12  Store Closing Procedures.  These procedures are consistent with procedures employed in
13  connection with other retail bankruptcy cases, such as KB Toys and Sharper Image, and
14  will be used to sell off all remaining inventory and fixtures to the bare walls.

15      The Post-Holiday Store Closing Procedures are necessarily more aggressive than
16  the initial store closing procedures.  For instance, whereas the initial store closing
17  procedures contained provisions prohibiting the Company from selling "seconds" or other
18  merchandise not traditionally sold in the stores, this Motion requests authorization to sell
19  inventory, furniture, fixtures and equipment.  Furthermore, whereas the initial procedures
20  indicated each store would operate at normal staffing levels and inventory would not be
21  moved to self-service racks or "bargain bins," the Post-Holiday Store Closing Procedures
22  contain no such assurance.  Finally, the Post-Holiday Store Closing Procedures contain
23  more detailed descriptions of the type and manner of advertising that may be used by the
24  Company or its agents when conducting a sale.  For example, whereas the initial store
25  closing procedures prohibited the stores from advertising sales as "going out of business"
26  or "bankruptcy" sales, the Post-Holiday Store Closing Procedures state that the Company
27  will use the terms "Total Liquidation Sale" or "Store Closing Sale," as applicable, in its
28  advertising.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1   Some of the Post-Holiday Store Closing Procedures may violate certain restrictions

2   or lease provisions.  Accordingly, the Company requests that the Court authorize the

3   Company to conduct the post-holiday store closing sales without interference by any of

4   the landlords who are parties to the underperforming leases (the "Landlords") or certain

5   government agencies affected, directly or indirectly, by such sales.  A copy of this

6   Motion, and the proposed Post-Holiday Store Closing Procedures, has been served  not

7   only on the Landlords but also on the Attorney General's office for each state where a sale

8   will be held and the division of consumer protection for each state where a sale will be

9   held (collectively, the "Government Agencies").  Within five business days of the entry of

10  the Order approving the Post-Holiday Store Closing Procedures, the Company will serve

11  the Order on the Government Agencies.  In addition to having the ability to object to this

12  Motion, if a dispute arises following entry of the Order with respect to the Company's

13  compliance with the Post-Holiday Store Closing Procedures or any applicable state laws

14  or regulations, such Government Agencies may give notice to the Company and its

15  counsel explaining the nature of the dispute.  If the Company and the Government Agency

16  are unable consensually resolve such dispute, then the parties may seek an expedited

17  hearing and resolution before this Court.

18      The Company, in the exercise of its reasonable business judgment and following

19  consultation with Tiger, believes that these procedures are reasonable in light of the

20  financial needs of the Company and its creditors and that they will also ensure that the

21  rights of the Landlords and the Governmental Agencies are not unfairly impacted.

22  **II.**

23  **ARGUMENT**

24      A.      <u>The Post-Holiday Store Closing Procedures Represent an Exercise of</u>

25          <u>the Company's Reasonable Business Judgment and Should Be</u>

26          <u>Approved Pursuant to Bankruptcy Code Sections 105(a) and 363(b)</u>

27      Bankruptcy Code section 363(b) provides, in relevant part, that a debtor in

28  possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary

1    course of business, property of the estate."[2]  Pursuant to applicable case law, in this and

2    other circuits, if a debtor's proposed use of its assets pursuant to Bankruptcy Code section

3    363(b) represents a reasonable business judgment on the part of the debtor, such use

4    should be approved.[3]

5         Store closing or liquidation sales are a routine occurrence in chapter 11 cases

6    involving retail debtors.[4]  A debtor's application of its sound business judgment in the use,

7    sale, or lease of property is subject to great judicial deference.[5]  It is well established that a

8    debtor may proceed with store closing sales under Bankruptcy Code section 363(b) where

9    the debtor has articulated a business reason for doing so.[6]  And when a valid business

10   justification exists, there is a strong presumption that "the directors of a corporation acted

11   on an informed basis, in good faith and in the honest belief that the action taken was in the

12   best interests of the company."[7]

13        Ample business justification exists in these cases to authorize the Company to

14   begin closing the Additional Stores and to approve the Post-Holiday Store-Closing

15   Procedures with respect to all Underperforming Stores.  Each of the Underperforming

16   Stores still has significant levels of inventory, and the Company, in consultation with

17   Tiger, believes that more aggressive sales techniques than were used during the holiday

18   season are now required to effectively liquidate this inventory.

19

---

20   [2] 11 U.S.C. § 363(b).

21   [3] *In re Global Home Prods., LLC*, 369 B.R. 778 (Bankr. D. Del. 2007); *In re Am. Dev. Corp.*, 95 B.R. 735 (Bankr. C.D. Cal. 1989).

22   [4] *See In re Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets").

23
24   [5] *See, e.g., In re Moore*, 110 B.R. 924 (Bankr. C.D. Cal. 1990); *In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985).

25   [6] *In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *in re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986)
26   (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Global Home Prods., LLC*, 369 B.R. 778 (Bankr. D. Del. 2007).

27   [7] *Official Committee of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650,
28   656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).

Bankruptcy courts have held that restrictive lease provisions affecting store closing sales in chapter 11 cases are unenforceable.[8]  Some of the leases with respect to the Underperforming Stores may contain provisions purporting to restrict or prohibit the Company from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under Bankruptcy Code section 363.[9]

The proposed Post-Holiday Store Closing Procedures are similar to those approved in other recent retail bankruptcy cases, such as KB Toys and Sharper Image.[10]  In those cases, the procedures were found to strike a reasonable balance between the debtor's rights to sell its property outside of the ordinary course of business and the landlord's rights to enforce the provisions of its leases.  In approving the procedures, the courts further found that reasonable measures had been taken to ensure that the closing sales would not disrupt other businesses in the shopping plazas and to ensure that the landlord's property was not harmed in the process.

**B.**      **The Company Has Proposed Reasonable Procedures to Ensure That the Post-Holiday Store Closing Procedures Comply with Any State Laws Restricting Store-Closing Sales**

The Ninth Circuit Court of Appeals has long held that 28 U.S.C. § 959, which requires trustees and, by definition, debtors in possession, to comply with state and other laws in performance of their duties, does not apply to the liquidation of assets conducted

---

[8] See In re KB Toys, Case No. 08-13269 (KJC), U.S. Bankruptcy Court for the District of Delaware; In re TSIC, Inc. f/k/a Sharper Image Corporation, Case no. 08-10322 (KG), U.S. Bankruptcy Court for the District of Delaware.

[9] See, e.g., In re Ames Dep't Stores, Inc., 136 B.R. at 359 (holding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets ...."); In re R. H. Macy and Co., Inc., 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.); In re Tobago Bay Trading Co., 112 B.R. 463 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); In re Lisbon Shops, Inc., 24 B.R. 693 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct going-out-of-business sale).

[10] See In re KB Toys, Case No. 08-13269 (KJC), U.S. Bankruptcy Court for the District of Delaware; In re TSIC, Inc. f/k/a Sharper Image Corporation, Case No. 08-10322 (KG), U.S. Bankruptcy Court for the District of Delaware.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1   by debtors or their agents.[11]   Nevertheless, the Post-Holiday Store Closing Procedures

2   provide for the Company to be bound by and comply with all state and local laws and

3   regulations pertaining to health and safety.

4       Moreover, the Company's Post-Holiday Store Closing Procedures fully address the

5   concerns raised by the Bankruptcy Court for the Eastern District of California in *In re*

6   *White Crane Trading Co. Inc.*   In that case, the Court held that at the juncture where the

7   debtors introduce new merchandise, prolong going-out-of-business sales for unlimited

8   duration, or mislead public with false advertising, state consumer protection laws become

9   significant.[12]   Here, the Post-Holiday Store Closing Procedures were designed, following

10  consultation with Tiger, to ensure that the Company's store-closing sales and inventory

11  liquidation will be in compliance with all applicable state and local regulations regarding

12  truth-in-advertising, consumer protection, and the like.   For example, California law

13  requires that store closing sales be concluded within 60 days, and many state and local

14  regulations limit practices such as augmentation of inventory   These and other regulations

15  are addressed by the Post-Holiday Store Closing Procedures, which provide, among other

16  things, that the store closing sales will be of limited duration, only merchandise of the

17  Company will be sold, and all advertising will fairly describe the store closing sales.

18  Moreover, the Company has served this Motion on the Government Agencies, and these

19  agencies will also receive a copy of any entered Order approving the Post-Holiday Store

20  Closing Procedures.   The procedures further provide a reasonable mechanism for the

21  resolution of any disputes that may arise with respect to the Company's conduct of the

22  store closings sales.

23      However, many state and local laws, statutes, rules, and ordinances require special

24  licenses, waiting periods, time limits and other procedures for store-closing, liquidation,

---

[11] *See, e.g., California State Bd. of Equalization v. Goggin*, 191 F.2d 726 (9th Cir. 1951) (28 U.S.C. § 959 does not apply to transactions that are in the nature of a liquidation); *see also In re Borne Chemical Co., Inc.*, 54 B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is applicable only where the property is being managed or operated for the purpose of continuing operations);

[12] *In re White Crane Trading Co Inc.*, 170 B.R. 694, 702-704 (Bankr. E.D. Cal. 1994).

1 or similar sales conducted outside of bankruptcy.  In addition, some states have statutes or

2 regulations requiring creditor notification before a company conducts a bulk sale.  By

3 virtue of 28 U.S.C. § 1334, this Court has exclusive jurisdiction over the Company's

4 property wherever located.[13]  Even if state or local laws do not expressly except

5 bankruptcy sales from their ambit, the Company submits that, to the extent the state or

6 local laws conflict with federal bankruptcy laws, they are preempted by the Supremacy

7 Clause. To hold otherwise would severely impair the relief otherwise available under

8 Bankruptcy Code section 363.  In the context of bankruptcy cases, therefore, when

9 creditors receive notice of the proposed sale, as well as opportunity to be heard in this

10 Court, enforcement of such statutes and regulations is redundant and unnecessary.  The

11 Bankruptcy Code and bankruptcy law preempt state and local laws that conflict with the

12 underlying policies of the Bankruptcy Code.[14]

13   In the instant case, state and local licensing requirements and waiting periods

14 would undermine the fundamental purpose of Bankruptcy Code section 363(b) by placing

15 constraints on the Company's ability to marshal and maximize estate assets for the benefit

16 of creditors.  Accordingly, authorizing the store closings to be commenced at the

17 Additional Stores without the necessity of, and the delay associated with, obtaining

18 various state and local licenses, observing state and local waiting periods or time limits,

19 and/or satisfying any additional administrative requirements is necessary and appropriate.

20 The requested waiver is narrowly tailored to facilitate the successful consummation of the

21 store closing sales.  The Company does not seek a general waiver of all state and local

---

22 [13] 28 U.S.C. § 1334.

23 [14] *See Belculfine v. Aloe (In re Shenango Group, Inc.),* 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code.... [A] state statute[] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd,* 112 F.3d 633 (3d Cir. 1997). While preemption of state law is not always appropriate, *see Baker & Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake, Inc.),* 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure), preemption is appropriate where, as here, the only state laws involved concern *economic regulation* rather then the protection of public health and safety. *See id* at 1353 (finding that "federal bankruptcy preemption is more likely ... where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); *see also In re Scott Housing Sys. Inc.,* 91 B.R. 190, 196-97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under section 362 is broad and preempts state law except for those laws designed to protect public health and safety).

1   requirements, or of those that govern health and safety or consumer protection and truth-

2   in-advertising, but rather it seeks only a limited waiver of those administrative

3   requirements that are preempted by the Bankruptcy Code and by the notice that the

4   Government Agencies have received of the proposed sales.

5   **III.**

6   **CONCLUSION**

7        For the reasons set forth herein, and based on the Motion, the notice of the Motion,

8   this Memorandum of Points and Authorities, the record in these cases, the Declarations of

9   Andrew D. Feshbach and Albert Nassi, the arguments of counsel at any hearing on this

10  Motion, and other admissible evidence properly brought before the Court at or before the

11  hearing on this Motion, there are good and sufficient grounds for this Court to enter an

12  Order:   (1) approving the Post-Holiday Store Closing Procedures with respect to all

13  Underperforming Stores; (2) authorizing the Company to initiate additional store closing

14  sales at the Additional Stores as set forth herein; and (3) granting any additional relief to

15  Company as is necessary and appropriate.

16

17  Dated: January 15, 2010                    **ARENT FOX LLP**

18

19                                             By: */s/ Mette H. Kurth*

20                                                Mette H. Kurth
                                                 *Proposed* Attorneys for the
21                                               Debtors and Debtors in Possession

22

23

24

25

26

27

28

## EXHIBIT 1

## THE WALKING COMPANY

## POST-HOLIDAY STORE-CLOSING PROCEDURES

The following Post-Holiday Store Closing Procedures[15] shall apply to the post-holiday store closing sales (the "Sales) to be held at the Underperforming Stores. Sales conducted pursuant to these procedures shall be referred to hereafter as "Post-Holiday Store Closing Sales".

*Operating Hours*

1.      The Sales shall be conducted during hours consistent with operating hour provisions contained in the applicable lease and the Company also shall abide by any applicable mall guidelines regarding maintenance, security, and trash removal.

2.      To the extent not inconsistent with these Post-Holiday Store-Closing Procedures or any order of the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), the Company shall comply with all relevant lease provisions including, without limitation, any provision (i) regarding the maintenance of insurance; and (ii) regarding the use of loading docks and other common areas.

3.      The Sales shall be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Sales shall be conducted on Sunday unless the Company has been operating such stores on a Sunday.

*Advertising/Signage*

4.      Within a shopping center, the Company shall not distribute handbills, leaflets, or other written materials to customers outside the interior of any Stores, unless permitted by the applicable Lease.  Otherwise, the Company may solicit customers in the Underperforming Stores themselves.

5.      The Company shall not use flashing lights or any type of amplified sound to advertise the Sales or solicit customers.

---

[15] Capitalized terms used but not defined herein shall have the meaning(s) ascribed to them in the Motion.

6.    The Company may use street signage and sign walkers as it deems appropriate. Sign walkers will not be used on mall property.

7.    All display and hanging signs used by the Company in connection with the Sales shall be professionally lettered and all hanging signs shall be hung in a professional manner.

8.    Up to three signs may be placed in each front window of the Underperforming Stores in an enclosed mall at any one time and the windows shall not be completely covered by such signs.

9.    All front window signs shall not be affixed to the window with tape or adhesive.

10.    Furthermore, with respect to enclosed mall locations:  (i) no exterior signs or signs in common area of a mall shall be used; and (ii) no more than one 3' x 15' interior banner sign may be placed in the Underperforming Store and only in the rear of the Underperforming Store; *provided, however,* that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the Underperforming Store and shall not be wider than the storefront of the Underperforming Store.  If necessary to affix the banners, the Company may affix exterior banners to the Underperforming Store by drilling into the façade of the building provided that the Company restores the drilled portion to its condition immediately prior to the drilling.

11.    Nothing contained herein shall be construed to create or impose upon the Company any additional restrictions not contained in the applicable Lease; *provided, however,* that the Company's use of interior signage in enclosed mall locations shall not exceed the parameters set forth in these Post-Holiday Store-Closing Procedures.

12.    No exterior balloons shall be used to advertise the Post-Holiday Store-Closing Sale.

13.    All advertising, signage, and promotion programs shall clearly indicate that any discounts advertised thereby shall apply only to the merchandise in the Underperforming Stores.

14.     No advertising shall be placed with entities that are controlled by or are affiliates of Tiger Capital Group ("Tiger"), a liquidation consultant which the Company has retained.

15.     Unless the print media requires the bankruptcy case number, the Company and/or Tiger may only use the terms "Total Liquidation Sale" or "Store Closing Sale" as applicable, to advertise the Sales in the Underperforming Stores.

16.     If Sales are to be considered "final," conspicuous signs shall be posted in each of the affected Underperforming Stores to the effect that all sales are "final."

*Maintenance of the Premises*

17.     No alterations shall be made to the Underperforming Stores, except as authorized pursuant to the applicable Lease.  The hanging of exterior banners or other signage shall not constitute an alteration to an Underperforming Store.  No drilling shall take place in the roof of any Underperforming Store without the Landlord's prior consent.

18.     The Company and/or Tiger shall keep the Underperforming Store premises and surrounding area clear and orderly, consistent with present practices.

*Turnover of the Premises at the Conclusion of the Sales*

19.     The Company and/or Tiger shall provide the Landlords of the Underperforming Stores with five days' notice of the conclusion of each of the Sales. The Landlords of the Underperforming Stores shall have reasonable access to the Underperforming Store premises upon conclusion of the Sales solely for the purpose of dressing store windows to minimize the appearance of a dark underperforming store. [Within five days after the conclusion any Sales.  The Company shall vacate the Underperforming Store in broom-clean condition including the removal of furniture, trade fixtures, equipment and remaining supplies (except items being abandoned) and shall leave the Underperforming Store in the same condition as on the commencement of the store-closing sale, ordinary wear and tear excepted.

20.     Items of furniture, fixtures and equipment that cannot be carried by the customer (e.g. items that due to weight or size require equipment such as a hand truck or

multiple persons to transport) shall be removed from the premises in accordance with rules relating to such removal applicable to the particular mall.  No permanent fixtures may be removed without the pertinent Landlord's written consent.

21.    Any inventory, furniture, trade fixtures or equipment remaining in the Underperforming Store five days after completion of the store-closing sale shall be deemed abandoned to the Landlords free and clear of any liens and, without further order of the Bankruptcy Court, Landlord may dispose of the same as landlord chooses without liability or accountability therefore.

22.    A Lease shall only be deemed rejected at such time as notice has been given in compliance with any order of the Bankruptcy Court.]

23.    The Company shall designate a party to be contacted by the Landlords should an issue arise concerning the conduct of the Sales, and will provide the Landlords with the name and phone number of that person.

24.    Only inventory and furniture, fixtures, and equipment ("FF&E") may be sold from the Underperforming Stores.  No property of any Landlord of an Underperforming Store shall be removed or sold during any of the Sales.  Removal of other FF&E shall take place before or after the regular hours of the Underperforming Store or shopping center and through service or other exits and corridors designated by the Landlord.

25.    The Company shall not conduct auctions at the Underperforming Stores.

***Resolution of Disputes***

26.    To the extent that any Landlord affected hereby contends that the Company or Tiger is in breach or default under these Post-Holiday Store Closing Procedures, such Landlord shall provide at least five days' written notice, served by facsimile and overnight delivery, on the Company and its attorneys at the following addresses and facsimile numbers:

DEBTOR AND ITS COUNSEL:

Mette H. Kurth, Esq.
Doug Flahaut, Esq.
ARENT FOX LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013-1065
Facsimile:   213.629.7401
E-mail:      kurth.mette@arentfox.com
             flahaut.doug@arentfox.com

and

Anthony J. Wall
The Walking Company
121 Gray Avenue
Santa Barbara, CA 93101
Facsimile:  805.962.3442
E-mail:  tonyw@BigDogs.com

27.   If the parties are unable to resolve the dispute, either the Landlord or the Company shall have the right to seek to schedule a "status hearing" before the Bankruptcy Court on no less than five days' notice to the other parties.

28.   None of the retail stores operated by the Company that are not designated as "Underperforming Stores" will be added to list of Underperforming Stores without further order of the Bankruptcy Court.

29.   In the event that a landlord receives any citation from any state or local authority with regard to the signage employed by the Company or Tiger at any premises, the Company and/or Tiger will promptly take reasonable steps to assure the withdrawal of the citation and the enforcement of the Company's and/or Tiger's rights, as they believe they exist, pursuant to the Order approving the Post-Holiday Store Closing Procedures entered by the Bankruptcy Court.

30.   The Company and/or Tiger shall cause to be displayed in each of the Underperforming Stores, during the Sales, a sign setting forth the contact information for the Company's return and gift card policies.

***Compliance with State Laws and Regulations***

31.   No bulk sale or similar law shall prohibit the Company or its agent from taking the actions contemplated herein.

32.    Provided that the Company complies with these procedures, it is presumed to be in compliance with the requirements of any applicable "going out of business," "store closing," inventory liquidation sales, bulk sale laws or any other laws that purport to regulate, prohibit, restrict or in any way limit the Company's use of signwalkers, interior signage and banners, or exterior banners (individually a "GOB Law" and collectively "GOB Laws").

33.    Within five business days of entry of an order approving these Post-Holiday Store Closing Procedures, the Company shall serve a copy of the order as well as a copy of these procedures via First Class Mail on: the Attorney General's office for each state where a store closing will occur and the division of consumer protection, if any, for each state where a store closing will occur. If any agency wishes to assert that these procedures are in violation of any GOB Law, it may communicate such objection to the Company's counsel by telephone, facsimile, or email within ten days from the date of service of the order and these procedures on such agency.

34.    If the Company's counsel and the objecting Governmental Agency are unable to resolve their dispute within ten days after Company's counsel is contacted, Company's counsel will file a motion with this court requesting that this court resolve the dispute. In the event such a motion is filed, nothing in the court's order approving these Post-Holiday Store Closing Procedures shall preclude the Company, a Landlord, a Governmental Agency, or any other interested party from asserting: (i) that the provisions of any GOB Law are preempted by the Bankruptcy Code, or (ii) that neither the terms of the order approving the sales procedures, nor the Company's or its agents' conduct pursuant to the order violates such GOB Law. Filing a motion as set forth in this paragraph shall not be deemed to affect the finality of the court's order approving these sales procedures or to limit or interfere with the Company's or its agents' ability to conduct or to continue to conduct store closing sales pursuant to these procedures.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES