(b)    At the close of each calendar year and within thirty (30) days thereafter, there shall be determined the Gross Sales of Tenant during said calendar year and the amounts paid to Landlord as Percentage Rent in accordance with the provisions of the preceding paragraph; and thereupon an adjustment shall be made with respect to said rent as follows: if Tenant shall have paid to Landlord an amount greater than Tenant would have been required to pay had Percentage Rent been computed on a calendar year basis, Tenant shall be entitled to a credit of said amount against the next Percentage Rent due to Landlord, or if Tenant shall have paid an amount less than the rent which would have been required had Percentage Rent been computed on a calendar year basis, Tenant shall pay Landlord such difference within forty-five (45) days after the close of such calendar year.  In no event shall the rent payable pursuant to this Lease be less than the Minimum Annual Rent specified in Section 5.1, as adjusted by Section 5.2.

(c)    For the purpose of computing the Percentage Rent, sales in the first fractional month in which rents commence shall be added to the sales for the first full month, and shall be payable on the tenth (10th) day of the calendar month immediately following the first full month.

5.4    <u>Statement of Gross Sales</u>.  Tenant agrees to furnish or cause to be furnished to Landlord a statement of Gross Sales of Tenant within ▓▓▓▓▓▓(15) days after the close of each calendar month, and an annual statement of Gross Sales within thirty (30) days after the close of each calendar year.  Such monthly statements shall be signed by Tenant if Tenant is composed of individuals, by a general partner of Tenant if Tenant is a partnership, or by a responsible officer if Tenant is a corporation.  Such annual statements shall be signed by Tenant's certified public accountant.  Tenant shall, within ten (10) days following submittal to the State Board of Equalization, also provide Landlord with a copy of state and local sales and use tax returns filed with said State Board.

Tenant shall keep full and accurate records, double entry books of account or other methods of account to be approved in writing by Landlord and the Port District and other pertinent data of the Gross Sales and Gross Sales of any subtenant, licensee or concessionaire and such books and records shall be kept for a period of three (3) years after the close of each calendar year, provided that no records shall be destroyed by Tenant until destruction is authorized in writing by the Port District.  Said records must be supported by source documents of original entry such as sales invoices, cash register tapes, purchase invoices, or other pertinent documents.  All retail sales shall be recorded by means of cash registers which display to the customer the amount of the transaction and automatically issue a receipt.  All cash registers shall be equipped with sales totalizer counters for all sales categories, as herein provided, and sequential transaction counters which are locked in, constantly accumulating, and which cannot be reset.  Said registers shall further contain tapes upon which sales details and sequential transaction numbers are imprinted.  Beginning and ending sales totalizer readings shall be made a matter of daily record.  Other types of cash registers may be used by Tenant with the written approval of Landlord and the Port District.  In the event of admission charges or rents, Tenant shall issue serially numbered tickets for each such admission or rent and shall keep an accurate record of said tickets both issued and unissued.  All of Tenant's books of account, records and documentation related to this Lease or to business operations conducted within or from the Premises shall be kept either at the Premises or at such other locations as are acceptable to Landlord and the Port District, and Landlord and the Port District shall have the right at any and all reasonable times to examine and audit said books and records without restriction for the purpose of determining the accuracy thereof and of monthly statements of Gross Sales submitted and of the rent paid to Landlord.  Landlord and the Port District shall each have the discretion to require the installation of any additional accounting methods or controls Landlord and the Port District may each deem necessary.  In the event Tenant does not make available the original records and books of account at the Premises or within the limits of San Diego County, Tenant agrees to pay all necessary expenses incurred by Landlord and the Port District in conducting an audit at the location where said records and books of account are maintained.

The receipt by Landlord of any statement or any payment of Percentage Rent for any period shall not bind it or the Port District as to the



correctness of the statement or the payment. Landlord and/or the Port District, at any time, shall
be entitled to an audit of such Gross Sales, either by Landlord and/or the Port District. Such
audits shall be limited to the determination of the hours either at the Premises or the principal place
of business of Tenant. Landlord shall provide Tenant with ▓▓▓▓▓▓▓▓▓▓▓ days
written notice of audit with the understanding of confidentiality between Landlord and Tenant. If
it shall be determined as a result of such audit that there has been a deficiency in the payment of
Percentage Rent, then such deficiency shall become immediately due and payable with interest
at the maximum lawful rate (the "Lease Interest Rate") from the date when said payment should
have been made; in addition, if Tenant's statement for the pertinent calendar year shall be found
to have understated Gross Sales by more than two (2%) percent, and Landlord is entitled to any
additional Percentage Rent as a result of said understatement, then Tenant shall pay all of
Landlord's and/or the Port District's reasonable costs and expenses connected with such audits.
If any of Tenant's statements shall be found to have understated Gross Sales by more than five
(5%) percent, then, in addition to any other rights of Landlord under this Lease, Landlord may
terminate this Lease. Any information gained from such statements or inspection shall be
confidential and shall not be disclosed other than to carry out the purposes hereof; provided,
however, that Landlord shall be permitted to divulge the contents of any such statements in
connection with any financing arrangements or assignments of Landlord's interest in the Premises
or in connection with any administrative or judicial proceedings in which Landlord is involved and
when Landlord may be required to divulge such information. Tenant understands that the Port
District shall have the right, at its sole discretion to divulge said information. ▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5.5    Definition of Gross Sales. "Gross Sales" of Tenant, as used in this Lease, is the gross selling
price of all merchandise or services sold in or from the Premises by Tenant, its subtenants, licensees and
concessionaires, whether for cash, or on credit or on barter or business exchange, and whether made by store
personnel or by approved vending machines, or otherwise, excluding therefrom (or, as the case may be, deducting
therefrom to the extent previously reported as a part of Gross Sales) the following:

(a)    The selling price of all merchandise returned by customers and accepted for full credit
or the amount of discounts and allowances made thereon, upon such return by customers;

(b)    Sums and credits received in the settlement of claims for loss of or damage to
merchandise;

(c)    Goods returned to sources or transferred to another store or warehouse owned by or
affiliated with Tenant;

(d)    Cash refunds made to customers in the ordinary course of business, but this exclusion
shall not include any amount paid or payable for what are commonly referred to as trading stamps;

(e)    Sales taxes, so-called luxury taxes and other similar taxes now or hereafter imposed
upon the sale of merchandise or services, but only if collected separately from the selling price of merchandise or
services and collected from customers and remitted to the taxing authority.
Gross Sales upon which the Percentage Rents are to be based shall include all income and
receipts of every kind and nature resulting from occupancy or use of the Premises in any manner whether by Tenant,
his sublessees or concessionaires or parties operating through Tenant, his sublessees or concessionaires, from
whatever source derived. Gross Sales shall include any manufacturer's or importer's excise tax included in the prices
of the goods sold, even though the manufacturer or importer is also the retailer thereof, and it is immaterial whether
the amount of such excise tax is stated as a separate charge. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
All sales originating at the Premises shall be considered as made and completed therein, even though bookkeeping
and payment of the account may be transferred to another place for collection and even though actual filling of the sale
or service order and actual delivery of the merchandise may be made from a place other than the Premises. ▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5.6    Taxes. Commencing with the date that the Minimum Annual Rent provided for in Section 5.1 above begins and continuing for the balance of the term of this Lease, Tenant agrees to pay to Landlord, as additional rent, the amount of all taxes and assessments (including possessory interest taxes) levied and/or assessed for any such year upon the Premises and the underlying realty and water. Such additional rent for any partial year of the term hereof shall be prorated on a time basis.

On the first day of every month of the first year of the term hereof, Tenant shall pay Landlord an amount determined by Landlord which will be sufficient to pay on a monthly basis for Tenant's pro rata share of said taxes and assessments, as hereafter set forth. In the event that Tenant has underpaid its proportionate share of said taxes and assessments for the first year of the term hereof, Tenant shall pay within ten (10) days after billing by Landlord an amount determined by Landlord which will be sufficient to pay Tenant's pro rata share of said taxes and assessments for said year. If Tenant shall have paid Landlord an amount greater than Landlord is required to pay under the terms hereof, Tenant shall be entitled to offset the excess against payments next thereafter to become due Landlord for such taxes and assessments. The same procedure shall be followed in the second and subsequent years of the term hereof. Beginning with the first day of the second year of the term hereof, and continuing thereafter on the first day of each succeeding month during the term of this Lease, Tenant shall pay Landlord Tenant's pro rata share of taxes and assessments on a monthly basis upon receipt of a written statement from Landlord at the beginning of each year setting forth the amount of such estimated taxes and assessments. Similarly, the same procedure shall be followed at the end of each year as to underpayments or overpayments by Tenant.

In the event the Premises and underlying realty and water are not separately assessed, taxes and assessments levied and assessed upon the Premises and the underlying realty and water shall be calculated by using a fraction of said taxes and assessments on the Shopping Center (or portion thereof designated by Landlord), the numerator of which shall be the Floor Area of the Premises and denominator of which shall be the Floor Area of the Premises and the Floor Area of all other areas in the Shopping Center (or portion thereof designated by Landlord) actually occupied and open for business by other tenants in the Shopping Center (or portion thereof designated by Landlord). With respect to any assessments which may be levied against or upon the Premises and the underlying realty or water, or which under the laws then in force may be evidenced by improvement or other bonds, or may be paid in annual installments, only the amount of such annual installment (with appropriate proration of any partial year) and applicable interest shall be included within the computation of the annual taxes and assessments levied against the Premises and the underlying realty or water. Landlord shall pay all taxes and assessments promptly unless Landlord in good faith disputes such taxes and assessments.

If at any time during the Lease term under the laws of the United States Government, State of California, or any political subdivision thereof in which the Premises are situated, a tax or excise on rent or any other tax however described is levied or assessed by any such political body, against Landlord or on account of rents payable to Landlord hereunder, such tax or excise shall be considered "taxes" for the purposes of this Article 5 excluding, however, from such tax or excise all general income taxes, gift taxes, inheritance taxes, and estate taxes. In the event Landlord receives any refund of any of the foregoing taxes, Landlord shall refund Tenant's prorata share to Tenant.

5.7    Additional Rent. Tenant shall pay, as additional rent, all sums of money required to be paid pursuant to the terms of this Article 5, the sums to be paid pursuant to Articles 19 and 20 of this Lease, and all other sums of money or charges required to be paid by Tenant under this Lease, whether or not the same be designated "rent" or "additional rent". If such amounts or charges are not paid at the time provided in this Lease, they shall nevertheless be collectible as additional rent with the next installment of monthly rent thereafter falling due, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder, or limit any other remedy of Landlord.

5.8    Failure to Pay Items Required Under Article 5. If Tenant shall fail to pay, when the same is due and payable, any rent or any additional rent, or amounts or charges of the character described in Section 5.7 hereof, such unpaid amounts shall bear interest at the Lease Interest Rate of ten (10%) percent per annum from the date due to the date of payment.

5.9    Address for Payments. All rent and other payments shall be paid by Tenant to Landlord at its management office in the Shopping Center, or at such other place as may from time to time be designated by Landlord in writing at least ten (10) days prior to the next ensuing payment date.

INITIALS

5.10   Returned Checks.   Tenant shall further pay, as additional rent, a charge of ~~seventy-five dollars ($75.00) or twenty-five dollars ($25.00) dollars~~ for each Tenant check made payable to Landlord which is returned due to insufficient funds, whether such payment is for rent or for any other charges required to be paid by Tenant under this Lease, in order to reimburse Landlord for Landlord's related costs.

[redacted paragraph]

[redacted paragraph]

## ARTICLE 6

## CONSTRUCTION OF IMPROVEMENTS

6.1   Building Construction.   Landlord, at Landlord's own cost and expense, has constructed, or shall construct, all or a portion of the shell of the building within which the Premises will be located, together with certain improvements related thereto, in accordance with the provisions set forth in Exhibit "C" attached to this Lease (the "Landlord's Work").

6.2   Improvement Construction.   Tenant, at Tenant's own cost and expense, shall construct certain interior and/or exterior improvements to the Premises in accordance with the provisions set forth in Exhibit "C" (the "Tenant's Work").

6.3   Condition of Premises.   Tenant acknowledges that Landlord has made no representations or warranties as to the condition of the Premises except as may be set forth as Landlord's Work in Exhibit "C." Tenant shall forthwith commence and diligently prosecute to completion the design and construction of Tenant's Work in order to ready the Premises for the conduct of Tenant's business therein. Tenant shall diligently perform the obligations imposed upon Tenant in Exhibit "C" at the times and in the manner therein provided.

6.4   Delivery of Possession for Tenant's Work.   The Premises shall be deemed ready for the commencement of Tenant's Work when Landlord shall have substantially completed Landlord's Work as set forth on Exhibit "C," other than any of Landlord's Work which cannot be performed until Tenant completes its work (or portions thereof). Landlord shall notify Tenant when the Premises are ready for Tenant's Work. In the event of any dispute between Landlord and Tenant as to the completion of any of Landlord's Work, the certificate of Landlord's architect shall be binding and conclusive upon all parties. By occupying the Premises, Tenant formally accepts the same and acknowledges that the Premises are in the condition called for in this Lease. Failure of Landlord to deliver possession of the Premises within the time and in the condition required hereunder will not give rise to any claim for damages by Tenant against Landlord or against Landlord's contractor(s). Occupancy of the Premises by Tenant prior to the substantial completion of Tenant's Work shall be in accordance with all terms and conditions of this Lease, other than the requirement to pay rent or any portion of Common Area Operating Expenses or real estate taxes.

## ARTICLE 7

## POSSESSION AND USE

7.1   Permitted Uses.   Tenant shall use the Premises solely for the purposes and under the trade name specified in Exhibit "B" attached hereto. Tenant shall not use or permit the Premises to be used for any other purpose or purposes and/or under any other trade name whatsoever.

INITIALS

ARTICLE 8
UTILITIES SERVICES

8.1    Tenant's Responsibilities. Commencing with the date Tenant first occupies the Premises (whether or not the Commencement Date has occurred), Tenant shall be solely responsible for and shall promptly pay all fees, deposits and charges, including use and connection fees, hook-up fees, standby fees or penalties for discontinued or interrupted service for water, gas, electricity, sewer and sanitation and any other service or utility used in or upon or furnished to the Premises, irrespective of whether any such fees, deposits or charges for any such services are not individually metered or billed to Tenant; Landlord shall apportion such charges among tenants in the Shopping Center receiving such utilities or services, based upon an equitable apportionment to be determined by Landlord.   In determining such equitable apportionment, Landlord may cause surveys of Tenant's usage of such services to be made by an independent consultant selected by Landlord. In no event shall Landlord be liable for damages or otherwise for any interruption, reduction, disruption, curtailment or failure in the supply, quality or character of water, gas, electricity, sewer and sanitation or any other service or utility, nor shall any such interruption, reduction, disruption, curtailment or failure constitute or be deemed to constitute constructive eviction of Tenant or relieve Tenant from its obligations under this Lease. With respect to any fees, deposits and charges which are separately metered or individually billed to Tenant, if such charges are not paid when due, Landlord may pay the same and any amount so paid shall thereupon become due to Landlord from Tenant as additional rent.  Any utility charges apportioned to Tenant by Landlord shall be deemed to be additional rent.

ARTICLE 9
INDEMNITY-INSURANCE-WAIVER OF SUBROGATION

9.1    Indemnity by Tenant.   Landlord shall not be liable for, and Tenant shall release, indemnify, defend and hold Landlord and Port District harmless from, any claim, demand, liability, judgment, award, fine, mechanics lien, or other lien, loss, damage, expense, charge, or cost of any kind or character (including reasonable attorney's fees, costs of suit, investigation costs, and discovery costs, and further including costs of appeal) arising directly or indirectly from (a) any labor dispute involving Tenant or its contractors and agents, (b) the construction, repair, alteration, improvement, use, occupancy, or enjoyment of the Premises or any other portion of the Shopping Center by Tenant, Tenant's assignees, and/or subtenants and their respective contractors, agents, licensees, or invitees, (c) any breach or failure of performance of any obligation on Tenant's part to be performed under this Lease or (d) injuries to and/or death of persons and damage to property occurring on or about the Premises (hereinafter collectively "Claims") including without limitation Claims caused by Landlord's negligence (whether active or passive), provided, however, Tenant shall have no obligation to indemnify or defend Landlord from claims solely caused by Landlord's  negligence, deliberate misconduct or criminal act.  Notwithstanding anything to the contrary contained herein, Tenant's obligations hereunder to indemnify Landlord shall only extend to those claims for which Tenant may be liable to the party claiming such damage, and then only to the extent of Tenant's proportionate degree of negligence, and shall not extend to claims for which Tenant is immune or for which Tenant's liability is otherwise limited by law, unless it is shown through discovery or at trial that the applicable statute of limitations has not expired, that the claimant has complied with any applicable claims presentation statute, and that there is substantial evidence indicating that the injury or damage for which claim is made was caused by Tenant's negligent act or omission, and further provided that such claim is also one for which damages were awarded, and that such damage arose as a result of Tenant's negligence and further provided that Tenant shall not be required to indemnify Landlord for its proportionate share of such damages.

9.2    Release and Waiver of Subrogation.

(a)    Landlord and Tenant release each other, and their respective authorized representatives, if any, from any claims for damage to any person or to the Shopping Center, the Premises, and the building and other improvements in which the Premises are located and to the fixtures, Tenant's personal property, merchandise, and improvements and alterations of either Landlord or Tenant, in or on the Premises and the building and other improvements in which the Premises are located, including loss of income, business or rents, that are caused by or result from risks insured against under any property insurance policies carried by the parties and in force at the time of such damage, or required to be carried under the terms of this Lease.

(b)    Each party shall endeavor to cause each property insurance policy obtained by it to provide that the insurance company waives all rights of recovery by way of subrogation against either party and their representatives in connection with any damage covered by any policy.  Neither party shall be liable to the other for any damage or loss caused by fire or any other risks insured against under any property insurance policy required by this Lease.  If any such insurance policy cannot be obtained with a waiver of subrogation clause or rider without payment of an additional premium charge above that charged by the insurance companies issuing such policies without waiver of subrogation, the party receiving the benefit shall elect to either forfeit the benefit (in which case the release set forth in this Section 9.2 with respect to a loss



caused by such policy shall be void) or shall pay such additional premium to the insurance carrier requiring such additional premium in order to obtain the waiver of subrogation.

9.3    Tenant's Insurance Obligations.    Tenant agrees to apply for and obtain from insurance companies with general policy holder's ratings of not less than "A," and a financial size rating of not less than "Class XI," as rated in the most current available edition of "Best's Insurance Guide," effective from and after the date of commencement of the term of the Lease at Tenant's sole cost and expense, insurance coverage in the amount specified and in the form hereinafter provided:

(a)    Commercial General Liability Insurance (Occurrence Form Policy) with an Each Occurrence Limit of not less than Two Million Dollars ($2,000,000.00) and a General Aggregate Limit of not less than Two Million Dollars ($2,000,000.00), insuring Tenant and Landlord (as additional insured) against claims for bodily injury, personal injury and property damage based upon, involving, and arising out of the use, maintenance or occupancy of the Premises and all areas appurtenant thereto. Such liability insurance shall include, among other coverages, Products and Completed Operations Liability coverage, Owners and Contractors Protective Liability coverage, Fire Legal Liability coverage, ~~contractual liability coverage, and a broad form property damage~~ ~~endorsement including coverage for the loss of use of such property.~~ Such liability insurance shall contain a "Cross-liability" endorsement, and an "Additional Insured-Managers or Lessors of Premises" endorsement, and an "Amendment of the Pollution Exclusion" for damage caused by heat, smoke or fumes from a hostile fire. Such liability insurance shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease. The Each Occurrence Limit and General aggregate Limit shall not include the cost of defense of third party claims and shall be per location limits. Tenant shall obtain any endorsements necessary to insure that said limits apply only to the Premises. In the event a loss occurs reducing the Each Occurrence limit or the General Aggregate Limit during any policy period, Tenant shall promptly take the action necessary, including, but not limited to, the payment of any additional premiums, to re-establish said limits. The limits of such liability insurance shall not limit the liability of Tenant hereunder nor relieve Tenant of any obligation hereunder.

(b)    Insurance covering all of Tenant's leasehold improvements, alterations, additions and/or improvements, trade fixtures, merchandise and personal property from time to time in, on or upon the Premises, in an amount equal to their full replacement cost from time to time during the term of this Lease, providing protection against any peril included within the classification "All Risk Coverage," including protection against earthquake, flood, sprinkler damage, vandalism and malicious mischief. Any policy proceeds shall be used for the repair or replacement of the property damaged or destroyed unless this Lease shall cease and terminate under the provisions of Article 18 hereof.

(c)    Insurance in the amount of Tenant's Minimum Annual Rent for the first year of the Lease and the amount equal to Tenant's Minimum Annual Rent together with Tenant's Percentage Rent for each year thereafter of the Lease term payable to Landlord in the event Tenant is unable to operate its business upon the Premises for any reasons other than the termination of this Lease.

(d)    All policies of insurance provided for herein to be obtained by Tenant shall be issued by an insurance company or insurance companies approved in writing by Landlord, and shall be issued in the name of Tenant with Landlord as an additional insured, which policies shall be for the mutual and joint benefit and protection of Landlord and Tenant, and executed copies of such policies of insurance or certificates thereof shall be delivered to Landlord within ten (10) days after issuance of each such policy. All public liability and property damage policies shall contain a provision that Landlord, although named as an additional insured, shall nevertheless be entitled to recovery under said policies for any loss occasioned to it, its servants, agents and employees by reason of the negligence of Tenant. As often as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent, and shall be delivered to Landlord at least ten (10) days prior to the expiration of the term of the existing policy. All policies of insurance delivered to Landlord must contain a provision that the company writing said policy will give Landlord thirty (30) days' notice in writing in advance of any cancellation or lapse of the effective date of any reduction in the amounts of insurance. All public liability, property damage and other casualty policies shall be written as primary policies, not contributing with and not in excess of coverage which Landlord may carry, whose insurance shall be considered excess insurance only. In the event that Tenant shall fail to insure or shall fail to furnish to Landlord any such policy, duplicate policy or certificate as herein required, Landlord may from time to time, but shall not be required to, effect such insurance for the benefit of Tenant or Landlord or both of them for a period not exceeding one year, and any premium paid by Landlord shall be recoverable from Tenant as additional rent on demand. No policy of Tenant insurance shall include a deductible; provided, however, that Landlord shall not unreasonably withhold its consent to a five hundred dollar ($500) deductible on the policy required by Section (b) above; provided further that in the event of a deductible, whether consented to by Landlord or not, Tenant shall be deemed to have self-insured in the amount of the deductible, and no such self insurance shall diminish the rights and privileges to which Landlord would otherwise have been entitled to under the terms of this Lease had there been a third-party insurer, such as waiver of subrogation.

Notwithstanding anything to the contrary contained within this Article 9, Tenant's obligations to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant, provided, however, that Landlord shall be named as an additional insured thereunder as its interest may appear and that the coverage afforded Landlord will not be reduced or diminished by

reason of the use of such blanket policy of insurance, and provided further that the requirements set forth herein are otherwise satisfied. Tenant agrees to permit Landlord at all reasonable times to inspect policies of insurance of Tenant covering risks upon the Premises for which policies or copies thereof are not required to be delivered to Landlord.

     9.4    Landlord's Insurance. Landlord shall at all times during the term hereof maintain in effect a policy or policies of insurance covering the building of which the Premises are a part, in an amount not less than ninety percent (90%) of full replacement cost (exclusive of the cost of excavations, foundations and footings) from time to time during the term of this Lease or the amount of such insurance the Port District or Landlord's mortgage lender requires Landlord to maintain, whichever is greater. Landlord's obligation to carry the insurance provided for herein may be brought within the coverage of any so-called blanket policy or policies of insurance carried and maintained by Landlord, provided that the coverage afforded will not be reduced or diminished by reason of the use of such blanket policy of insurance. Tenant agrees to pay Landlord as additional rent, during each year or partial year of the term of this Lease, the cost to Landlord of the insurance required to be maintained by Landlord on the Premises (including any deductible portion thereof) for each such year or partial year. Such additional rent for any partial year of the term hereof shall be prorated on a time basis. Payment shall be made by Tenant within fifteen (15) days after receipt of a written statement from Landlord setting forth the cost of such insurance and showing in reasonable detail the manner in which it has been computed. In the event the cost to Landlord of the insurance it is required to maintain on the Premises under this Section 9.4 is not separately charged to Landlord by its insurance carrier, the portion applicable to the Premises of the cost of such insurance shall be based upon a fraction the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of the Premises and of all other areas of the Shopping Center occupied and open for business by other tenants of Landlord.

     Landlord shall additionally be entitled to, but not required to, obtain any other insurance coverage, including without limitation earthquake coverage, as it deems necessary or appropriate for the benefit of the Shopping Center, and Tenant agrees within ten (10) days following billing therefor to pay that portion of such cost as the Floor Area of the Premises bears to the Floor Area of the Premises and of all other areas of the Shopping Center occupied and open for business by other tenants of Landlord.

     9.5    Insurance Use Restrictions. Tenant agrees that it will not carry any stock or goods or do anything in or about the Premises that will in any way increase the rates for insurance covering the Shopping Center, or cause a loss of coverage for the Shopping Center. Tenant agrees to pay to Landlord forthwith upon demand the amount of any increase in premiums charged to Landlord for insurance carried by Landlord pursuant to Section 9.4 above, which increase results from Tenant's violation of the foregoing restrictions, irrespective of whether Landlord shall have consented to Tenant's carrying said stock or goods or to Tenant's actions. If Tenant installs upon the Premises any electrical equipment which overloads the electrical lines, Tenant shall, at its own expense, make all changes to its Premises and install any fire extinguishing equipment that Landlord's insurance underwriters or applicable fire, safety and building codes and/or regulations may require. Nothing herein contained shall be deemed to constitute Landlord's or the Port District's consent to such overloading.

     9.6    Changes in Insurance Coverage, Form and Amount. If, at any time, in the reasonable opinion of Landlord's lender or of the Port District, or the insurance broker retained by Landlord, the coverage, form or amount of any insurance required under this Article 9 to be carried by Tenant is inadequate, then Tenant shall, at its sole cost and expense, forthwith upon the request of Landlord obtain insurance in coverage, form and amount as required by either Landlord's lender, the Port District, or Landlord's insurance broker.

## ARTICLE 10

### MASTER LEASE

     10.1    Subject to Master Lease. Landlord is the lessee under a ground lease (the "Master Lease") executed by the Port District, as "Lessor," and Landlord, as "Lessee," and it is agreed that this Lease shall be and remain subject and subordinate to the terms, covenants and conditions of the Master Lease and any modification, replacement, alteration or substitution

therefor including, without limitation, any modification, replacement, alteration or substitution made in connection with any expansion, redesign or reconfiguration of the Shopping Center. Tenant agrees that as to its leasehold estate it, and all persons in possession or holding under it, will conform to and will not violate any of the terms or provisions of the Master Lease as such Master Lease may be modified, altered, replaced or substituted from time to time. In the event of any conflict or inconsistency between this Lease and the Master Lease, the provisions of the Master Lease shall govern and prevail. It is understood that this Lease shall not become effective until it is consented to by the Port District.

All consents and approvals required under this Lease from the Port District shall be applied for solely by Landlord. Tenant shall at no time apply directly to the Port District for any required approval or consent. In connection with obtaining such consents and approvals, Tenant shall promptly furnish to Landlord such information and material as the Port District may require and shall pay to Landlord all fees and other charges imposed by the Port District.

Notwithstanding the provisions of Article 4, it is agreed that the Lease term shall not in any event extend beyond the term of the Master Lease.

In the event the amount of rent increases that Landlord is required to pay the Port District for the property which includes the Premises covered by this Lease, the rent that Tenant pays Landlord shall automatically increase at the same time by the same rate or amount in the case of a Percentage Rent change and, in the case of a flat rent increase, the portion of such increase applicable to the Premises based upon a fraction, the numerator of which shall be the Floor Area of the Premises, and the denominator of which shall be the Floor Area occupied and open for business by other tenants ░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░ ░░░░░░░░░░░in the Shopping Center (or portion thereof designated by Landlord). The foregoing shall include any increases in rent under the Master Lease in connection with, as a result of, or as a condition to the Port District's consent to this Lease.

## ARTICLE 11

### ALTERATIONS BY TENANT

11.1  Alterations.  Tenant agrees that it will not make any alterations, additions or changes in and to the ░░░░░░░░ interior of the Premises ░░░░░░░░░░░░░░░░░░░░░░░░░ ░░░░░░░without the prior written consent of Landlord and the Port District, which may be granted or withheld in their sole and absolute discretion. In the event that said consents are given, Tenant shall be responsible for the entire cost and expense of such alterations, additions and changes. All alterations, additions or changes to the Premises shall be designed by and made under the supervision of a competent licensed architect and/or engineer(s) and made in accordance with plans and specifications with respect thereto, which are first approved in writing by Landlord and the Port District before the commencement of work, and shall otherwise be subject to the provisions of Exhibit "C" hereto as though it were Tenant's Work to be performed pursuant to Article 6.  Upon completion of any alterations, Tenant shall provide Landlord with "as-built" drawings thereof.

11.2  Insurance for Permitted Alterations.  In the event that Tenant shall make any permitted alterations, additions or improvements to the Premises under the terms and provisions of this Article 11, Tenant agrees upon its part to carry such insurance as required by Section 9.3 and Exhibit "C" covering any such alteration, addition, or improvement, it being expressly understood and agreed that none of such alterations, additions or improvements shall be insured by Landlord under such insurance as it may carry upon the building of which the Premises are a part, nor shall Landlord be required under any provisions for reconstruction of the Premises to reinstall any such alterations, improvements or additions.

## ARTICLE 12

### MECHANIC'S LIENS

12.1  Tenant's Covenants.  Tenant agrees that it shall pay or cause to be paid all costs for work done by it or caused to be done by it on the Premises, and Tenant shall keep the Premises free and clear of all mechanic's liens and other liens on account of work done for Tenant or persons claiming under it. Tenant agrees to and shall indemnify, defend and hold Landlord free and harmless against liability, loss, damage, costs, attorneys' fees, and all other expenses on account of claims of lien of laborers or materialmen or others for work performed or materials or supplies furnished Tenant or persons claiming under it.

20003431
Retail Sublease
CS/dm/September 17, 1996

INITIALS

12.2 <u>Contest of Lien</u>. If Tenant shall desire to contest any claim of lien, it shall furnish Landlord adequate security of the value or in the amount of the claim plus estimated costs and interest, or a bond of a responsible corporate surety in such amount conditioned on the discharge of the lien. If a final judgment establishing the validity or existence of a lien for any amount is entered, Tenant shall pay and satisfy the same at once.

12.3 <u>Right to Cure</u>. If Tenant shall be in default in paying any charge for which a mechanic's lien claim and suit to foreclose the lien have been filed, and shall not have given Landlord security to protect the property and Landlord against such claim of lien, Landlord may (but shall not be so required to) pay the said claim and any costs, and the amount so paid, together with reasonable attorneys' fees incurred in connection therewith, shall be immediately due and owing from Tenant to Landlord, and Tenant shall pay the same to Landlord with interest at the Lease Interest Rate commencing from the date(s) of Landlord's payment(s).

12.4 <u>Notice of Lien</u>. Should any claim of lien be filed against the Premises or the Shopping Center, or should any action affecting such property be commenced, the party receiving notice of such lien or action shall forthwith give the other party written notice thereof.

12.5 <u>Notice of Nonresponsibility</u>. Landlord or its representatives shall have the right to go upon and inspect the Premises at all reasonable times and shall have the right to post and keep posted thereon notices of nonresponsibility, or such other notices which Landlord may deem to be proper for the protection of Landlord's interest in the Premises. Tenant shall, before the commencement of any work which might result in any such lien, give to Landlord written notice of its intention to do so in sufficient time to enable the posting of such notices.

ARTICLE 13

SIGNS

13.1 <u>Restrictions</u>. Tenant shall not affix or maintain upon the glass panes and supports of the windows (and within 24 inches of any window), doors, interior of doors as they face open to the outside of the shop onto the Common Area, or the exterior walls of the Premises, any signs, advertising placards, names, insignia, trademarks, neon tubes, descriptive material or any other such like item or items. Anything to the contrary in this Lease notwithstanding, Tenant shall not affix any sign or advertising medium to the roof of the Premises. In addition, no advertising medium shall be utilized by Tenant which can be heard or experienced outside Tenant's Premises, including without limiting the generality of the foregoing, flashing lights, searchlights, loudspeakers, phonographs, radios, or television.

Tenant shall not display, paint or place or cause to be displayed, painted or placed, any handbills, bumper stickers, or other advertising devices on any vehicle parked in the parking area of the Shopping Center, whether belonging to Tenant, or to Tenant's agent, or to any other person; nor shall Tenant distribute in the Shopping Center any handbills or other advertising devices.

Tenant further agrees that no banners, pennants, flags, eye-catching spinners, balloons, or other advertising devices, nor any temporary signs shall be permitted to be flown, installed, placed or erected on the Premises.

13.2 <u>Landlord's Authority and Responsibility</u>. Landlord shall have sole authority and responsibility for the design, construction, and installation of all signage in the Shopping Center, including tenant identification signs. Tenant shall be responsible for all costs of such identification signs, including the maintenance thereof. Landlord shall, in accordance with the Shopping Center sign program presently in effect and after consulting with Tenant regarding design and location, submit all sign proposals to the Port District for approval. Such signs shall not be constructed or installed without the prior written consent of the Port District; provided that Tenant shall not make any direct sign submittals to the Port District.

13.3 <u>Removal</u>. Any item or items placed in the Shopping Center by Tenant in violation of this Article 13 shall be considered a violation of this Article 13 and shall be subject to summary removal by Landlord without notice to Tenant.

13.4 <u>Sign Criteria</u>. All signs shall be constructed, installed, maintained, and operated in accordance with the sign criteria prescribed by Landlord from time to time with the approval of the Port District. Lessee shall be allowed to include in its sign its logo, docawican's plake and note wina red do que.

INITIALS

## ARTICLE 14

### TRADE FIXTURES, PERSONAL PROPERTY AND IMPROVEMENTS

**14.1** <u>Trade Fixtures and Personal Property</u>. Any of Tenant's goods, merchandise, trade fixtures, furniture, movable equipment, counters, shelving, showcases, mirrors and other movable items (collectively, the "Removable Property") shall remain the property of Tenant, and Landlord agrees that Tenant shall have the right, provided Tenant is not then in default under the terms of this Lease, at any time, and from time to time, prior to the end of the term of this Lease to remove any and all of its Removable Property which it may have stored or installed in the Premises. Nothing contained in this Article 14 shall be deemed or construed to permit or allow Tenant to remove so much of such personal property during the term, without the immediate replacement thereof with similar personal property of comparable or better quality, as to render the Premises unsuitable for conducting the type of business specified in Exhibit "B" attached hereto. Tenant at its sole cost and expense shall immediately repair any damage occasioned to the Premises by reason of the removal of any Removable Property, and upon the last day of the Lease term or a date of earlier termination of this Lease, shall leave the Premises in a neat and clean condition, free of debris. All Removable Property installed in the Premises by Tenant shall be new and of good quality when so installed.

**14.2** <u>Improvements</u>. Subject to the provisions of Section 14.4 below, all improvements to the Premises attached or installed by Tenant including but not limited to light fixtures, electrical panels, air conditioning units, floor cover-ings and partitions, but excluding Tenant's Removable Property, shall become the property of Landlord upon expiration or earlier termination of this Lease. Except as otherwise expressly agreed in writing by the parties, property affixed or attached to the Premises shall be presumed not to be a trade fixture and therefore not a part of Tenant's Removable Property; provided that said presumption shall be rebuttable by Tenant by a preponderance of the evidence.

**14.3** <u>Personal Property Taxes and Assessments</u>. Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation and upon its personal property and leasehold improvements (including but not limited to those referred to in Articles 6 and 11) in, to or on the Premises. In the event any such items of property are assessed with property of Landlord, then, and in such event, such assessment shall be equitably divided between Landlord and Tenant to the end that Tenant shall pay only its equitable proportion of such assessment.

Landlord shall determine the basis of prorating any such assessments and such determination shall be binding upon both Landlord and Tenant. No taxes, assessments, fees or charges referred to in this Paragraph shall be considered as taxes under the provisions of Article 5 hereof.

**14.4** <u>Removal</u>. Structures, installations, or improvements of any kind now existing or hereafter placed on the Premises by Tenant shall not be removed by Tenant without the prior written consent of Landlord and the Port District, and shall, at the written option of Landlord, with the prior written consent of the Port District, be removed by Tenant prior to the expiration of the term of this Lease or sooner termination hereof. Landlord may exercise said option as to any or all of the structures, installations and improvements, either before or after the expiration or sooner termination of this Lease. If Landlord exercises such option and Tenant fails to remove such structures, installations or improvements within two (2) days after termination of this Lease, Landlord shall have the right to have such structures, installations or improvements removed at the expense of Tenant. As to any or all structures, installations or improvements that Landlord does not exercise said option for removal, title thereto shall vest in Landlord without cost to Landlord and without any payment to Tenant.

Tenant's Removable Property now existing or hereafter placed on the Premises by Tenant shall be removed by Tenant prior to the expiration of the term of this Lease or sooner termination hereof; provided, however, Tenant agrees to repair any and all damage occasioned by the removal thereof. If any such Removable Property is not removed prior to the expiration or termination of this Lease, the same may be considered abandoned and shall thereupon become the property of Landlord without cost to Landlord and without any payment to Tenant; except that Landlord shall have the right to have the same removed at the expense of Tenant.

During any period of time beyond the expiration or earlier termination of this Lease employed by Tenant under this Article 14 to remove structures, installations, improvements, or machines, appliances, equipment, goods, trade fixtures, or any other Removable Property

which Landlord has required Tenant to remove, Tenant shall pay rent to Landlord in accordance with this Lease, prorated for the actual number of days.

ARTICLE 15
ASSIGNING, MORTGAGING, SUBLETTING,
CHANGE IN OWNERSHIP

15.1  Definitions.  As used in this Article, the following definitions shall apply:

(a)  "Transfer" means any voluntary, or involuntary (a) assignment of Tenant's entire interest, rights and duties in the Lease and the Premises, including Tenant's right to use, occupy and possess the Premises, or (b) sublease of Tenant's right to use, occupy and possess the Premises, in whole or in part;

(b)  "Encumbrance" means any conditional, contingent or deferred assignment or sublease voluntarily or involuntarily made by Tenant of some or all of Tenant's interest, rights or duties in the Lease or the Premises, including without limitation Tenant's right to use, occupy or possess the Premises, in whole or part, including, without limitation, any mortgage, pledge, hypothecation, lien, franchise, license, concession or other security arrangement other than a sublease;

(c)  "Change of Control" means the transfer by sale, assignment, death or incompetency, mortgage, trust, operation of law, or otherwise of any shares voting rights or other interests of Tenant which will result in a change in the identity of the person or persons, exercising, or who may exercise, effective control of Tenant, unless such change results from the trading of shares listed on a recognized public stock exchange and such trading is not for the purpose of acquiring effective control of Tenant.  If Tenant is a private corporation whose stock becomes publicly held with its shares listed on a recognized public stock exchange, the transfer of such stock from private to public ownership shall not be deemed a Change of Control.  Landlord agrees that in no event shall the trading of shares by the principal shareholders of Big Dogs USA, Inc. a change in the identity of the person or persons exercising or who may exercise effective control of (Big Dogs USA, Inc. all tenant's retail premises) Tenant, or any similar event be defined as a Occupancy Transaction, however, should this transaction occur Landlord and Port district's consent is required.

(d)  "Occupancy Transaction" means any Transfer, Encumbrance, Change of Control, or other arrangement whereby the identity of the person or persons using, occupying or possessing the Premises changes or may change, whether such change be of an immediate, deferred, conditional, exclusive, nonexclusive, permanent or temporary nature;

(e)  "Transferee" means the proposed assignee, sublessee, mortgagee, pledgee or other recipient of Tenant's interest, rights or duties in this Lease or the Premises in an Occupancy Transaction.

15.2  First Two Years.  Landlord is entering into this Lease based upon Tenant's representation to Landlord that Tenant has the expertise and ability to produce maximum sales in the operation of the business to be conducted by Tenant on the Premises.  It is recognized by the parties that it is of importance to Landlord that Tenant operate the business during the first two (2) years of this Lease, particularly in view of the fact that this is a percentage Lease and Landlord is relying on Tenant's merchandising and operating expertise.  Landlord would not enter into this Lease if Tenant were permitted to 'trade' on the value of the Lease and assign the Lease or sublease the Premises during the first two (2) years of the term hereof.

Tenant, therefore, shall not enter into any Occupancy Transaction during the first two (2) years of the term hereof without the consent of Landlord, which consent shall not be unreasonably withheld.  Any attempted Occupancy Transaction during the first two (2) years after the execution hereof shall be void and confer no rights upon any third person.



15.3  Remaining Term.
(a)  After the first two (2) years of the term hereof, Tenant shall not enter into any Occupancy Transaction with respect to any of Tenant's interest in and to the Premises without first procuring the written consent of Landlord, which consent shall not be unreasonably withheld.  Any attempted Occupancy Transaction without Landlord's prior written consent shall be void and confer no rights upon any third person.  Landlord reserves the right to refuse to give such consent unless Tenant remains fully liable during the unexpired term of the Lease.  The consent by Landlord to any assignment or subletting shall not be construed as relieving Tenant or any Transferee of this Lease from complying with the terms of this Article 16 with respect to any further Occupancy Transaction.
(b)  By way of example and without limitation, Landlord and Tenant hereby agree that it shall be reasonable for Landlord to withhold its consent if any of the following situations exist or may exist:

INITIALS

(i)    The Transferee's proposed use of the Premises following the Occupancy Transaction will conflict with the "Use of Premises" portion of Exhibit "B";

(ii)    In Landlord's reasonable judgment, the Transferee lacks sufficient ability and expertise to operate a successful business of the type and quality permitted under the Lease.

(iii)    In Landlord's judgment, the present net worth of the Transferee is less than the greater of Tenant's net worth at the commencement date of the term of this Lease or Tenant's net worth at the date of Tenant's request for consent;

(iv)    In Landlord's judgment, the Percentage Rent under Article 5 that Landlord reasonably anticipates receiving from the Transferee will be less than that which Landlord has received or reasonably expects to receive from Tenant;

(v)    The Occupancy Transaction would breach any covenant of Landlord respecting radius, location, use or exclusivity in any other lease, financing agreement, or other agreement relating to the Shopping Center;

(vi)    In Landlord's judgment, the quality of the merchandising operation would be adversely affected; or

(vii)    In Landlord's judgment, the Transferee and/or the principals thereof are not reputable (meaning they have a reputation for dishonesty, criminal conduct, or association with criminal elements).

15.4    Procedures For Obtaining Landlord's and Port District's Consent.

(a)    Should Tenant desire to enter into an Occupancy Transaction, Tenant shall request in writing Landlord's consent to such transaction at least sixty (60) days before the effective date of any such transaction, and shall provide Landlord with the following:

(i)    The full particulars of the proposed transaction, including its nature, all consideration to be paid pursuant to said transaction, effective date, terms and conditions, and copies of any offers, draft agreements, subleases, letters of commitment or intent, and other documents pertaining to such proposed transaction;

(ii)    A description of the identity, net worth and previous business experience of the Transferee and the persons involved therein, including, without limitation, copies of Transferee's latest income, balance sheet and change-of-financial-position statements (with accompanying notes and disclosures of all material changes thereto) in audited form, if available, and certified as accurate by the Transferee, copies of the past two years' federal income tax returns, and resumes and business and financial references of the Transferee and the persons involved therein;

(iii)    Any further information relevant to the transaction which Landlord shall have requested within fifteen (15) days after receipt of Tenant's request for consent;

(iv)    Any further information relevant to the transaction which the Port District shall have requested; and

(v)    A statement that Tenant intends to consummate the transaction if Landlord consents thereto.

(b)    Subject to Section 15.5 below, within thirty (30) days after receipt by Landlord of the information required by subsection (a) above, Landlord may either:

(i)    Consent, to the Occupancy Transaction, subject to Section 15.7 below, if, pursuant to Sections 15.2 or 15.3 above, Landlord is not entitled to withhold its consent; or

(ii)    Refuse to consent to the Occupancy Transaction, if, pursuant to Sections 15.2 or 15.3 above, Landlord is entitled to withhold its consent; or

(iii)    In any case terminate this Lease on ten (10) days' written notice to Tenant unless Tenant rescinds its request for consent within five (5) days following receipt of Landlord's notice of termination.

15.5    Port District's Consent Required.    Tenant and Landlord hereby acknowledge and agree that no Occupancy Transaction may be consented to by Landlord or entered into by Tenant without first obtaining the additional prior written consent of the Port District.

15.6    Documentation and Expenses.    Each Occupancy Transaction to which Landlord has consented shall be evidenced by an instrument made in such written form as is satisfactory to Landlord and the Port District and executed by Tenant and Transferee.    By such instrument, Transferee shall assume and promise to perform the terms, covenants and conditions of this Lease which are obligations of Tenant including the payment of all monies due or to become due under this Lease directly to Landlord. Unless expressly released by Landlord, Tenant shall remain fully liable to perform its duties under the Lease following the Occupancy Transaction. Tenant shall reimburse Landlord for all attorneys' fees incurred in obtaining advice and preparing documentation for each Occupancy Transaction for which Landlord has processed which amount shall not be less than $750.

15.7    Consideration to Landlord.

(a)    In the event Landlord shall consent to an Occupancy Transaction, the Transferee shall thereafter pay directly to Landlord the Minimum Annual Rent specified in Section 1.7;

-18-

INITIALS

provided, however, that said Minimum Annual Rent shall be increased on the effective date of such Occupancy Transaction to the highest of:

(i) The minimum or base rent, if any, payable by the Transferee to Tenant; or

20003431
Retail Sublease
CS/dm/September 17, 1996



**15.8** <u>Right of Refusal</u>. Notwithstanding any other provision hereof, in lieu of Landlord's giving consent to an Occupancy Transaction [in the event Tenant attempts to transfer or sublet Seacon Village location and/or more than 50% of the Tenant's retail locations then] Landlord may elect to construe such proposed transfer as an offer to Landlord which may be accepted at any time within thirty (30) days after receipt thereof, and if so accepted, such transfer to Landlord shall be consummated on all the terms and provisions set forth in such proposed transfer, and Tenant shall be released from any liability under this Lease (as to that portion of the Premises involved) accruing after the effective date of such transfer to Landlord.

**15.9** <u>No Waiver</u>. Landlord's consent to an Occupancy Transaction on any one occasion shall apply only to the specific transaction thereby authorized and such consent shall not be construed as a waiver of the duty of Tenant, the Transferee, or any subsequent transferee to obtain Landlord's consent to any other or subsequent Occupancy Transaction or as modifying or limiting Landlord's rights hereunder in any way. Landlord's acceptance of rent or any other payment directly from any third party shall not be construed as a waiver of any of Landlord's rights or as Landlord's agreement to accept the attornment of any third party in the event of a termination of this Lease. In no event shall Landlord's enforcement of any provision of this Lease against any third party be deemed a waiver of Landlord's rights to enforce any term of this Lease against Tenant or any other person.

**15.10** <u>Consent To Approved Third Parties</u>. In the event that Landlord gives its consent to an Occupancy Transaction, such Transferee or consented to third party must in turn apply to Landlord for its consent to subsequent Occupancy Transactions, in which case the provisions of this Article 15 shall apply as fully as possible to such third party (including this Section 15.10 in the case of more remote transfers); provided, however, that as an additional condition of the granting of Landlord's consent the Premises will not, in Landlord's opinion, thereby become unduly fractionalized.

ARTICLE 16
<u>TENANT'S CONDUCT OF BUSINESS</u>

**16.1** <u>Operating Covenants; Days and Hours</u>. Tenant covenants and agrees that, continuously and uninterruptedly from and after its initial opening for business, it will operate and conduct within the Premises the business and uses which it is permitted to operate and conduct under the provisions hereof in a manner calculated to maximize Gross Sales, except as necessary while the Premises are untenantable by reason of fire or other casualty or during remodeling; and that it will keep the Premises in a neat, clean and orderly condition. Tenant shall maintain at all times adequate stock levels of quality merchandise, together with a sufficient number of trained peronnel in order to service and supply the reasonable expectations of its customers. Tenant agrees that all trash and rubbish of Tenant shall only be deposited within receptacles as provided by Landlord and that there shall be no other trash receptacles permitted to remain outside of the Premises. Landlord agrees to cause such receptacles to be kept out of sight of customers and to be emptied and trash removed at Tenant's cost and expense. Tenant shall provide its own janitorial service.

Should Tenant fail to use the trash receptacles designated by Landlord for trash deposit after (10) days' written notice by Landlord to do so, Tenant shall be obligated to pay to Landlord the sum of One Hundred Dollars ($100.00) for each such failure, which amount(s) shall be payable as additional rent.

Tenant shall continuously, during the Lease term, operate the business and be open for business a minimum of eleven hours a day (10:00 a.m. to 9:00 p.m.) from the day immediately following Labor Day through May 31, and a minimum of twelve hours per day

INITIALS

(10:00 a.m. to 10 p.m.) June 1 through Labor Day, seven (7) days a week. The hours during which Tenant shall be open for business may be adjusted upon mutual written agreement of Landlord and a majority of the tenants in the Shopping Center to increase, but not decrease, the hours.

Tenant hereby agrees to pay to Landlord the amount of ▓▓▓▓▓▓ Hundred Dollars ($100.00) per day as additional rent for each day Tenant fails to comply with the minimum hour requirement hereinabove set forth.

Tenant and Landlord acknowledge and agree that the foregoing charges for failure to use trash receptacles and to comply with the minimum hour requirements represent fair and reasonable estimates of the costs, expenses, and damages that Landlord will incur by reason of such defaults by Tenant, the exact amount of such costs, expenses and damages being extremely difficult and impracticable to fix. Acceptance of any such charges shall not constitute a waiver by Landlord of Tenant's default nor prevent Landlord from exercising any of the other rights and remedies available to Landlord hereunder or as provided by law.

_____                    _____
       Tenant                                 Landlord

Tenant shall conform to, abide by, shall be subject at all times to, and shall comply with, all applicable laws, rules, regulations, resolutions, ordinances, orders and statutes of the County of San Diego, City of San Diego, State of California, the Port District and federal government and all other governmental agencies where applicable; and where permits are required for such operations, the same must be first had and obtained from the regulatory body having jurisdiction before such operation is undertaken.

Tenant shall keep the Premises in a safe, clean, wholesome and sanitary condition to the complete satisfaction of Landlord, the City and County of San Diego, and the Port District, who shall have the right to enter upon and inspect the Premises at any time for cleanliness and safety. Should Landlord and/or representatives of the City or County of San Diego or the Port District determine the Premises are not being maintained in compliance herewith, Landlord shall be entitled to put the Premises in a safe, clean, wholesome and sanitary condition and charge the costs and expenses thereby incurred to Tenant as additional rent.

16.2 New Locations. Tenant agrees that it will not, during the first five (5) years after the Commencement Date ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ directly or indirectly, operate or own any similar type of business (not so operated or owned on the date of this Lease) at Horton Plaza ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Without limiting Landlord's remedies, in the event Tenant should violate this covenant, Landlord may, at its option and for so long as Tenant is operating said other business, include "Gross Sales" of such other business for the purpose of computing Percentage Rent due hereunder. After the aforementioned five-year period, Tenant may operate another business within the aforementioned radius, provided: (a) Tenant gives Landlord written notice of its intention to operate such business and the location and anticipated opening date of such business; and (b) within thirty (30) days of the date of said written notice, Landlord and Tenant shall enter into a written Lease Amendment Agreement, adjusting the Minimum Annual Rent payable under Article 5 hereof. Said Minimum Annual Rent shall be adjusted as follows: From the statements of Gross Sales as submitted by Tenant under Section 5.4 hereof, Landlord shall compute a sum which represents the annual Percentage Rent paid or payable by Tenant under Section 5.3 hereof for the highest twelve (12) month calendar year of the immediately preceding sixty (60) month period, and this sum, if any, shall be added to the sum specified in Article 1 as Minimum Annual Rent, and this resulting sum shall thereafter be the Minimum Annual Rent payable hereunder. The effective date for payment of the adjusted Minimum Annual Rent shall be the first day of the calendar month following the opening of Tenant's other business.

16.3 Quality of Operation. At all times the business to be conducted in the Premises and the kind and quality of merchandise and if permitted by this Lease the food service to be offered and the conduct thereof will be first class in every respect, and the sales methods of merchandising, display and advertising will be dignified and in conformity with the highest standards of practice prevailing among first class stores (and restaurants) in the San Diego area. Without limitation upon other Landlord remedies, in the event Tenant displays signage

INITIALS

unsatisfactory to Landlord, Landlord may (i) without notice and (ii) without such constituting a forcible entry (x) enter upon the Premises and remove or alter unsatisfactory signage and (y) employ a professional window dresser and/or merchandiser who shall have the right to enter upon Premises and re-display, re-sign, and re-merchandise portion of Tenant's store visible from without the Premises, and Tenant shall reimburse Landlord for all costs incurred as additional rent within ten (10) days following billing.

16.4 <u>Rules and Regulations</u>. Tenant shall comply and shall cause its subtenants, and its and their respective employees, agents, customers and invitees to comply at all times with the rules and regulations attached hereto as Exhibit "F" (such rules and regulations, as the same may be amended, being herein defined as the "Rules and Regulations"). Landlord shall have the sole and exclusive right from time to time, with the prior written approval of the Port District, to amend the Rules and Regulations and to make other and different Rules and Regulations for the safety, care and cleanliness of and the preservation of good order in the Premises, the Common Area, and the other parts of the Shopping Center. The Rules and Regulations and all such amended and additional Rules and Regulations shall, after notice thereof to Tenant, be binding upon Tenant and shall become conditions of Tenant's tenancy and shall become covenants on the part of Tenant and shall be performed by Tenant as though they were set forth in this Lease; and a material violation thereof by Tenant shall be a default under this Lease. To the extent permitted by leases with other Shopping Center tenants, all such Rules and Regulations shall be uniformly applicable to all tenants and occupants of the Shopping Center; provided, however, that Tenant shall have no claim, demand or cause of action against Landlord or any other person by reason of, or arising out of, the breach or violation of such Rules and Regulations by any other tenant or occupant of the Shopping Center, the failure of Landlord to enforce any of such Rules and Regulations or the waiver by Landlord of compliance with respect to any such Rules and Regulations. In the event of any conflict between the provisions of this Lease and the provisions of any of the Rules and Regulations, the provisions of this Lease shall control.

ARTICLE 17

REPAIRS AND MAINTENANCE

17.1 <u>Tenant's Obligations</u>. By entry hereunder Tenant accepts the Premises as being in good condition, order, and repair and in the condition in which Landlord is obligated to deliver the Premises. Tenant has conducted its own inspections and has relied entirely thereupon and upon those of its agents, representatives, and consultants in evaluating the condition of the Premises. Other than as expressly stated in Section 17.2, and as to the Common Area, there is no Landlord repair obligation. Tenant shall, at all times during the term hereof and at Tenant's sole cost and expense, keep the Premises and every part thereof (except as provided in Section 17.2) in good and sanitary condition and repair. ~~Tenant hereby waives all rights to make repairs at the expense of Landlord or in lieu thereof to vacate the Premises as provided in California Civil Code Section 1942 or any other law, statute or ordinance now or hereafter in effect. Without limiting the generality of the foregoing:~~

(a)   Tenant shall maintain in good condition and to the highest standard of cleanliness, and to Landlord's satisfaction, all signs (whether within or outside of the Premises), metal work, ceilings, hardware, moldings, walls, partitions, floors, doors, door frames, thresholds, and the interior and exterior of all windows, glazing, frames, and show cases in the Premises. Tenant shall cause all wood floors in the Premises to be waxed as often as is necessary to protect and preserve the same, but in no event less than once per quarter. Should Landlord determine that the condition of wood floors is dangerous or unsightly, and such condition persists for ten (10) days following written notice to Tenant, Landlord may cause the floors to be refinished, re-waxed, or otherwise put into condition satisfactory to Landlord, and Tenant shall reimburse Landlord for all costs incurred, as additional rent within ten (10) days following Landlord billing. ~~Tenant shall complete or cause all walls bearing ceilings and display cases needed, but in any event not less frequently than every two (2) years.~~

(b)   (i)   Tenant shall maintain, repair and replace, at its own expense and in a good and safe operating condition, all heating, ventilating and air conditioning equipment and facilities (the "HVAC") installed in or exclusively serving the Premises. If the Premises may be used for food service, any grease hood ventilation equipment shall include a fine pre-filter and activated charcoal filters or their equivalent, and all kitchen ventilating equipment shall be so operated and maintained as to prevent the emission of odors and smoke from the Premises. Tenant shall maintain a service contract satisfactory to Landlord, which shall provide for preventive maintenance not less frequently than each three (3) months, for the regular maintenance of the

INITIALS

HVAC with service company(s) designated by Landlord at Tenant's expense. Evidence of such service contract shall be provided to Landlord prior to commencement of the term, and thereafter at least thirty (30) days prior to the expiration date of any contract. Notwithstanding the foregoing provisions, Landlord may elect at any time upon written notice to Tenant to perform the maintenance of the HVAC for the account of Tenant. In such event, Tenant shall pay the full cost of the maintenance contract for the HVAC within ten (10) days of receipt of billing therefor from Landlord, as well as for costs of repair or replacement thereof as necessary, in the reasonable judgment of Landlord.

(ii) Landlord may, at its option, elect to have the HVAC in or exclusively serving the Premises maintained in common with its other equipment, and if any heating, ventilation and/or cooling equipment and/or facilities serve others in common with Tenant, Landlord shall maintain it. In such event Tenant shall pay its pro rata share of such maintenance costs which share shall be established in an equitable manner by Landlord based upon the relative tonnage serving the Premises, compared to the total tonnage under contract, or some other reasonable means of allocation as selected by Landlord. Landlord's good faith judgment as to the allocation of the charges described in this paragraph shall be conclusive. Included in the charges to be allocated to Tenant shall be the following, without limitation: the maintenance contract upon the HVAC, the additional cost of any warranty or insurance upon the major operating parts of the HVAC system, and repairs and replacements not covered by the maintenance contract or the warranty or insurance previously referred to.

(c)    If the Premises are used for food service, Tenant shall install and maintain food traps (unless Landlord installs a master food trap serving several food operations including the Premises, in which event the cost and expense thereof shall be borne by Tenant pro rata with the other tenants using the same, as reasonably determined by Landlord) and an impervious membrane in the floor areas of the kitchen and bar in the Premises and shall otherwise take such action and conduct its operations in such a manner that no liquid seeps from the Premises to the space of any other tenant or to any other portion of the Shopping Center. In any event, Tenant shall install and maintain such equipment and facilities as shall be required by law for food operations.

(d)    Tenant shall maintain all electrical and plumbing pipes, lines, outlets, fixtures and all other utility installations in or exclusively serving the Premises or installed by Tenant. Tenant shall also maintain all sanitary waste lines and facilities within the Premises and beyond the Premises to the point of intersection with common waste lines.

(e)    Tenant shall retain the services of a licensed pest control contractor approved by Landlord to maintain the Premises free of rodents, roaches, and other vermin, and to maintain in the same condition any adjacent areas affected by rodents, roaches, and other vermin attracted to the Premises.

17.2 Landlord's Obligations. Landlord shall maintain the following components of Shopping Center buildings: roof, structure, exterior walls, foundations, and utility lines disturbances from the office above installed by Landlord and serving more than one (1) tenant (but Landlord's obligation shall not include interior surfaces of the aforesaid, storefront, plate glass, moldings, window sills, doors, or any hardware, glazing, or fixtures in connection therewith); provided, however, that if a need for maintenance and repair is caused by the acts or omissions of Tenant, its agents, licensees, employees, customers, or invitees, then Tenant shall bear the cost of such repairs. Cost of performance of the aforesaid Landlord obligations shall be included within the definition of Operating Expenses.

ARTICLE 18

DAMAGE OR DESTRUCTION

18.1 Reconstruction. Subject to the provisions of Section 18.2, in the event of damage to or destruction by fire, the elements, acts of God, or any other cause, of improvements constructed on the Premises (provided Landlord is insured for such damage or destruction), or in the event said improvements are declared unsafe or unfit for use or occupancy by a public entity with the authority to make and enforce such declaration, Landlord shall commence repair, reconstruction and restoration of the outer shell of said improvements substantially as provided for Landlord's Work in Exhibit "C" hereto, and shall prosecute the same diligently to completion, and this Lease shall continue in full force and effect without any abatement of rent. In the event of such reconstruction of the outer shell by Landlord, upon

completion of said reconstruction, Tenant, at its sole cost and expense, shall commence repair, reconstruction and restoration of the interior of the Premises substantially as provided for Tenant's Work in Exhibit "C" hereto, including all leasehold improvements, and replacement of its stock in trade, fixtures, furniture, furnishings and equipment.  Tenant shall diligently prosecute such installation to completion.

18.2  Election to Terminate.  If, in Landlord's opinion, (a) such repairs, reconstruction or restoration cannot be made within ninety (90) days following the occurrence thereof, or (b) insurance proceeds sufficient to pay for such work are not reasonably available, or (c) the Premises are totally destroyed, Landlord may elect, but is not obligated to do so, upon written notice to Tenant within thirty (30) days after the date of such fire or other casualty (with the consent of the Port District), to terminate this Lease as of the date of such fire or other casualty.  If Landlord does not so elect to terminate this Lease, then Landlord shall make any such repairs, reconstruction or restoration (with the consent of the Port District).

In the event the Shopping Center or the building containing the Premises is destroyed to the extent of not less than thirty-three percent (33%) of the replacement cost thereof, then Landlord may, with the consent of the Port District, elect to terminate this Lease whether or not the Premises are damaged.  Further, in the event the Premises are damaged to the extent of thirty-three percent (33%) or more of the replacement cost during the final twelve (12) months of the Lease term, Landlord may, within thirty (30) days following the date of such casualty, with the consent of the Port District, elect to terminate this Lease.

18.3  No Abatement of Rent.  In the event that Landlord undertakes such repair and reconstruction, as above set forth, Tenant shall continue the operation of its business on the Premises during any such period to the extent reasonably practicable from the standpoint of prudent business management; and the obligation of Tenant hereunder to pay Minimum Annual Rent, Percentage Rent, and any additional rent shall remain in full force and effect.  Tenant shall not be entitled to any compensation or damages from Landlord for loss of use of the whole or any part of the Premises, or the building of which the Premises are a part, Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

18.4  Waiver.  With respect to any partial or total destruction which Landlord is obligated to restore or may restore under any of the provisions of this Lease, the provisions of Section 1932, Subdivision 2, and Section 1933, Subdivision 4, of the Civil Code of California, are hereby waived by Tenant.

ARTICLE 19
COMMON AREA

19.1  Definition.  The term "Common Area" as used in this Lease shall be deemed to include those portions of the Shopping Center that are designated by Landlord from time to time for the general use, convenience and benefit of Landlord, tenants in the Shopping Center and other authorized users.  The "Common Area" may include, without limitation, automobile parking areas and parking structures, floors, ceilings, roofs, skylights, driveways, roadways, sidewalks, service areas, seating areas, pedestrian walkways, public restrooms, landscaped and planted areas, open and enclosed courts and malls, museum pieces, artistic displays, ponds and waterscaping, pedestrian overpasses or underpasses, elevators, escalators, people movers and other items as Landlord may designate, from time to time, for the nonexclusive use and benefit of Landlord, tenants in the Shopping Center and other authorized users.  Should a portion of the Shopping Center be owned or leased under another master lease by separate legal entities, Common Area shall include any portions of the Shopping Center under such separate ownership or master lease that may be designated in any reciprocal easement agreement or similar agreement between Landlord and such other separate owner(s) or master lessor(s) and consented to by the Port District.  The phrase "Common Area" as used in this Lease shall include such specialized areas as enclosed mall(s) and food fair(s), unless otherwise indicated.

19.2  Use Of Common Area.  Subject to the provisions of this Lease, the Rules and Regulations, which shall be established from time to time by Landlord, concerning the use of the Common Area, and any reciprocal easement agreement or similar agreement affecting the Shopping Center entered into by Landlord from time to time and consented to by the Port District, Tenant and its employees and invitees are, except as otherwise specifically provided in this Lease, authorized, empowered and privileged to use the Common Area in common with other persons during the term of this Lease.  The Common Area is at all times to be used for the benefit of the

INITIALS

customers and patrons of Tenant, and other tenants, owners and occupants of the land constituting the Shopping Center of which the Premises are a part; provided that Landlord has the right to operate the parking areas and any other area within the Shopping Center for purposes of Landlord profit.

19.3 Operating Expenses. Landlord shall keep or cause to be kept the Common Area in a neat, clean and orderly condition, properly lighted and landscaped, and shall repair, maintain or replace as Landlord shall deem necessary all equipment and facilities thereof, but all expenses in connection with the Common Area (hereinafter referred to as "Operating Expenses") shall be charged and prorated in the manner hereinafter set forth. Operating Expenses as used herein shall mean all sums expended (including financing costs, if any) for the repair, maintenance, or replacement of any equipment, facilities, structures and property of the Common Area, including without limitation the following items: all general maintenance and repairs; resurfacing; painting; restriping; cleaning; sweeping and janitorial services; exterior walls and faces of the buildings; maintenance and repair of sidewalks, curbs and Shopping Center signs; sprinkler systems, planting and landscaping; special effects in lighting and other utilities; Shopping Center transportation systems, including people movers, shuttle buses, directional signs and other markers and bumpers; maintenance and repair of any fire protection systems, lighting systems, storm drainage systems and any other utility systems; personnel to implement any of the foregoing services including, if Landlord deems necessary, the cost of security guards; real and personal property taxes and assessments on the improvements and land and water comprising the Common Area; costs, fees and expenses incurred by Landlord in connection with appeals of possessory interest; and real property taxes; merchandising audits; Confidential Shoppers' Program(s); any governmental imposition or surcharge imposed against Landlord or assessed against any automobile parking areas or parking structures or any other portion of the Common Area; all costs and expenses pertaining to the security alarm system for the tenants in the Shopping Center; depreciation on maintenance and operating machinery and equipment (if owned) and rent paid for such machinery and equipment (if rented); adequate public liability and property damage insurance on the Common Area and any other insurance deemed necessary by Landlord, including earthquake and flood endorsements; payments (not compensated for by insurance) in settlement or payment of any claim or potential claim for damages relating to the Common Area, and attorneys' fees and costs incurred in defending against any such claims; fees for required licenses, permits or approvals; and all costs and expenses for maintenance and keeping of the waterways, fountains and piers; and public transit and carpooling facilities and charges. With respect to Landlord's replacement, in accordance with this Section 19.3, of any capital item with a useful life in excess of five (5) years whose replacement cost exceeds Twenty-Five Thousand Dollars ($25,000), the expenses in connection with the Common Area for each calendar year shall include, in lieu of the full amount of said replacement cost in any given year, at Landlord's option, either (i) an annual amount sufficient, on the basis of Landlord's experience or reasonable estimate, to establish in advance of the time for such replacement a reserve to fund said cost, or (ii) the total payments of principal and interest owed for each year or partial year on any commercially reasonable loan which is fully amortized over said useful life that Landlord may obtain from a third party, or that Landlord may make itself, for the benefit of Tenant and all other tenants at the Shopping Center to finance said cost; provided, however, if Landlord shall make such a loan, Landlord shall charge interest on the basis of actual days elapsed compared to a 360-day year, compounded monthly, at a fixed rate which is the lesser of the maximum lawful rate or two percent (2%) above the annual rate of yield available at the time of replacement on a Treasury Note or Bond of the United States of America maturing at approximately the end of said useful life. In addition, Tenant shall pay a sum to Landlord for the accounting, bookkeeping and collection of the expenses in connection with said Common Area in an amount equal to Tenant's pro rata share of fifteen percent (15%) of the total of the aforementioned expenses for each calendar year. Landlord may cause any or all of said services to be provided by an independent contractor or contractors. The parties hereto agree that Landlord need not itself directly manage or otherwise service all or any part of the Premises and the Shopping Center of which the Premises are a part but may cause, with the prior written consent of the Port District, such management, maintenance and operation and other services to Tenant to be performed by Landlord's agent (hereinafter the "Manager of the Shopping Center"). Landlord shall notify Tenant in writing of the name of the Manager of the Shopping Center but shall have the absolute right to designate from time to time, with the prior written consent of the Port District, another person, association, or corporation as Manager of the Shopping Center upon ten (10) days' notice to Tenant and other tenants of the Shopping Center. Landlord may cause the Manager of the Shopping Center to render the services to Tenant, other tenants and occupants required or permitted to be performed by Landlord pursuant to this Article 19 in connection with the maintenance, repair, management and operation of the Common Area.

In the event that Tenant has paid to Landlord Tenant's pro rata portion of real property taxes and assessments (including possessory interest taxes) on the improvements, land

and water comprising the Common Area, under and pursuant to the terms and provisions of Article 5.6, Tenant shall not be required to pay for said taxes and assessments under the provisions hereof.

Should Landlord acquire or make available additional land or water which Landlord elects to designate as a portion of the Shopping Center (with the prior written consent of the Port District), then any costs, fees or expenses relating to such additional Common Area shall be included in Operating Expenses for the purposes of this Lease, and any Floor Area of buildings within such additional area occupied and open for business shall be included in the determination of Floor Area for the entire Shopping Center for the purposes of this Lease.

19.4  Method of Payment.  Tenant shall pay to Landlord Tenant's pro rata share of Operating Expenses in the following manner:

(a) From and after the date the Minimum Annual Rent provided for in Article 1 hereof has commenced, but subject to adjustment as hereinafter set forth in this subparagraph (a), Tenant shall pay Landlord on the ▓▓▓▓▓ day of each calendar month of the term of this Lease an amount ▓▓▓▓▓ estimated by Landlord to be Tenant's pro rata share of Operating Expenses. Should Tenant fail to make any payment to Landlord of Tenant's pro rata share of Operating Expenses, including, without limitation, the quarterly or yearly payments required pursuant to subparagraph (b) below, by the ▓▓▓▓▓ day following the date on which such payment becomes due, a late charge equal to ten percent (10%) of Tenant's pro rata share of such expenses shall be assessed.  Tenant acknowledges that the foregoing charge represents a fair and reasonable estimate of the costs, expenses, and damages that, Landlord will incur by reason of such failure by Tenant, the exact amount of such costs, expenses and damages being extremely difficult and impracticable to fix.  Acceptance of any such charge shall not constitute a waiver by Landlord of Tenant's default nor prevent Landlord from exercising any of the other rights and remedies available to Landlord hereunder or as provided by law.  Landlord may adjust the estimated monthly charge at the end of any calendar quarter on the basis of Landlord's experience and reasonably anticipated costs.

| Tenant | Landlord |
|--------|----------|

(b) Within ▓▓▓▓▓▓▓▓▓ days following the end of ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the calendar year, Landlord shall furnish ▓▓ Tenant ▓▓▓▓▓▓▓ a statement covering the calendar ▓▓▓▓▓▓ year just expired, certified as correct by ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓ an authorized representative of Landlord, showing the total Operating Expenses, the amount of Tenant's pro rata share of Operating Expenses for ▓▓▓▓▓▓▓▓▓▓▓ ▓▓ year and the payments made by Tenant with respect to such period as set forth in subparagraph (a).  If Tenant's pro rata share of Operating Expenses exceeds Tenant's payments so made, Tenant shall pay Landlord the deficiency within the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ after receipt of such statement.  If said payments exceed Tenant's pro rata share of Operating Expenses, Tenant shall be entitled to offset the excess against payments next thereafter to become due Landlord as set forth in subparagraph (a).  Tenant's pro rata share of the total Operating Expenses for the previous ▓▓▓▓▓▓▓▓▓▓▓▓ year shall be that portion of all of such expenses which is equal to the proportion thereof which the number of square feet of Floor Area in the Premises bears to the total number of square feet of Floor Area of buildings in the entire Shopping Center, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

20023-01
Retail Sublease
CS/dmj September 17, 1995


INITIALS

There shall be an appropriate adjustment of Tenant's share of Operating Expenses as of the commencement of rents and expiration of the term of this Lease.

19.5 Landlord's Rights to Determine Common Area. Landlord shall at all times have the unqualified right and privilege of determining the nature and extent of the Common Area, and of making such changes therein and thereto from time to time which in its sole and absolute discretion are deemed to be desirable and for the best interests of persons who may from time to time be using said Common Area, including the location and relocation of driveway(s), entrances, exits, automobile parking spaces, the direction and flow of traffic, installation of prohibited areas, landscaped areas, and other facilities thereof.

After obtaining the prior written consent of the Port District, Landlord shall have the right, in connection with any expansion or reconfiguration of the Shopping Center, to close portions of the Common Area and to construct structures, improvements, facilities, landscaping, waterscaping, parking, pedestrian walkways and other features on the Common Area, including, without limitation, any parking area which may exist from time to time, provided that Landlord provides replacement parking spaces in a number not substantially less than the number of spaces made unavailable as a result of any such expansion or reconfiguration of the Shopping Center. The location of replacement parking (subject to the prior written consent of the Port District), shall be determined by Landlord in Landlord's sole and absolute discretion, and may be less proximate to the Premises than the previous parking areas. Any costs or expenses incurred by Landlord in connection with the repair, maintenance, and operation of such replacement parking shall be included in Operating Expenses.

Landlord shall have the right to temporarily close the Common Area when required in the opinion of Landlord's counsel to prevent a dedication of any of the Common Area or the accrual of any rights of any person or public to the Common Area. Further, Landlord may temporarily close any portion of the Common Area for maintenance purposes, or to conduct promotional activity thereon. Landlord shall have the right at any time to change the arrangement, character, use and location of entrances, passageways, doors and doorways, corridors, elevators, escalators, stairs, landscaping, toilets, and any other portions of the Common Area, parking garage or other parts of the Shopping Center; to change Common Area to gross leasable area and gross leasable area to Common Area; and to remodel any or all of the Shopping Center. None of the actions taken by Landlord as referred to in this Section 19.5 shall (a) be deemed an actual or constructive eviction of Tenant, (b) entitle Tenant to any reduction of rent, (c) otherwise reduce Tenant's obligations hereunder or (d) result in any liability of Landlord to Tenant. Tenant acknowledges that the foregoing, if and when it may occur, may involve barricading materials, storage, noise, the presence of workmen and equipment, rearrangement, and other inconveniences typically associated with construction.

Notwithstanding Section 19.5 or any other provisions of this Lease, Landlord covenants that no improvements shall be placed, constructed or maintained on the Shopping Center which interfere in the access to or visibility of the Premises from the abutting public thoroughfares or the adjoining Common Areas.

19.6 Release of Liability. Nothing contained herein shall be deemed to create any liability upon Landlord for any loss of, or damage to motor vehicles of customers or employees or for loss of property from within such motor vehicles. Tenant acknowledges that by providing security guards for the Common Area, Landlord does not represent, guarantee or assume responsibility that Tenant will be secure from losses caused by the illegal acts of third parties and does not assume responsibility for any such illegal acts. To induce Landlord to provide such security guards, if any, as Landlord deems reasonable, appropriate and economically feasible, Tenant hereby waives any present or future claim Tenant may have against Landlord, whether known or unknown, for bodily injury or property damage or loss arising from the performance of such security guards, if any.

19.7 Charged Parking; Validation. Landlord may, in its sole and absolute discretion, following reasonable notice to Tenant, institute a system or systems of controlling access to all or any portion of the automobile parking areas under Landlord's control, including charging for parking therein. In connection therewith, Landlord may offer parking free or at reduced rates for specified periods to customers of Tenant who present parking tickets validated by Tenant for such periods, and Landlord can establish such other validation system as it may in its sole and absolute discretion determine. Tenant agrees to purchase from Landlord a validation machine at least $150.00 per class each month of a reasonable increase in the machine tape/validations (or other evidence of validation issued by Landlord for such purpose, and agrees to deliver them to customers in consideration for purchases by the customers from Tenant, pursuant to particular rules and regulations promulgated by Landlord from time to time. Landlord may, at any time and from time to time in its sole and absolute discretion, initially establish and thereafter change the parking areas to be so controlled, the rates and other charges for parking and validations, the hours thereof, the particular rules and regulations relating thereto, and any other aspect of the

INITIALS

parking arrangements, so long as Tenant is not discriminated against vis-a-vis a majority of the other tenants in the Shopping Center similarly situated. [Tenant acknowledges that no employees may park within the Shopping Center. Landlord currently provides employee parking from Labor Day through Holiday at 20 cents per day per car from July 1 through Labor Day and royalty weekends there is no employee parking available; however there are off-site parking lots which allow Landlord to property where employees may pay for parking. Tenant understands and acknowledges in place that a landlord acknowledges that it is not contractual and could change at any time.]

19.8  Control of Common Area.  Landlord shall at all times during the term of this Lease have the right to control the use by Tenant and other authorized users of the automobile parking areas, and parking structures, the parking spaces thereon, driveways, entrances and exits and the sidewalks and pedestrian passageways and other Common Area, and may at any time from time to time during the term hereof exclude and restrain any person from use or occupancy thereof, excepting, however, bona fide customers, patrons and service suppliers of Tenant, and other tenants of Landlord who make use of said areas in accordance with the rules and regulations established by Landlord from time to time with respect thereto.  The right of Tenant hereunder in and to the parking areas and parking structures shall at all times be subject to the rights of Landlord as provided in this Lease and shall be subject to the rights of Landlord, and its employees, other tenants of Landlord and other authorized users to use the same in common with Tenant, and it shall be the duty of Tenant to keep all of said areas free and clear of any obstructions created or permitted by Tenant or resulting from Tenant's operation and to permit the use of any said areas only for normal parking and ingress and egress by the said customers, patrons and service suppliers to and from the building occupied by Tenant and other tenants of Landlord.

If, in the opinion of Landlord, unauthorized persons are using any of said areas by reason of the presence of Tenant in the Premises, Tenant, upon demand of Landlord, shall enforce such rights against all such unauthorized persons by appropriate proceedings.  Nothing herein shall affect the rights of Landlord at any time to remove any such unauthorized persons from said areas or to restrain the use of any said areas by unauthorized persons.

19.9  See page 28(a)
19.10  See page 28(b)

## ARTICLE 20

## BANKRUPTCY - INSOLVENCY

20.1  Right of Termination.  The filing by Tenant of any petition for relief under the provisions of federal bankruptcy law, including any petition for or in reorganization, or the making by Tenant of a general assignment for the benefit of Tenant's creditors, or any action at the corporate or partnership level taken by Tenant to authorize either of the foregoing actions to be taken on behalf of Tenant, or the appointment of a receiver or trustee to take possession of all or substantially all of the assets of Tenant, or any action taken or suffered by Tenant under any state insolvency law now or hereafter in effect, or the taking or seizing of the Premises or any portion thereof under levy of execution or attachment against Tenant, and the continuance of such filing, assignment, action, appointment or taking for a period of thirty (30) days, shall constitute a breach of this Lease by Tenant and in such event Landlord may at its option terminate this Lease upon written notice to Tenant.  The term "Tenant" as used in this Article 20 shall be deemed to include as well any parent corporation of which Tenant is a subsidiary, and any Guarantor of this Lease.

It is understood and agreed that neither this Lease, nor any interest herein or hereunder, nor any estate hereby created, in favor of Tenant, shall pass by operation of law under any state or federal insolvency or bankruptcy act, or any similar law now or hereafter in effect, to any trustee, receiver, assignee for the benefit of creditors, or any other person whomsoever without the prior written consent of Landlord and the Port District.  Any transfer in violation of the provisions of this Article 20 shall constitute a breach of this Lease by Tenant.

20.2  Assumption and Assignment.  The following provisions shall become applicable if Tenant files, or has filed against it, a petition for relief under the provisions of federal bankruptcy law and this Lease is assumed by Tenant and assigned to a third party ("Assignee") by (i) Tenant, as debtor in possession, (ii) a successor of Tenant pursuant to a plan or reorganization in such bankruptcy, or (iii) a court appointed trustee, receiver or examiner:

(a)  Assignee shall pay Landlord an amount equal to one-quarter (1/4) of the Minimum Annual Rent as a security deposit subject to Section 32.1.

(b)  The provisions of Sections 15.5, 15.7 and 15.8 of this Lease shall apply.

(c)  Landlord shall have the right to reject any Assignee who has filed, or has had filed against it, or has been the subject of, a bankruptcy petition during the six (6) years preceding the assignment.

INITIALS

19.9  Landlord will not use the Common Area expenses for:

(i)  Any ground lease rental;

(ii)  Costs of capital alterations, repairs, improvements and equipment, except for those (a) acquired to reduce Operating Expenses (amortized at an annual rate reasonably calculated to equal the amount of operating expenses to be saved in each year throughout the Term), together with interest at the actual interest rate incurred by landlord, or (b) cost of capital tools not in excess of $10,000 in any one year;

(iii)  Rentals for items (except when needed in connection with normal repairs and maintenance of permanent systems) which if purchased, rather than rented, would constitute a capital improvement which is specifically excused in Subsection (ii) above (excluding, however, equipment not affixed to the building which is used in providing janitorial or similar services);

(iv)  Costs incurred by Landlord for the repair of damage to the Shopping Center, to the extent Landlord is reimbursed by insurance proceeds;

(v)  Costs, including permit, license and inspection costs, incurred with respect to the installation of tenant or other occupants improvements made for tenants or other occupants in the Shopping Center or incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space for tenants or other occupant of the Shopping Center.

(vi)  Depreciation, amortization and interest payments, except on materials, tools, supplies and vendor-type equipment purchased by Landlord to enable Landlord to supply services landlord might otherwise contract for with a third party where such depreciation, amortization and interest payments would otherwise have been included in the charge for such third part's services, all as determined in accordance with generally accepted accounting principles, consistently applied and when depreciation or amortization is permitted or required, the item shall be amortized over its reasonably anticipated useful life;

(vii)  Marketing costs including leasing commissions, attorney's fees, space planning costs, and other costs and expenses incurred in connection with leases, sublease and/or assignment negotiations and transactions, with present or prospective tenants or other occupants of the Shopping Center;

(viii)  Expenses in connection with services or other benefits which are not offered to Tenant or for which Tenant is charged for directly by which are provided to another tenant or occupant of the Shopping Center the cost of which is included as Operating Costs;

(ix)  Costs incurred by landlord due to the violation by Landlord or any tenant of the terms and conditions of any lease of space in the Shopping Center.

(x)  Overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for goods and /or services in the Shopping Center to the extent the same exceeds the costs of such goods and /or services rendered by unaffiliated third parties on a competitive basis;

(xi)  Interest, principal, points and fees on debts or amortization on any mortgage or mortgages or any other debt instrument encumbering the Shopping Center or the site;

(xii)  Landlord's general corporate overhead and general and administrative expense, other than the 15% administrative charge;

(xiii)  Except for making repairs or keeping permanent systems in operation while repairs are being made, rentals and other related expenses incurred in leasing airconditioning systems, elevators or other equipment ordinarily considered to be of a capital nature, except equipment not affixed to the shopping center which is used in providing janitorial or similar services;

(xiv)  Costs of signs in or on the Shopping Center identifying the owner of the Shopping Center or other tenants' signs;

(xv)  Electric power costs for which any tenant directly contracts with the local public service company;

(xvi)  Tax penalties incurred as a result of Landlord's negligence, inability or unwillingness to make payments and/or file any income tax or informational returns when due;

(xvii)  Any expenses which are prepaid for more than the then current lease year;

(xviii)  Costs arising from landlord's charitable or political contributions;

(xix)  Costs arising from latent defects in the base, shell or core of the Shopping Center or improvements installed by Landlord or repair thereof;

Notwithstanding any provision to the contrary contained herein, Tenant's proportionate share of real estate taxes and Common Area Maintenance Costs (including insurance) per leasable square foot of space within the Premises (A) for the calendar year in which the Lease term commences shall not exceed the product of (i) $19.40 and (ii) a fraction, the numerator of which shall be the number of days from and including the Commencement date to the end of such calendar year and (B) for each subsequent calendar year, shall not exceed 105% of the Common Area Maintenance Charges of the prior year (using $19.40 for the first year).

Landlord shall keep accurate records showing in detail all expenses incurred for such maintenance and showing the ground floor area of each building and similar structure in the Shopping Center. Within sixty (60) days after the end of each Lease Year, Landlord shall provide tenant with a written statement itemizing operations Expenses for the period covered (b) the total ground floor area within the Shopping Center and (c) Tenant's pro rata share of such expenses.

20033431
Retail Sublease
CS/am/September 17, 1996

-28(a)-

INITIALS